UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 10-20098-CIV-Lenard

DANIEL LUGO,

     Petitioner,

vs.

WALTER A. MCNEIL,

     Respondent.

_____/

FILED by SJS D.C.

MAR 0 8 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

BOUND VOLUME 1

APPENDIX A-F

<u>Lugo v. State</u>, 845 So. 2d 74 (Fla. 2003)("Lugo I")
(No. SC93,994, Direct Appeal)

Initial Brief......................................................A
Answer Brief.......................................................B
Reply Brief........................................................C
Amended Supplemental Initial Brief.................................D
Supplemental Answer Brief..........................................E
Supplemental Reply Brief...........................................F

Respectfully Submitted

BILL MCCOLLUM
Attorney General
Tallahassee, Florida

SANDRA S. JAGGARD
Assistant Attorney General
Florida Bar No. 0012068
Rivergate Plaza, Suite 650
444 Brickell Avenue
Miami, Florida  33131
Tel. (305) 377-5441
Fax (305) 377-5655

# APPENDIX A

IN THE SUPREME COURT OF FLORIDA

CASE NUMBER 93,994

DANIEL LUGO,

Appellant,

vs.

THE STATE OF FLORIDA,

Appellee.



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

A CAPITAL APPEAL FROM THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR
DADE COUNTY

CRIMINAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INITIAL BRIEF OF APPELLANT

J. RAFAEL RODRIGUEZ
Specially Appointed Public
Defender for Daniel Lugo
LAW OFFICES OF
J. RAFAEL RODRIGUEZ
6367 Bird Road
Miami, Florida  33155
(305) 667-4445
(305) 667-4118 (FAX)

Oral Argument Requested



# TABLE OF CONTENTS

Page(s)

TABLE OF CITATION OF AUTHORITIES....................iv

CERTIFICATE OF TYPE SIZE AND STYLE.................xv

INTRODUCTION.......................................1

STATEMENT OF JURISDICTION.........................1

STATEMENT OF THE CASE............................1

STATEMENT OF FACTS...............................6

ISSUES PRESENTED................................39

## (I)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE IMPROPER JOINDER OF COUNTS

## (II)

WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTIONS FOR RACKETEERING

## (III)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER OPENING STATEMENT

## (IV)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL WHERE COUNSEL FOR CO-DEFENDANT DOORBAL WAS ABLE TO QUESTION WITNESSES ADVERSELY TO DEFENDANT

## (V)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF EVIDENCE CONCERNING DEFENDANT'S CONVICTION AND PROBATION IN A FEDERAL CASE

## (VI)

WHETHER THE TRIAL COURT ERRED WHEN IT PROHIBITED DEFENSE COUNSEL FROM QUESTIONING DEFENDANT'S EX-WIFE ABOUT THE FACT THAT SHE APPEARED AT THE STATE ATTORNEY'S OFFICE WITH A LAWYER

ii

## (VII)

WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL AND REQUEST FOR DISCOVERY CONCERNING THE PROSECUTION'S FAILURE TO DISCLOSE VICTIM SCHILLER'S FEDERAL CRIMINAL INVESTIGATION AND CASE AND THE PROSECUTION'S FAILURE TO DISCLOSE AN INVESTIGATION INVOLVING THE MEDICAL EXAMINER

## (VIII)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER CLOSING ARGUMENT

## (IX)

WHETHER DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO THE CUMULATIVE EFFECT OF THE CUMULATIVE ERRORS

## (X)

WHETHER DEFENDANT IS ENTITLED TO RESENTENCING BASED UPON THE PROSECUTOR'S IMPROPER PENALTY PHASE ARGUMENTS

## (XI)

WHETHER THE TRIAL COURT'S SENTENCE OF DEATH SHOULD BE VACATED SINCE DEATH WAS A DISPROPORTIONATE SENTENCE IN THIS CASE

## (XII)

WHETHER THE TRIAL COURT'S SENTENCING ORDER HAS ERRORS THAT, BOTH INDIVIDUALLY AND CUMULATIVELY, REQUIRE REVERSAL OF DEFENDANT'S DEATH SENTENCE AND A REMAND FOR RESENTENCING BY THE TRIAL COURT

## (XIII)

WHETHER THE TRIAL COURT ERRED IN ORDERING ALL SENTENCING TERMS AND MINIMUM/MANDATORY TERMS TO RUN CONSECUTIVELY TO EACH OTHER

## (XIV)

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING AN UPWARD DEVIATION IN THE SENTENCING GUIDELINES AND ORDERING ALL TERMS OF IMPRISONMENT TO BE RUN CONSECUTIVE TO EACH OTHER

(XV)

WHETHER CAPITAL PUNISHMENT AS PRESENTLY ADMINISTERED
VIOLATES THE STATE AND FEDERAL CONSTITUTIONS

SUMMARY OF ARGUMENT................................40

ARGUMENT..........................................45

CONCLUSION.......................................100

CERTIFICATE OF SERVICE...........................100

TABLE OF CITATION OF AUTHORITIES

Cases

Page(s)

Abreu v. State, 610 So.2d 564 (Fla. 3d DCA 1992)....98

Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804,
60 L.Ed.2d 323 (1979)...............................89

Aja v. State, 658 So.2d 1168 (Fla. 5th DCA 1995)....80

Anderson v. State, 546 So.2d 65 (Fla.
5th DCA 1989).......................................65

Asay v. State, 580 So.2d 610 (Fla. 1991)...........95

Ashley v. State, 265 So.2d 685 (Fla. 1972).........66

Bass v. State, 547 So.2d 680 (Fla. 1st DCA),
rev. den., 553 So.2d 1166 (Fla. 1989)..............77,79

Beal v. State, 620 So.2d 1015 (Fla. 1st DCA 1993)...49

Bertolotti v. State, 476 So.2d 130 (Fla. 1985)......76,78,84,85

Blanco v. State, 452 So.2d 520 (Fla. 1984).........95

Bonifay v. State, 680 So.2d 413 (Fla. 1996)........79,84

Botte v. Pomeroy, 497 So.2d 1275 (Fla. 4th
DCA 1986), rev. den., 508 So.2d 15 (Fla. 1987)......65

Bowden v. State, 402 So.2d 1173 (Fla. 1981)........51

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,
10 L.Ed.2d 215 (1963)...............................72

Breedlove v. State, 580 So.2d 605 (Fla. 1991)......67,72

Brooks v. State, 762 So.2d 879 (Fla. 2000).........81,82,83,85

Bryan v. State, 748 So.2d 1003 (Fla. 1999).........72

Buckner v. State, 714 So.2d 384 (Fla. 1998)........93,95

Bush v. State, 690 So.2d 670 (Fla. 1st DCA 1997)....66

Callins v. Collins, 510 U.S. 1141, 114 S.Ct.
1127, 127 L.Ed.2d 435 (1994).......................99

Campbell v. State, 679 So.2d 720 (Fla. 1996).......84,85

Capehart v. State, 583 So.2d 1009 (Fla. 1991).......95

Caruthers v. State, 465 So.2d 496 (Fla. 1985).......95

Cochran v. State, 280 So.2d 42 (Fla. 1st DCA 1973)..75

Coco v. State, 62 So.2d 892 (Fla. 1953)............68

Consalvo v. State, 697 So.2d 805 (Fla. 1996).......92

Craig v. State, 685 So.2d 1224 (Fla. 1997).........73

Crossley v. State, 596 So.2d 447 (Fla. 1992).......47,48,49

Crum v. State, 398 So.2d 810 (Fla. 1981)...........62

Crump v. State, 622 So.2d 963 (Fla. 1993).........79,94

Cruse v. State, 588 So.2d 983 (Fla. 1991).........94

Dailey v. State, 594 So.2d 254 (Fla. 1992).........55

Daniels v. State, 634 So.2d 187 (Fla. 3d DCA 1994)..63

D.C. v. State, 400 So.2d 825 (Fla. 3d DCA 1981)....68

Dixon v. State, 630 So.2d 1242 (Fla. 3d DCA 1994)...55

Dixon v. State, 610 So.2d 35 (Fla. 2d DCA 1992).....98

Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074,
13 L.Ed.2d 934 (1965)..............................67

Downs v. State, 740 So.2d 506 (Fla. 1999)..........72,73

Duest v. State, 462 So.2d 446 (Fla. 1985)..........55

Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869,
71 L.Ed.2d 1 (1982)................................85

Ellis v. State, 622 So.2d 991 (Fla. 1993)..........47,49

Farr v. State, 656 So.2d 448 (Fla. 1995)...........97

Farrell v. State, 686 So.2d 1324 (Fla. 1996).......84

Finney v. State, 660 So.2d 674 (Fla. 1995).........96

First v. State, 696 So.2d 1357 (Fla. 2d DCA 1997)...54

Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988).....86

vi

Fotopoulos v. State, 608 So.2d 784 (Fla. 1992)......48

Fuller v. State, 540 So.2d 182 (Fla. 5th DCA 1989)..80

Garcia v. State, 568 So.2d 896 (Fla. 1990).........47,48

Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197,
51 L.Ed.2d 393 (1977)..............................88

Garron v. State, 528 So.2d 353 (Fla. 1988).........78,81

Gavins v. State, 587 So.2d 487 (Fla.
1st DCA 1991)......................................64

George v. State, 539 So.2d 21 (Fla. 5th DCA 1989)...77

Ghent v. State, 685 So.2d 72 (Fla. 1st DCA 1996)....46

Gonzalez v. State, 588 So.2d 314 (Fla.
3d DCA 1991).......................................79

Green v. State, 427 So.2d 1036 (Fla. 3d DCA),
rev. den., 438 So.2d 834 (Fla. 1983)...............76

Gross v. State, 765 So.2d 39 (Fla. 2000)..........51,52

Gore v. State, 719 So.2d 1197 (Fla. 1998)..........79

Hair v. State, 428 So.2d 760 (Fla. 3d DCA 1983).....68

Halliwell v. State, 323 So.2d 557 (Fla. 1975)......93

Hamblen v. State, 527 So.2d 800 (Fla. 1988)........97

Hamilton v. State, 547 So.2d 630 (Fla. 1989).......95

Hamilton v. State, 678 So.2d 1228 (Fla. 1996)......93

Hansbrough v. State, 509 So.2d 1081 (Fla. 1987)....94

Hardwick v. State, 461 So.2d 79 (Fla. 1984)........95

Harris v. State, 414 So.2d 557 (Fla. 3d DCA 1982)...77

Heath v. State, 648 So.2d 660 (Fla. 1994)..........55

Heiney v. State, 447 So.2d 210 (Fla.),
cert. den., 469 U.S. 920, 105 S.Ct. 303,
83 L.Ed.2d 237 (1984)..............................66

Henry v. State, 574 So.2d 73 (Fla. 1991)...........66

vii

H.J. Inc. v. Northwestern Bell Telephone Co., 492
U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)....51,52

Hodges v. State, 595 So.2d 929 (Fla. 1992).........83

Holland v. State, 636 So.2d 1289 (Fla. 1994).......65

Holton v. State, 573 So.2d 284 (Fla. 1990).........95

Jackson v. State, 451 So.2d 458 (Fla. 1984)........93

Jackson v. State, 498 So.2d 906 (Fla. 1986)........65

Jackson v. State, 522 So.2d 802 (Fla. 1988)........78

Jackson v. State, 627 So.2d 70 (Fla. 5th DCA 1993)..65

Jackson v. State, 648 So.2d 85 (Fla. 1994).........93

Jean-Mary v. State, 678 So.2d 928 (Fla.
3d DCA 1996)......................................67

Johnson v. State, 608 So.2d 4 (Fla. 1992)..........94

Johnson v. State, 720 So.2d 232 (Fla. 1998)........57

Jones v. State, 497 So.2d 1268 (Fla. 3rd DCA 1986)..48

Jones v. State, 569 So.2d 1234 (Fla. 1990).........81

Kearse v. State, ___ So.2d ___, 25 Fla.L.Weekly
S507 (Fla., June 29, 2000)........................55

King v. State, 623 So.2d 486 (Fla. 1993)...........89

Knowles v. State, 632 So.2d 62 (1993)..............97

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555,
131 L.Ed.2d 490 (1995)............................74

Lackey v. Texas, 514 U.S. 1045, 115 S.Ct. 1421,
131 L.Ed.2d 304 (1995)...........................100

Larzelere v. State, 676 So.2d 394 (Fla. 1996)......87

Lawrence v. State, 691 So.2d 1068 (Fla. 1997)......84

Leonard v. State, 386 So.2d 51 (Fla. 2d DCA 1980)...64

Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954,
57 L.Ed.2d 973 (1978).............................89

Lockwood v. State, 107 So.2d 770 (Fla. 2d DCA 1959)...................................64

Lusk v. State, 531 So.2d 1377 (Fla. 2d DCA 1988)....81

Lutherman v. State, 348 So.2d 624 (Fla. 3d DCA 1977)...................................68

Mabery v. State, 303 So.2d 369 (Fla. 3d DCA 1974), cert. den., 312 So.2d 756 (Fla. 1975)..............55

Macklin v. State, 395 So.2d 1219 (Fla. 3d DCA 1981)...................................46

Maharaj v. State, 597 So.2d 786 (Fla. 1992)........94

Mahn v. State, 714 So.2d 391 (Fla. 1998)...........94

Matthews v. State, 366 So.2d 170 (Fla. 3d DCA 1979)...................................66

Maxwell v. State, 603 So.2d 490 (1992)............97

May v. State, 600 So.2d 1266 (Fla. 5th DCA 1992)....47

McCray v. State, 416 So.2d 804 (Fla. 1982).........56

McKinney v. State, 579 So.2d 80 (Fla. 1991)........92

McKinzy v. Wainwright, 719 F.2d 1525 (11th Cir. 1983)...................................68

Mead v. State, 86 So.2d 773 (Fla. 1956)............64

Melendez v. State, 718 So.2d 746 (Fla. 1998).......72

Meyers v. State, 561 So.2d 1304 (Fla. 3d DCA 1990)..65

Mitchell v. State, 527 So.2d 179 (Fla. 1992).......94

Northard v. State, 675 So.2d 652 (Fla. 4th DCA 1996)...................................77

Pacifico v. State, 642 So.2d 1178 (Fla. 1st DCA 1994)...................................77,80

Padgett v. State, 64 Fla. 389, 59 So. 946 (1912)....68

Pardo v. State, 563 So.2d 77 (Fla. 1990)...........94

Paul v. State, 385 So.2d 1371 (Fla. 1980)..........49

Perez v. State, 689 So.2d 306 (Fla. 3d DCA 1997)....76

Peterson v. State, 376 So.2d 1230 (Fla. 4th DCA 1979)...................................76

Phillips v. State, 608 So.2d 778 (Fla. 1992).......73

Porter v. State, 671 So.2d 184 (Fla. 2d DCA 1996)...48

Porter v. State, 564 So.2d 1060 (Fla. 1990)........86

Porterfield v. State, 522 So.2d 483 (Fla. 1st DCA 1988)...................................80

Post v. State, 315 So.2d 230 (Fla. 2d DCA 1975).....55

Power v. State, 605 So.2d 856 (Fla. 1992)..........96

Rhodes v. State, 547 So.2d 1201 (Fla. 1989)........78

Richardson v. State, 604 So.2d 1107 (Fla. 1992).....94

Robertson v. State, 611 So.2d 1228 (Fla. 1993)......92

Rosso v. State, 505 So.2d 611 (Fla. 3d DCA 1987)....80

Routly v. Singletary, 33 F.3d 1279 (11th Cir. 1994)...................................72

Routly v. State, 590 So.2d 397 (Fla. 1991).........73

Rowe v. State, 404 So.2d 1176 (Fla. 1st DCA 1981)...62

Ruiz v. State, 743 So.2d 1 (Fla. 1999).............77,79

Ryan v. State, 457 So.2d 1084 (Fla. 4th DCA 1984), rev. den., 462 So.2d 1108 (Fla. 1985).............77

Schremmer v. State, 578 So.2d 392 (Fla. 3d DCA 1991)...................................51

Sexton v. State, ___ So.2d ___, 25 Fla.L.Weekly S818 (Fla., October 12, 2000).....................87

Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998)...................................72,74

Sinclair v. State, 657 So.2d 1138 (Fla. 1995)......86

Singletary v. State, 483 So.2d 8 (Fla. 2d DCA 1985)...................................77

x

Sosa v. State, 639 So.2d 173 (Fla. 3d DCA 1994).....47

Spencer v. State, 645 So.2d 377 (Fla. 1994)........48

State v. Bowen, 413 So.2d 798 (Fla. 1st DCA 1982)...50

State v. Christian, 692 So.2d 889 (Fla. 1997).......98

State v. Conde, 743 So.2d 78 (Fla. 3d DCA 1999).....46,49

State v. Dixon, 283 So.2d 1 (Fla. 1973)............86

State v. Fudge, 645 So.2d 23 (Fla. 2d DCA 1994).....47

State v. Marshall, 476 So.2d 150 (Fla. 1985).......55

State v. Nishi, 521 So.2d 252 (Fla 3d DCA 1988).....50

State v. Richardson, 621 So.2d 752 (Fla.
5th DCA 1993)....................................66

State v. Vazquez, 419 So.2d 1088 (Fla. 1982).......66

Stewart v. State, 51 So.2d 494 (Fla. 1951).........75

Straight v. State, 397 So.2d 903 (Fla.),
cert. den., 454 U.S. 1022, 102 S.Ct. 556,
70 L.Ed.2d 418 (1981).............................66

Strickler v. Greene, 527 U.S. 263, 119 S.Ct.
1936, 144 L.Ed.2d 286 (1999).......................73

Taylor v. State, 640 So.2d 1127 (Fla.
1st DCA 1994)...................................54

Taylor v. State, 583 So.2d 323 (Fla. 1991).........83

Thompson v. State, 235 So.2d 354 (Fla.
3d DCA 1970)....................................75

Tillman v. State, 591 So.2d 167 (Fla. 1991)........86

Traina v. State, 657 So.2d 1227 (Fla.
4th DCA 1995)...................................54

Urbin v. State, 714 So.2d 411 (Fla. 1998)..........78,81,82
                                                    83,85,86

United States v. Alzate, 47 F.3d 1103
(11th Cir. 1995)................................73

United States v. Arnold, 117 F.3d 1308
(11th Cir. 1997)................................73

United States v. Bagley, 473 U.S. 667, 105 S.Ct.
3375, 87 L.Ed.2d 481 (1985)........................72

United States v. De Parias, 805 F.2d 1447
(11th Cir. 1986), cert. den., 482 U.S. 916,
107 S.Ct. 3189, 96 L.Ed.2d 678 (1987)..............68

United States v. Dinitz, 424 U.S. 600, 96 S.Ct.
1075, 47 L.Ed.2d 267 (1976).......................54

United States v. Fernandez, 136 F.3d 1434 (11th
Cir. 1998)........................................72

United States v. Lemm, 680 F.2d 1193
(8th Cir. 1982)...................................51

United States v. Massey, 89 F.3d 1433 (11th
Cir. 1996)........................................72

United States v. Robinson, 530 F.2d 1076
(D.C. Cir. 1976)..................................68

United States v. Turkette, 452 U.S. 576, 101 S.Ct.
2524, 69 L.Ed.2d 246 (1981).......................50

Walls v. State, 641 So.2d 381 (Fla. 1994)..........93,94

Washington v. State, 86 Fla. 533, 98 So. 605 (1923).75

Way v. State, 760 So.2d 903 (Fla. 2000).............72,73

Wickham v. State, 593 So.2d 191 (Fla. 1991)........92

Williams v. Chrans, 945 F.2d 926 (7th Cir. 1991)....81

Williams v. State, 117 So.2d 473 (Fla. 1960)........66

Williams v. State, 621 So.2d 413 (Fla. 1993)........65

Woods v. State, 733 So.2d 980 (Fla. 1999)..........94

Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct.
2978, 49 L.Ed.2d 944 (1976).......................84,97

Wuornos v. State, 676 So.2d 966 (Fla. 1995)........96

Wright v. State, 586 So.2d 1024 (Fla. 1991)........48

Zakrzewski v. State, 717 So.2d 488 (Fla. 1998)......94

Constitutions

Sixth Amendment, United States Constitution.........67

Article I, Section 16, Florida Constitution.........67

Statutes

Section 90.404(2)(a), Florida Statutes..............65

Section 90.610(1), Florida Statutes.................65

Section 319.30(5)(b), Florida Statutes..............2

Section 770.04, Florida Statutes....................1

Section 775.087, Florida Statutes...................1

Section 777.04, Florida Statutes....................1

Section 777.04(4)(b), Florida Statutes..............2

Section 777.011, Florida Statutes...................1,2

Section 782.04(1), Florida Statutes.................1

Section 787.01, Florida Statutes....................1,2

Section 806.01(1), Florida Statutes.................2

Sections 810.02(3), Florida Statutes................1

Section 812.13, Florida Statutes....................2

Section 812.13(2)(a)(b), Florida Statutes...........1

Section 812.014(1)(2)(b), Florida Statutes..........2

Section 812.014(2)(c)6, Florida Statutes............1

Sections 831.01, Florida Statutes...................2

Section 831.02, Florida Statutes....................2

Section 836.05, Florida Statutes....................1,2

Section 895.03(3), Florida Statutes.................1

Section 895.03(4), Florida Statutes.................1

Section 896.101(2)(a), Florida Statutes.............2

Section 921.141(4), Florida Statutes................1

Chapter 895, Florida Statutes.......................50

Rules

Rule 3.150(a), Florida Rules of
Criminal Procedure................................46

Rule 3.151(a), Florida Rules of
Criminal Procedure................................47

Rule 3.152(a)(1), Florida Rules of
Criminal Procedure...............................46,47

Rule 3.152(b), Florida Rules of
Criminal Procedure................................56

Rule 9.030(a)(1)(A)(i), Florida Rules
of Appellate Procedure.............................1

Treatise

2 Weinstein's Evidence Para. 607[03],
at 607-17 (1975)...................................68

<u>CERTIFICATE OF TYPE SIZE AND STYLE</u>

Appellant states that the size and style of type used in his initial brief is Courier 10cpi, 12 point.

## INTRODUCTION

Appellant was the Defendant in the trial court and Appellee, the State of Florida, was the prosecution.  The parties will be referred to as they stood in the lower court.  The symbol "R" will designate the record on appeal, and "T" will designate the trial transcript.

## STATEMENT OF JURISDICTION

This Court has appeal jurisdiction in this case.  Defendant was sentenced to death.  Rule 9.030(a)(1)(A)(i), Florida Rules of Appellate Procedure, provides that the Florida Supreme Court has jurisdiction of final orders of courts imposing sentences of death.  See also Section 921.141(4), Florida Statutes.

## STATEMENT OF THE CASE

### Guilt Phase

Defendant Daniel Lugo was charged by Indictment with numerous counts.[1]  In particular, it was alleged that Daniel Lugo joined

---

[1]     These counts were: conspiracy to commit racketeering (RICO), in violation of Section 895.03(4), Florida Statutes [**Count I**]; one count of racketeering (RICO), in violation of Section 895.03(3), Florida Statutes [**Count II**]; two counts of first degree murder, in violation of Sections 782.04(1) and 777.011, Florida Statutes [**Counts III & IV**]; two counts of kidnapping, in violation of Section 787.01 and 777.011, Florida Statutes [**Counts V & VI**]; one count of attempted extortion, in violation of Sections 836.05, 770.04 and 777.011, Florida Statutes [**Count VIII**]; two counts of grand theft auto, in violation of Sections 812.014(2)(c)6 and 777.011, Florida Statutes [**Counts IX & XV**]; one count of attempted first degree murder, in violation of Sections 782.04(1), 777.04, 775.087 and 777.011, Florida Statutes [**Count X**]; one count of armed kidnapping, in violation of Section 787.01 and 777.011, Florida Statutes [**Count XI**]; one count of armed robbery, in violation of Sections 812.13(2)(a)(b) and 777.011, Florida Statutes [**Count XII**]; one count of Burglary of a Dwelling, in violation of Sections 810.02(3) and 777.011, Florida Statutes [**Count XIII**]; one count of grand theft second degree, in violation of Sections

1

various other defendants between October, 1994, and June, 1995, in committing the aforementioned crimes against two separate sets of victims: Krisztina Furton and Frank Griga, and Marcello Schiller and Diana Schiller.   Trial commenced in the cause on January 22, 1998. (T. 2495).[2] The court conducted individual voir dire.   The court conducted a preliminary hearing on cause challenges. (T. 3552-3586).   The court continued with individual voir dire with additional jurors.   The court conducted a second hearing on cause challenges. (T. 3868-3873).   Subsequently, the court conducted additional individual questioning.   A further hearing on cause challenges was conducted. (T. 4387-4388).   On February 17, 1998, the court reconvened for additional voir dire.   The prosecutor questioned the panel.   The defense thereafter questioned the panel. Following this questioning, the parties participated in jury selection. (T. 4697-4731).   A jury was selected. (T. 4732-4733).

---

812.014(1)(2)(b) and 777.011, Florida Statutes [**Count XIV**]; one count of possession of removed identification plate, in violation of Sections 319.30(5)(b) and 777.011, Florida Statutes [**Count XVI**]; one count of first degree arson, in violation of Sections 806.01(1) and 777.011, Florida Statutes [**Count XVII**]; one count of extortion, in violation of Sections 836.05 and 777.011, Florida Statutes; eight counts of money laundering, in violation of Sections 896.101(2)(a) and 777.011, Florida Statutes [**Counts XIX through XXVII**]; six counts of forgery, in violation of Sections 831.01 and 777.011, Florida Statutes (**Counts XXVIII, XXXI, XXXIV, XXXVII, XL, XLIII**]; six counts of uttering a forged instrument, in violation of Sections 831.02 and 777.011, Florida Statutes [**Counts XXX, XXXIII, XXXVI, XXXIX, XLII and XLV**]; and one count of conspiracy to commit a first degree felony, to wit: abduction and/or robbery and/or extortion, in violation of Sections 812.13, 787.01, 836.05, 777.04(4)(b) and 777.011, Florida Statutes [**Count XLVI**]. (R. 61-111).

[2]     Before commencement of trial in this cause, the court granted a motion for separate juries; one jury for Defendant Lugo and another jury for co-defendants Noel Doorbal and John Mese.

On February 24, 2000, the jury was sworn. (R. 3442; T. 4787).   The rule of sequestration was invoked. (R. 3442; T. 4785).   The court then gave the jury preliminary instructions and read the indictment. (T. 4789-4796; T. 4799-4842).   The State presented an opening statement. (R. 3442; T. 4842-4883).   Defendant's counsel thereafter presented opening statement. (R. 3443; T. 4883-4894). At trial, the State called over ninety (90) witnesses in its case-in-chief.   Following testimony of Theresa Merritt, the State rested its case. (R. 4147; T. 11740).   Defendant presented his arguments on motions for judgments of acquittal. (R. 4148; T. 11743-11751). The court denied the motions. (R. 4148; T. 11776).   Defendant renewed all prior motions. (T. 11777).   Thereafter, the defense rested its case. (R. 4151; R. 4155; T. 11929).   The defense renewed all previous motions, including the motion for judgment of acquittal. (R. 4155; T. 12293-12294).   The court conducted charge conferences. (R. 4156; T. 11907-11915; T. 11974-12043; T. 12052-12096; T. 12363-12373).   Subsequently, counsel for Defendant presented closing argument. (R. 4193; T. 12392-12453).   The State then presented closing argument. (R. 4194; R. 4196; T. 12455-12508; T. 12522-12571).   Counsel for the defense presented a rebuttal closing argument. (R. 4196; T. 12572-12622).   Subsequently, the court instructed the jury. (R. 4197; R. 4339-4392; T. 12626-12683). The jury retired to deliberate. (R. 4197; T. 12684).   Thereafter, the court reconvened to consider two jury questions concerning John Raimondo and Defendant's statements to the police. (R. 4197; T. 12699-12703).   On May 4, 1998, the court reconvened to accept the

3

jury's verdicts.   The court ordered the verdicts sealed until verdicts were to be rendered as to the co-defendants. (R. 4322-4323; T. 12718-12720; T. 12723).  After the verdicts were rendered and sealed as to the co-defendants, the court ordered the proceedings to reconvene on May 5, 1998. (R. 4323-4324).  On May 5, 1998, the court published the verdicts. (R. 4326; T. 12730-12735). Defendant was found guilty on all counts. (R. 4330-4338).  The jury was polled. (R. 4326; T. 12735-12737).   The court adjudged Defendant guilty on all counts. (R. 4326; T. 12743-12744).   The verdicts as to the co-defendants were published. (R. 4327). Defendant filed a motion for new trial/ or in arrest of judgment. (R. 4399-4401).  The court denied the motion. (T. 12920-12921).

### Penalty Phase

In late May, 1998, the court considered certain pre-penalty phase motions. (T. 12792-12917).  The court made various rulings. (T. 12918-12919).   Thereafter, the trial court conducted the penalty phase and sentencing hearings.   The State of Florida presented an opening statement.  The court gave preliminary instructions. (T. 12946-12947).  Thereafter, counsel for Defendant presented an opening statement. (R. 4729; T. 12948-12957). Following the testimony of Istaban Furton and Suzusana Griga, the State rested its case. (R. 4729; T. 12992).  The defense called Carmen Lugo and Santiago Gervacio.  The defense rested. (R. 4730; T. 13061).  A charge conference was conducted. (T. 13065-13084). Defendant objected to the CCP and HAC instructions. (T. 13068; T. 13156-13157).  The prosecution presented a penalty phase argument.

(R. 4730; T. 13087-13115). The defense presented its penalty phase argument. (R. 4730; T. 13115-13146). The court instructed the jury. (R. 4731; R. 4732-4749; T. 13146-13156). After deliberations, the jury returned an advisory verdict. The court sealed the verdict. (R. 4731; T. 13161-13164). On June 11, 1998, the court published the jury's verdict. The jury recommended the death sentence by a vote of 11-1 on both counts of first degree murder. The jury was polled. (R. 4751; R. 4753-4754; T. 13173-13176). On July 8, 1998, the court conducted the final sentencing hearing. The State presented an opening argument. The defense presented an opening argument. The State called Marcelo Schiller and Susanna Griga. Thereafter the State rested. (R. 5214; T. 13201-13207). The State presented a closing argument. (R. 5214; T. 13208-13213). The defense presented a closing argument. (R. 5215; T. 13213-13226). On July 17, 1998, the court issued its sentencing order. (R. 5493-5514; T. 13245-13278). The court imposed the death penalty on Counts III and IV. (R. 5512; T. 13279).[3]   Defendant

---

[3]   The court also sentenced Defendant to 30 years on Count I, 30 years on Count II, life imprisonment on Count V, life imprisonment on Count VI, 5 years on Count VIII, 5 years on Count IX, life imprisonment on Count X, life imprisonment with a three year minimum-mandatory term on Count XI, life imprisonment with a three year minimum-mandatory term on Count XII, 15 years imprisonment on Count XIII, 15 years imprisonment on Count XIV, 5 years imprisonment on Count XVI, 30 years imprisonment on Count XVII, 30 years imprisonment on Count XVIII, 15 years imprisonment on Counts XXIX, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI and XXVII each, 5 years imprisonment on Counts XXVIII, XXXI, XXXIV, XXXVII, XL and XLIII each, 5 years imprisonment on Counts XXX, XXXIII, XXXVI, XXXIX, XLII and XLV each, and 15 years imprisonment on Count XLVI. The court ordered each term of imprisonment to run consecutive to the imposition of death and consecutive to each other, and each death sentence to run consecutive and each minimum-mandatory term to run consecutive. (R. 5512-5514; R. 5578-5584; T.

filed a supplemental motion for new trial based on newly discovered evidence, alleging that Marcello Schiller, one of the State's chief witnesses, had been indicted for money laundering in federal court following a federal investigation and that information pertaining to the federal investigation and impending indictment had been kept from the defense by the State.   The defense also claimed that information concerning an investigation involving Dr. Roger Mittleman, the medical examiner in the case, had not been provided to the defense. (R. 5516-5521).[4]   The State filed a response to the motion for new trial. (R. 5627-5638).   On January 13, 1999, the circuit court conducted a hearing on the motion for new trial.   The court denied the motion. (R. 5727; T. 13370-13372).   This appeal follows.

## STATEMENT OF THE FACTS

### Guilt Phase

The State of Florida presented testimony and evidence pertaining to two main criminal episodes.   These episodes involved the Schiller kidnapping and the Griga/Furton homicides.   The prosecution called a multitude of witnesses in its case.   The principal witnesses testified as follows.

Judi Bartusz testified she was Griga's neighbor and oftentimes visited Griga's home.   She knew Griga's girlfriend, Krisztina Furton.   Furton lived with Griga.   Griga had a dog. (T. 4909-4914).

---

13278-13282).

[4]   The defense tried to postpone sentencing in the case pending the outcome of its investigation on the Schiller matter. (T. 13229-13242).

6

Bartusz knew that Griga owned a home in Golden Beach. (T. 4914-4915). Griga's home had a key punch pad by the front door. (T. 4917). Bartusz knew that Griga owned a yellow Lamborghini automobilie, as well as a red Viper. Krisztina had a blue Dodge Stealth. Griga also owned a speedboat. Bartusz was aware that Griga owned a home in the Bahamas and owned a lot in Hawaii. Griga had jet skis. (T. 4919-4921). Bartusz testified that in 1995 she used to see Griga on a daily basis. On the night of May 24 or May 25 of that year, Bartusz stated she was taking her dog for a walk when she saw Griga trying to park. She walked up to Griga's house and noticed an unknown gold, four-door Mercedes parked in Griga's driveway. Griga invited Bartusz into the house. Bartusz met with Krisztina who was dressed to go out. Bartusz also saw "Adrian and Danny," whom Bartusz identified in court as Noel Doorbal and Daniel Lugo, respectively. (T. 4921-4925). That night, Bartusz overheard that Griga and Krisztina were going out with Adrian and Danny to Don Shula's for dinner. (T. 4925). Krisztina was dressed in a red leather dress and jacket. She also had a red purse and was wearing red shoes. Bartusz identified these items in evidence. (T. 4925-4929). Griga was dressed in jeans and a silk shirt. He was wearing Crocodile boots. (T. 4929). Bartusz identified the boots in evidence. (T. 4930-4931). Bartusz testified she was aware that Griga and Furton were planning to go to the Bahamas on the 25th. When they travel, they usually put the dog up in a kennel. That night, Bartusz left Griga's house and returned to her home. She never saw Griga again. Bartusz testified that on the 25th she

7

called Griga's house to leave a message, but he did not call back. On the 26th, Bartusz received a call from Eszter, Griga's house cleaning employee, who said she felt something was wrong at Griga's house because. Bartusz and Eszter entered Griga's home together and found the dog running wild inside the house. Bartusz had Griga's code combination to get inside the house. Bartusz saw drinking glasses on a coffee table, just as they had been on the night she had been there. She found Griga's plane tickets still in his office, as well as Griga's passport. She noticed that Furton's wallet was in the house. Bartusz knew something was wrong. She called the police and described Griga and Furton. She told them about the gold Mercedes and Griga's vehicle. The following day, Bartusz decided to go to Don Shula's restaurant. She saw the gold Mercedes. She wrote down the tag number and gave the information to the police. Subsequently, Bartusz was told that Griga's Lamborghini had been found. She later met with Metro-Dade police officers and told them about Adrian and Danny. The police showed her some photographs and she picked out both Adrian and Danny. Bartusz also identified in court certain other items, including Griga's Rolex watch, Furton's tennis bracelet and rings. (T. 4932-4954).

Eszter Lapolla testified that she was employed by Griga for his home in Golden Beach. In May, 1995, Lapolla moved into Griga's home with her daughter because she was going through a divorce. On May 25th, Griga and Furton planned to visit the Bahamas and Lapolla planned to move out. On the evening of 24th, Lapolla met two men

8

at Griga's house. Lapolla identified "Adrian," as one of the men at the home. Lapolla explained that Griga's dog was acting strangely that night and actually ran out of the house at one point. Griga and Furton left with the two men. Lapolla noticed that the dog began scratching at the door. The following morning, Lapolla noticed that Griga and Furton had not returned. She left the house, leaving a message on the refrigerator. She called later that afternoon but did not speak to either Griga or Furton. (T. 4991-5001). Lapolla testified that she returned to the house on the 26th. She looked through a window and saw Griga's dog. Lapolla called Judi Bartusz and visited her home. Both Lapolla and Bartusz drove over to Griga's house. After they gained entry, Lapolla noticed that the house was in the same condition she had left it on the 24th. The police were called. Later, Lapolla identified photographs shown to her by the police. (T. 5001-5006).

Attila Weiland testified that he was part of a Hungarian social circle while living in South Florida. He met Frank Griga at that time. Weiland learned about Griga's ability to make money. Weiland also met Krisztina Furton. (T. 5035-5036). Mr. Weiland got to know Noel Doorbal after his ex-wife Beatrice started dating him. He learned Doorbal was in love with Beatrice. Doorbal mentioned he was doing work for the C.I.A. It appeared that Doorbal had money. (T. 5037-5041). Weiland would speak with Doorbal almost every other day. Weiland went with Doorbal to Solid Gold on one occasion. Beatrice had started to work there. Doorbal mentioned to him that he wanted to start a phone business and was looking for

9

partners.  He asked him to mention the matter to Griga.  Weiland
did so.  Doorbal had stated that he had a partner named Danny.
Eventually, Griga invited Doorbal and his partner to his home.
Doorbal picked Weiland up and drove over to Griga's house.  Weiland
was hoping to get a better job out of the introduction.  Weiland
understood that Doorbal wanted to go into business with phone lines
in India. (T. 5044-5053).  Weiland testified that when he arrived
at Griga's house with Doorbal and Lugo, Doorbal got into Griga's
Lamborghini and tried it out.  Later, the men sat inside the house
and began discussing business.  Lugo mentioned that he had already
invested $5,000,000.00 in the business.  Weiland went upstairs
during the meeting and spoke with Krisztina.  After a while,
Weiland returned to the meeting with Krisztina and she showed
Doorbal and Lugo around the house.  After they left, Doorbal
mentioned the meeting was good and the future looked bright.  They
invited Weiland to Don Shula's for dinner but he declined. (T.
5053-5056).  Weiland testified that on May 24, 1995, he spoke with
Griga.  Griga told him Doorbal and Lugo were at his house talking
some business.  On the following day, Weiland tried to reach Griga
unsuccessfully.  On the 26th, Judi Bartusz called Weiland to ask
about Griga.  That evening, Weiland drove with Doorbal to Solid
Gold.  Doorbal told Weiland he was depressed because he had had a
fight with his girlfriend.  On the 27th, Weiland spoke with Doorbal
again.  Weiland explained that Griga and Furton were missing.
Doorbal told Weiland that they had gone together to Don Shula's but
it was closed.  After that he tried to go to another place and

ended up at Doorbal's apartment.   Later, Griga and Furton left.
Weiland testified that he was eventually interviewed by the police.
On May 31st, Weiland spoke again with Doorbal.   Doorbal did not
give him any information about Griga's disappearance but made it
clear to Weiland not to ask him about it.   A few days later, he
spoke to Doorbal again but did not bring up Griga's disappearance
again because he was scared to do so.   (T. 5058-5066).

Beatrice Weiland testified that she worked at Solid Gold as a
strip dancer for five years.   She met Krisztina Furton and Frank
Griga.   Eventually, she dated Griga for a few months.   Ms. Weiland
later began dating Adrian Doorbal.   She met Doorbal at Solid Gold.
Doorbal usually came to Solid Gold with Lugo.   Both Doorbal and
Lugo had lots of money when they came.   Ms. Weiland learned that
Krisztina moved in with Griga.   (T. 5079-5089).   During her work at
Solid Gold, Weiland came to know Sabrina Petreski, another dancer.
She learned that Sabrina was living with Lugo.   (T. 5090-5091).   Ms.
Weiland testified that during the time she dated Doorbal he told
her he was investing money for computer businesses and that Lugo
worked for the C.I.A.   Doorbal would tell her that he would help
out Lugo on occasion.   She noticed that Doorbal and Lugo were very
close and good friends.   Weiland testified that Doorbal's apartment
was close to Don Shula's.   She explained that the apartment had two
floors.   The first floor consisted of a living room, a kitchen, a
bathroom and another room.   Lugo lived across the street with his
girlfriend Sabrina.   Doorbal owned a Nissan car.   She was inside
the vehicle and found a small gun in the glovebox.   Doorbal

explained that Miami was a very dangerous place and he needed the gun to protect himself. Doorbal once explained to Weiland that he wanted to move to an island and retire. Doorbal owned a gym with Lugo. He told Weiland that he took steroids because he wanted to define his body. Doorbal was under a doctor's treatment because of a hormonal problem and she accompanied him to the doctor's office in Coral Springs. She asked her ex-husband Attila to take her. She introduced Attila to Doorbal. (T. 5092-5107). Attila and Doorbal became friends. Weiland broke up with Doorbal and started dating an old boyfriend. (T. 5110). Ms. Weiland testified that before she broke up with Doorbal she had shown him personal photographs. Three of the photographs were of Griga's Lamborghini. Doorbal asked questions about the car and the owner of the car. She showed Doorbal a picture of Griga. (T. 5112-5117). In May, 1995, Weiland attended Griga's birthday party. That was the last time she saw Griga. On May 27th, Attila called her to tell her that Griga was missing. Weiland started making phone calls in the Hungarian community to look for Griga. On May 31st, Weiland spoke with Metro-Dade homicide detectives at Attila's home. She told the police about Doorbal and Lugo. On June 1st, she saw Doorbal and Lugo at Solid Gold. She asked them about Griga but they claimed to have no knowledge of the matter. Weiland tried to call the detective to tell him she had seen Doorbal and Lugo. (T. 5117-5121).

Marcello Schiller took the stand. Mr. Schiller testified that he moved into 7641 S.W. 140th Terrace in 1990. By 1993, the

12

Schillers had paid off the mortgage on their home.   Schiller started his own accounting firm and later started a Medicare business.   He formed Dadima Corporation.   One of Schiller's employees was Linda Delgado, married to Jorge Delgado.   Eventually, Jorge Delgado was given a job, trying to sign people up for the business.   Mr. Delgado then began to work as a runner.   Schiller was doing well with his business, earning about $1,000,000 per year. (T. 6604-6621).   Schiller testified that he came to view Delgado as his friend.   Schiller became involved with a group of family investors, managing their money and setting up offshore accounts.   Subsequently, Schiller sold his Medicare business to Delgado for $250,000.   The Medicare business involved providing nutritional supplements to elderly patients.   Schiller started D.J. & Associates for his accounting services after selling Dadima.   Delgado took on Rolando Caceres as a partner.   Delgado changed the name of Dadima to J&R Medical. (T. 6622-6628).   After Delgado began his business Schiller began seeing him in the company of Daniel Lugo.   Delgado told Schiller he had met Lugo at a gym.   Schiller noticed that Lugo spoke with a New York accent and spoke with a slight lisp.   In November, 1993, Schiller and Delgado started a new business, JoMar Property Investments, which was involved in the buying and selling of mortgages.   Schiller became concerned with Delgado's relationship with Lugo and told Delgado that Lugo was an unsavory character.   He noticed that Delgado was acting tougher and crueler since joining the gym. (T. 6629-6632).   Schiller testified that in April, 1994, the JoMar corporation was broken up.   Schiller

13

remembered a lunch meeting where a banker asked Delgado various questions about his buisness relationship with Lugo which Delgado refused to answer. Delgado acted very defensively. Schiller became very concerned but Delgado became angry at him. Schiller broke off any further contact with Delgado. (T. 6633-6636). Schiller testified that he became involved in establishing two franchises for Schlotzsky's Deli. Schiller hired attorney Gene Rosen, a long-time friend, to assist him in this endeavor. In 1994, Schiller was also looking for a new home. He put some money down on a condo in La Gorce Palace. Schiller also testified that at the time he had two life insurance policies listing his wife as beneficiary. Schiller stated that he had various bank accounts, both in the U.S. and abroad. (T. 6645-6650). Schiller testified he opened Schlotzsky's Deli but had decided to sell the business because it was taking too much of his personal time. On November 15, 1994, at around 4 P.M., Schiller went to the deli in order to meet a prospective buyer. Schiller was unable to agree with the individual and decided to leave. Schiller walked out the back toward his vehicle, a Toyota 4-Runner. He noticed some people walking towards him. Schiller opened the door to his car and suddenly he was grabbed from behind. Someone applied a taser to him and Schiller continued to struggle. Schiller was dragged into a van. The subjects placed Schiller face down and handcuffed him with his hands behind his back. They told him not to move or they would kill him. Schiller's eyes were taped over and he was covered with a blanket. The subjects took Schiller's wallet and the chains

he was wearing. The subjects drove for about 20 minutes and during the ride they kept kicking him in the ribs. Schiller heard what appeared to be a warehouse door opening up and the van drove in. (T. 6651-6656; T. 6717-6722). Schiller testified that he was taken out of the van and placed on a piece of cardboard. Schiller's feet were handcuffed to his hands. The subjects threw water on his face. He was threatened with what felt like a bat. Eventually, Schiller was uncuffed and he was taken to another room. His hands and feet remained separately handcuffed. He stayed in the room for about 3 or 4 hours with a radio on in loud volume. Later, Schiller was taken to another room and the subjects demanded a list of Schiller's assets. Schiller was not cooperative and they slapped him, hit him with the butt of a gun and shocked him with a taser. At one point, the subjects told Schiller they were going to play a game and they put a gun next to Schiller's ear and spun the cylinder, firing the gun a couple of times. The subjects read aloud a list of Schiller's assets, which was an accurate list. In particular, they asked Schiller about his Swiss bank account, his Cayman's account, his house and the insurance policies. At first, Schiller was unable to recognize any of the voices. Later, Schiller recognized a lisp which he remembered Lugo spoke with. (T. 6656-6662). Schiller testified that the individuals took him back into a room and asked him to call his wife and tell her he was on a business trip and to stay calm. The men later burned him with a cigarette and a lighter. Schiller was unable to go to the bathroom and he urinated in his pants. The men threatened to bring

15

Schiller's wife and rape her and to chain his children next to him. Schiller finally reached an agreement with the men that he would give them anything they wanted as long as they would allow his wife and children leave the country. Schiller realized that Jorge Delgado was involved because the men talked about his house codes, his insurance policies, his Rolex ring and his bank accounts, which only Delgado would know about. The following day, Schiller was allowed to make travel arrangements for his wife to leave the country. During his captivity, Schiller's eye-taping came loose and he was able to see a room with a file cabinet, a chair and a box. He noticed a window behind him with a white frame and a mini-blind. He was not able to see anybody. After that, the tape about his eyes was re-applied and he was not able to see anything again. After Schiller's wife left, Lugo told Schiller that they were going to go to the house. Later, the men came back and were very upset because they had not found the jewelry and the money that was supposed to be in the safe. Schiller continued to be handcuffed throughout the ordeal. He was chained in the bathroom and left alone for hours at a time. He was kicked and threatened with a gun. Eventually, the men asked Schiller to call the banks and asked him to sign some papers. It appeared that some were checks. At one point, the men asked him to sign a confession to Medicare fraud. (T. 6662-6681). Schiller testified that during his second week in captivity one of the men began to talk to him about his life. This subject mentioned that he was black, that had a drinking problem, that he had a daughter he was very proud of, that

16

he had been in the Army and that he used to smoke cigarettes. This particular individual gave Schiller food and some soda at night. He also said he was sad for what was going on. Schiller continued to be tormented during this time. He was rarely given food and was humiliated by his captors. During the men talked to Schiller about the transfer of the deli and the house. His tape was changed at one point and he was allowed to change clothes and brush his teeth about two weeks into the captivity. Schiller continued to sign papers. The men started sitting Schiller in his Toyota 4-Runner. The men told Schiller that he was going to be let go but that he had to be drunk. Schiller agreed to get drunk rather than be drugged. At one point, the men told Schiller to call his attorney Gene Rosen and tell him that Delgado had power of attorney over the deli, which he had already closed on instructions. The men started training Schiller by giving him amounts of liquor. On the fourth week of captivity, Schiller was told that he was going to be released but that he had to call his friends and say he was going away with his new girlfriend, Lillian Torres, and they would never see him again. Schiller had never met Lillian Torres. Schiller called Rosen and Kathy Leal, his real estate agent. Later that day, Schiller was allowed to wash. His tape was removed but he was told to keep his eyes shut and look away. Schiller was given something to drink and he passed out. That was the last thing he remembered of his captivity. (T. 6681-6701). Schiller testified that the next thing he remembered was waking up in Jackson Memorial Hospital. He was on a board. He was told he might be paralyzed

and that he had just gone through six hours of surgery. He had tubes running out of every part of his body. Schiller learned his pelvis was broken and his bladder was shattered. He had cuts and bruises. His wrists were burned and bruised. He had an incision from his chest down to his pubic hair. Schiller was told he had been in a car accident. He insisted that he had been kidnapped but the hospital personnel thought he was crazy. Schiller called Gene Rosen, who in turn called Schiller's sister in New York. Schiller did not feel safe in Miami and he was finally transported to New York by air ambulance. Schiller stayed in the New York hospital about ten days and he was then released to his sister's house. Schiller instructed Gene Rosen to correct his financial situation. He could not talk coherently for quite a while. Schiller learned through Ed Dubois that someone was living in his house in Miami. He learned that his place in La Gorce had been transferred to Lillian Torres. Schiller's life insurance policies had been altered to reflect a new beneficiary: Lillian Torres. Schiller testified that he was able to walk on crutches in February, 1995. He decided to leave the country because he did not want to place his sister in danger. (T. 6701-6711). Schiller testified that in January, 1995, he instructed Ed Dubois, a private investigator, to begin negotiations to get his money and property back. He told Gene Rosen to start legal action. Schiller hired another lawyer, Ed O'Donnell, to review an agreement that was reached with the kidnappers. The negotiations continued into March, 1995. Schiller decided to come to Miami in order to report the entire matter to

the police.   In April, 1995, Schiller arrived in Miami and met with a special task force officer from Metro-Dade Police Department. Schiller noticed that the police were skeptical because Schiller's injuries were consistent with a car accident.   Schiller spoke with other detectives and even tried to speak to the F.B.I.   Schiller left town.   In late May, 1995, Dubois asked Schiller to return to Miami because someone else had been a victim of a similar crime. Schiller returned and spoke to Detective Garafalo and it occurred to both of them that the same people were involved in both crimes. (T. 6711-6717).   Schiller identified various items in evidence, including photographs of the warehouse (T. 6723-6727) and items from his house. (T. 6727-6732).   Schiller testified he had never been in Doorbal's apartment. (T. 6732).   Schiller recognized some of his jewelry. (T. 6734-6736).   He identified a special warranty deed for his property at 7641 S.W. 140th Terrace as well as his 1991 tax return and one of his American Express cards in evidence. (T. 6736-6739).   Schiller recognized the note paying off his mortgage as well as certain checks which he did not write. (T. 6740-6741).   Schiller identified various other items in evidence belonging to him but found in other locations, including one of the agreements with Delgado, Lugo and Mese.   Schiller testified that certain documents appeared to have his signature but that his signature was unusual on the documents.   He also said his wife's signature on some of the documents was not even close to her signature.   Schiller testified that John Mese never notarized any documents for him.   Schiller denied changing the beneficiary on his

19

life insurance policies or transferring any property to Lillian Torres.   Schiller also testified that he never ordered any NEC computer. (T. 6741-6793).   Schiller testified that about $10,000 worth of jewelry was taken from him when he was forcibly taken into the van at the deli. (T. 6804-6806).

Edward Du Bois, a private investigator working for attorney Gene Rosen, testified that in December, 1994, he received a call from Rosen on an investigation.   Du Bois made contact with Marcelo Schiller who explained his need for services.   Du Bois advised Schiller to move from his hospital immediately.   Later, in January, Du Bois looked at some documents from Schiller.   He received a detailed memo from Schiller (Exhibit 861) along with a warranty deed and a change of beneficiary form on a life insurance policy. (Exhibit 133).   Du Bois recognized the name of John Mese, whom he identified.   Du Bois investigated some of Schiller's assets.   Du Bois called Mese and set up an appointment.   In early February, Du Bois met with Mese.   Mese told Du Bois he did not recognize the name Marcelo Schiller.   Du Bois had Mese read Schiller's memo. Mese, in a very unemotional way, told Du Bois that it appeared Schiller had had a hard time.   Du Bois asked Mese if he knew Lugo or Delgado and Mese said that he did.   Mese said he represented them before the IRS.   Du Bois set up a second meeting with Mese. (T. 7091-7116).   At the second meeting, Du Bois was accompanied by three persons.   Du Bois waited for two to three hours.   At one point, Mese was unable to identify Schiller as the person he had notarized documents for.   Finally, Mese led Du Bois and his

20

assistant to a back room where he met Delgado.  Mese left and Du
Bois began to talk to Delgado and showed Delgado Schiller's memo.
At one point, Delgado said the matter dealt with a business deal.
Du Bois' assistant, Ed Seibert, intervened, trying to reassure
Delgado after Du Bois got angry at Delgado.  Du Bois told Delgado
that they had left a clear paper trail but had Shiller died they
would have committed the perfect crime.  Delgado remained unmoved
and asked for another meeting that included Lugo.  Mese re-entered
the room and a third meeting was agreed upon.  Du Bois decided to
go to the next meeting only with Seibert because Delgado did not
intimidate him.  While waiting at Mese's office for the the third
meeting, Seibert checked the building and noticed that Delgado had
an office there.  Du Bois and Seibert waited two or three hours.
Finally, Mese arrived and later told them that Delgado and Lugo
were on their way.  Mese handed them a Sun Fitness file and told
them to look at it and that he was not involved in the matter.  In
the meantime, Seibert looked in a trash can and found a lot of
documents, including deposit slips totalling $219,500.92, a bill
for Cellular One, Merrill Lynch account papers addressed to
Doorbal, a membership card for Doll House of America (a strip
joint), a copy of a money order paid to the U.S. Courts for Daniel
Lugo in the amount of $67,845, a Central Bank statement for Sun
Fitness with a beginning balance on January 12, 1995, in the amount
of $122,507.57, some checks signed by Lugo (including checks
payable to John Demeter, owner of a spy shop, a check payable to
Doorbal and checks made payable to Lillian Torres), and

miscellaneous documents. Du Bois also found two checks payable to John Mese totalling $55,000. (T. 7123-7175; T. 7181-7182). Du Bois testified that after sorting the papers found in the trash, Mese came into the room and escorted Du Bois and Siebert to another room where Delgado was waiting. Du Bois began to talk when suddenly Delgado signalled him to stop and said they were going to give Schiller back his money. Delgado mentioned returning $1,260,000 in return for a signed statement from Schiller. (T. 7184-7187). Delgado explained that Schiller had to sign a statement that the money was being returned because of a sour business deal. Delgado also told Du Bois that Schiller could not report the matter to the police. Du Bois intended to take the money and go to the police anyway. Delgado dictated an agreement. Delgado said he could have the money ready by the next day. Du Bois and Siebert left and later called Schiller. Du Bois' secretary typed up the agreement and Du Bois faxed it to Delgado in care of John Mese. Eventually, Du Bois learned Delgado wanted to add language to the agreement that Schiller would not threaten or attempt to blackmail Delgado, Lugo or Mese and that the events occurring between November 15, 1994 and December 15, 1994 did not happen. Du Bois prepared the new agreement and spoke to Mese, who said he would get back to him. Du Bois did not get the money so he started to make demands for the money. In the meanwhile, Du Bois started to do background investigation on Delgado, Lugo and Caceres. Du Bois learned that Doorbal was connected to Sun Fitness Consultants and so he investigated Doorbal. On February 23, 1995, Mese faxed Du Bois a

statement that he believed everything could be resolved.   Other
faxes followed.   Du Bois engaged the services of attorney Ed
O'Donnell to assist him.   Du Bois continued to make demands for a
cash settlement.   On March 16, 1995, Du Bois received a fax from
attorney Joel Greenberg concerning the agreement.   The Schillers
finally signed a final agreement.   Du Bois faxed Greenberg copies
of the quick-claim deed and other documents.   He also faxed him a
letter from Schiller making a final demand for money.   On March
24th, Greenberg sent O'Donnell a communication noting that Schiller
was involved in extortion.   On April 3, 1995, O'Donnell faxed
Greenberg informing him that a cashier's check for the agreed sum
should be prepared.   No check was ever made.   In the end, Schiller
went to the authorities.   Du Bois made contact with a friend at the
Metro-Dade Police Department and he and Schiller reported the
matter in full.   Schiller prepared a memo which was turned over to
the police.   Schiller had a second meeting with the police a short
time later.   In late May, 1995, Du Bois became aware of the
disappearance of a Hungarian couple.   Two detectives visited his
office and Du Bois turned over various documents and other items.
Du Bois gave an interview to Sgt. Jimenez.   Du Bois testified that
he was paid $10,000 for rights to a book he collaborated on for
these crimes, with a $90,000 option if a movie is bought. (T. 7192-
7285).

Mario Sanchez testified that he believed Lugo was the owner of
Sun Gym. (T. 7780).   While working out at Sun Gym, Sanchez would
sometimes train with Doorbal. (T. 7782).   Sanchez quit the gym in

23

May, 1994 after a heated argument with Doorbal. (T. 7784). Doorbal was the manager of the personal trainers. (T. 7788). Sanchez kept training at Sun Gym. (T. 7791). Doorbal apologized to Sanchez and the two began to train together again. (T. 7792). On November 15, 1994, Sanchez was training at Sun Gym when he was asked by Doorbal to go outside. The two men entered a van in which Carl Weeks was waiting. Doorbal told him a drug dealer owed him money and he wanted Sanchez to go with him and collect. Sanchez was promised $1,000. Sanchez told Doorbal he had to think about it and he went home. Sanchez decided he was going to help because his only role would be an intimidator. Doorbal showed up at Sanchez's building and Sanchez joined him. Sanchez took his gun and drove with Doorbal and Weeks in the van. They drove to a shopping center on 79th Avenue. Doorbal spotted a Toyota 4-Runner and said that's the one. They parked the van. They waited. Finally, Schiller, the supposed drug dealer, walked out of the restaurant. At that point, Doorbal and Weeks approached Schiller and as Schiller opened his truck they grabbed him. Schiller was stunned by a stun gun. Schiller continued to struggle and they finally bring him to the van where Sanchez grabbed him. Sanchez did not know there was going to be a kidnapping. Schiller was handcuffed. Weeks and Doorbal yelled at Schiller telling him they were going to kill him. Weeks taped up Schiller's eyes. Doorbal drove off. Sanchez said nothing out of fear. Weeks placed a mover's mat over Schiller and kept stunning him with the gun. Sanchez struck Schiller. Weeks stripped Schiller of his jewelry and wallet. The men drove to a

24

warehouse in Hialeah. (T. 7797-7833). Sanchez testified Doorbal made some calls on his cellular phone during the drive. Three times he called and said, "The eagle has landed." Once at the warehouse, they waited about 10 minutes. Thereafter, Lugo and Stevenson Pierre arrived. Pierre opened the door to the warehouse. (T. 7850-7854). Doorbal backed the van into the warehouse. Doorbal and Weeks took Schiller out of the van and took him into a room. Sanchez overheard a lot screaming and slapping. There were threats. Sanchez saw Doorbal place a gun in Schiller's mouth. Sanchez told Lugo and Pierre he wanted to go home. Lugo told him to wait. Doorbal finally came out of the room and took Sanchez home. Doorbal told Sanchez on the way home that they were going to have Schiller sign papers and pay money and then send him home. Sanchez did not call the police because he was afraid for his family and himself. Later that night, Doorbal dropped by and paid Sanchez $1,000. (T. 7856-7868). About two weeks later, Sanchez saw Doorbal at Gold's Gym. Doorbal told Sanchez they were partners forever. He noticed that Doorbal was now driving a new 300ZX. Doorbal paid for Sanchez's Gold's Gym membership and they continued to work out together. One time Doorbal mentioned to Sanchez that when he gets mad he'd do anything, like start up a chain saw and cut somebody. Doorbal mentioned that he would go to Solid Gold a lot and spend money. Sanchez noticed Doorbal wearing a Rolex watch and Doorbal said he paid $25,000 for it. Sanchez testified that in April, 1995, Doorbal asked him to help on a similar job and offered him $5,000. Sanchez said he was not interested. The next day at

the gym Lugo joins them.  Doorbal asked Sanchez again for his help but Sanchez turns him down again.  Doorbal finally backed off. Doorbal once mentioned to him that he wanted a yellow Lamborghini. He later told him that the Lamborghini was not right for him.  (T. 7870-7891).  Sanchez never saw Frank Griga or Krisztina Furton. (T. 7893).  In June, 1995, Sanchez started working out again at Gold's Gym after taking some time off.  He found out that Doorbal was not coming to the gym anymore.  Sanchez began to feel that he was going to be arrested eventually.  The police arrested him and charged him with attempted first degree murder, kidnapping, robbery and burglary.  Later, Sanchez pled guilty to kidnapping in July, 1996. He agreed to cooperate with the State.  Sanchez was sentenced to two years imprisonment with two years house arrest.  Sanchez served time and was finally released.  (T. 7894-7908).

Stevenson Pierre testified he had met Lugo in October, 1993. (T. 8160-8161).  Pierre went to Central Bank to open accounts for a collection agency and for Sun Pro Ware and Sun Juice Bar, subsidiaries of the gym.  (T. 8163).  Pierre believed that John Mese owned the gym.  (T. 8164).  During his work at the gym, Pierre got to know Doorbal.  (T. 8166).  He met Mario Sanchez as well.  (T. 8167).  In August, 1994, Pierre met Jorge Delgado.  Lugo told him that Delgado was one of his business associates.  (T. 8169-8170). Lugo gave Pierre directions as to what to do at the gym.  (T. 8170). Pierre met Carl Weeks, who moved to Florida in September, 1994.  (T. 8170-8171).  Toward the end of September, 1994, Pierre was told by Lugo that Marc Schiller owed him and Delgado money and that they

26

wanted to collect on that money. They wanted to kidnap the man and obtain the money. About a week later, Pierre was called to Lugo's office at John Mese's office by Lugo. At the office he met with Lugo, Delgado, Weeks and Doorbal. Lugo asked the group to kidnap Schiller. Lugo explained that they were all involved in some type of medicare fraud and that Schiller had treated them badly. Lugo offered each of the men $100,000 to participate in the scheme. Pierre was skeptical. Within a week there was a second meeting. (T. 8172-8178). At the second meeting, at Mese's office, the men discussed the proposed kidnapping. Delgado talked about the layout of the house and Lugo mentioned that the abduction had to occur before December because Schiller usually would go away to Colombia for the holidays. (T. 8179-8180). Pierre learned that Schiller had a lot of money and that he owned a business. Delgado gave out the code to Schiller's house. The men particpated in two stake-outs in the area of Schiller's house. One time, Pierre went to Schlotsky's Deli on the pretense of applying for a job but actually to see if Schiller was on the premises. (T. 8183-8189). Later, the men found Schiller driving his 4-Runner and they followed him. They discussed bumping Schiller's car and then abducting him. It was agreed to take Schiller to a warehouse. They lost Schiller. Thereafter, Pierre went with the group to the Spy Shop and bought a series of handcuffs, two tasers, two-way CB radios and batteries. The men tried to abduct Schiller a second time but Pierre did not act quickly enough and Delgado and Lugo got very upset. (T. 8191-8199). A third attempt was made to abduct Schiller. The men

travelled to Schiller's restaurant but they aborted the attempt because there were people around.   Later, at another meeting, Doorbal mentioned the possibility of a home invasion during Halloween when no one would be paying attention to men wearing masks.   They never tried to do the abduction on Halloween but a couple of days later the men dressed in black and went to Schiller's house.   They noticed a jogger and the attempt was aborted. (T. 8205-8215).   In still another attempt to sequester Schiller, Pierre and the other men travelled to Schiller's restaurant but they could not get their van started in order to effectuate the kidnapping. (T. 8215-8217).   Lugo became very angry and said he could not use the group anymore. (T. 8218).   Pierre was taken home that day after the attempt.   Later, Doorbal called him and asked him to go the warehouse.   When Pierre arrived at the warehouse he noticed that Schiller was tied up inside the van. They entered the warehouse and Schiller was taken in and beaten. Pierre and Weeks stayed at the warehouse while the others left to run various errands.   Eventually, Lugo, Dooral and Delgado returned and began to question Schiller.   Pierre and Weeks left and were told to come back in the morning.   The following day, Pierre returned to the warehouse and learned that Schiller had been burned and that the men had played Russian Roulette with him.   Pierre found out that Schiller had called his wife and had asked her to withdraw money of their account.   The group figured out a schedule whereby they set times for staying at the warehouse. (T. 8220-8229).   Pierre testified that during his shifts he would sometimes

28

talk to Schiller about different things. Weeks would also talk to Schiller on occasion. During the time Schiller was held captive Lugo and Doorbal visited Schiller's home. They came back with papers and about $10,000 in cash. Pierre was paid $3,000. Pierre would oftentimes see Schiller sign documents. Pierre became aware that Schiller's house was transferred to D&J International. Lugo told Pierre he was going to set up an account in order to filter the money he was going to collect from Schiller's account. The money was supposed to be wired from Switzerland. Lugo said that Mese would be notarizing the paperwork to get the money transferred. Pierre also found out that Schiller's life insurance policy was going to be transferred to Lugo's ex-wife, Lillian Torres. Pierre understood that Schiller was going to be let go. They were confident that he would not report the matter to police because he was involved in shady business matters. Pierre testified that Doorbal wanted to kill Schiller from the beginning but that Lugo was wavering. Pierre noticed at one point that Schiller was given a lot of alcoholic beverages. On December 4, 1994, Lugo called Pierre and asked him to go to the area of 36th Street and see if there was any police activity. When Pierre got to the scene he saw Schiller's car was run into a pole and people were putting out flames. Later that night, Pierre went to the warehouse and told Lugo, Doorbal and Weeks what he had seen. Pierre was told that Lugo drove Schiller's car to a certain location. Schiller was then placed in the driver's seat. The men then set the car on fire. Pierre was told that at one point

Schiller escaped so they decided to run him over with their car. Pierre noticed that everyone was joking about what had happened but that there was some concern that Schiller had survived. A day or two days later, the men met at the warehouse again. Pierre was told by Lugo that Schiller's brother had called to say that he knew what had happened. The men proceeded to Jackson Memorial Hospital and began looking for Schiller. The plan was to find him and kill him by suffocating him. They could not find him. (T. 8234-8253). Pierre testified that he helped Lugo move some furniture out of Schiller's house to the warehouse. Lugo made a decision to change the landscaping on the property and to place surveillance cameras around the house. Pierre remembered that some of Schiller's credit cards were used. Pierre also participated in the changing of the VIN number of one of Schiller's vehicles. (T. 8255-8259). Pierre testified that in January and February he lost contact with Lugo and Doorbal. Pierre spent the money he was paid for his participation. On June 3rd, Pierre learned that Doorbal and Delgado were arrested. (T. 8260-8263). Pierre testified prior to these arrests, Lugo had told Pierre and Weeks at the bank that he could not pay them the rest of the money owed because he had to repay Schiller the money taken from him. At the time, Doorbal stood off to the side in a threatening manner. Pierre had no involvement with Frank Griga or Kriztina Furton. (T. 8265-8267). After June 3rd, Pierre was called by Lugo who told him not to believe what was in the papers or the media about him and that it was all Doorbal's fault. Pierre and Weeks made plans to explain

away the money they had received in case the police came to arrest them. Eventually, the police came and talked to Pierre, who did not tell them the truth. In October, the police asked to see him again. Pierre finally gave the police a sworn statement admitting his involvement in the matter. In January, 1996, Pierre entered into a plea agreement with the State under which he would receive 10 years. (T. 8267-8279).

Elena Sabina Petrescu testified that she entered the United States illegally. Petrescu ended up dancing in a strip club. Eventually, Petrescu and her husband moved to Florida. She continued to dance at strip clubs. She gained employment at Solid Gold in Miami Beach. In November, 1994, she divorced her husband. Petrescu was earning about $300 a night. On Superbowl Sunday, 1995, Petrescu was working at Solid Gold when she met Daniel Lugo. Later, she met Doorbal and Weeks. (T. 9613-9627). Petrescu began to date Lugo. Lugo eventually offered her an apartment free of charge. Their relationship became sexual. Lugo stayed with Petrescu at the apartment. Lugo bought a car for her. She noticed once that Lugo owned a gun. Petrescu remembered that Lugo told her that there was a dispute between Marcelo Schiller and Jorge Delgado. Lugo told her that Schiller was stealing from Delgado. Lugo said he fixed it so that Schiller would not steal from Delgado anymore. Lugo told her he worked in the stock market. He later told her he worked for the CIA. He showed her surveillance equipment. (T. 9643-9666). Lugo mentioned once to Petrescu that he should have run Schiller over with the car. (T. 9675). Lugo later

31

gave her a BMW. (T. 9685). On one occasion, Lugo told Petrescu he was going on a mission with a terrorist. Lugo pointed out the house of the terrorist to Petrescu and explained he was going to capture and beat him. Lugo was going to go on the mission with Doorbal. (T. 9690-9696). Petrescu testified that one day she accompanied Lugo to attorney Joel Greenberg's office in Ft. Lauderdale. She overheard a conversation about the payment of $1,000,000 to Marc Schiller. She learned that Lugo wanted to pay Schiller in Italian lira not dollars. (T. 9705-9706). On another occasion, Lugo told Petrescu about a Hungarian man who made a lot of money from phone sex and who was wanted by the FBI. The man drove a yellow Lamborghini or Ferrari. He explained they were going to capture the man and deliver him to the FBI. Lugo said he was going to make some money before he turned him over to the FBI. Lugo explained that the Hungarian and his girlfriend were going to be taken to a warehouse. One day Lugo arrived with a lot of items like handcuffs, syringes and tape. Lugo was planning the mission with Doorbal. Petrescu was told the couple would be confined in the trunk of the car. Petrescu was supposed to drive the car. Petrescu testified that she later drove Lugo and Doorbal to the Hungarian's home. Lugo and Doorbal entered the house with guns. About 15 minutes later, Lugo and Doorbal left the house and got back in the car. Petrescu drove off and Doorbal kept saying, "We should have done it." (T. 9721-9751). Lugo made plans to meet with the Hungarian man, Griga, later that afternoon. Petrescu drove the men back to Miami Lakes. She was told to play the role of

32

Doorbal's Russian wife. Lugo and Doorbal left and told Petrescu to wait in the apartment. She stayed behind for 5 hours. Lugo finally returned but was spaced out. Doorbal was also spaced out. Lugo told her he just could not do it. Later, Lugo told her if she really wanted to know if the Hungarian couple was still alive. Eventually, Lugo told her the couple was at Doorbal's apartment. Lugo told her Doorbal's apartment stunk and it was cold. Some time thereafter, Petrescu went to the house at Golden Beach but Lugo could not gain access. She overheard a conversation Lugo had with Doorbal on the phone where Doorbal said "The bitch is cold." Petrescu did not call the police because she thought Lugo worked for the CIA. She was afraid that Lugo would kill her. (T. 9754-9779). Petrescu testified that Lugo and Doorbal came by the apartment and left some items in the storage room. They placed some computers on the floor. Later, Petrescu noticed some blood on the computers. One day Lugo came to the apartment with Jorge Delgado and brought some items. Petrescu later joined Lugo and Delgado to Naples where they dropped off some bags. Lugo and Petrescu then went to the Bahamas on two trips. While there, Lugo found out that Doorbal and others had been arrested. Lugo mentioned alternatively that he wanted to surrender or escape. Lugo mentioned to her that bloody clothes were hidden in the bags in the apartment. Petrescu returned to Miami where she was arrested. At first, Petrescu lied to the police. Later, she found out Lugo had been arrested. Petrescu visited him in jail and on one occasion Lugo told her that they could not find out who they

33

were because the fingers had been cut off and thrown into a canal and he mentioned something about teeth. Petrescu met with the prosecutor and the detectives and gave a sworn statement. (T. 9781-9829).

Jorge Delgado testified his wife used to work for Marc Schiller. Delgado later began working for Schiller as an accounting salesman. Delgado became a good friend to Schiller. Eventually, Delgado came to know Schiller's finances. (T. 10919-10928). Delgado assisted Schiller in Medicare billing. Delgado later started his own business. Delgado started going to Sun Gym. Daniel Lugo became Delgado's personal trainer. He met Doorbal. Delgado joined Schiller in a mortgage business. Delgado became concerned with possible Medicare fraud in the medical supplies business. Delgado introduced Lugo to Schiller. Schiller began business with Lugo but later he broke with Lugo. Delgado retained the services of John Mese for his accounting services. At one point, Lugo told Delgado that Schiller was cheating them but Schiller denied it to Delgado. Lugo suggested kidnapping Schiller and get the money from him. In October, 1994, Lugo set up a meeting with Delgado, Weeks, Doorbal and Pierre to discuss the kidnapping. Delgado learned that they had scouted Schiller's house and restaurant. Delgado understood that Lugo would be instructing everyone on what to do during the kidnapping. Delgado was to provide him with information about Schiller and watch him. The other men were supposed to do the actually kidnapping. Schiller was supposed to taken to Delgado's warehouse. Delgado saw various

34

items that were going to be used to kidnap Schiller.  In November, 1994, Lugo told Delgado he had a surprise for him and Delgado saw Schiller confined at the warehouse.  A schedule was prepared to watch over Schiller.  Schiller was questioned at gunpoint.  He was beaten and burned with a cigarette.  Schiller was asked to sign papers.  These documents were later taken to Mese for notarization. Delgado was seeking $200,000 which he thought Schiller owed him. Eventually, a decision was made that Schiller had to be killed. Delgado later learned that Schiller had been placed in his car and his car had been set afire and that later he had been run down. When they found out that Schiller was alive at Jackson Memorial Hospital, Delgado stated that Lugo planned to finish him off at the hospital.   Delgado later learned there was a plan to capture Schiller's brother.  Delgado admitted taking some of Schiller's home articles and using his credit cards.  (T. 10961-11022). Delgado testified that in February, 1995, Mese called him and told him that an investigator by the name of Dubois had talked to him about Schiller's kidnapping and that he was trying to extort money. Lugo told Delgado to meet with the investigator.  Delgado was told by Dubois that Schiller wanted his money back and he would not prosecute if he got his money.  Lugo instructed Delgado on how to negotiate the return of the money.  Lugo and Delgado met with an attorney to draft a contract.  Lugo decided to pay in lira rather than dollars.  (T. 11022-11034).   Delgado testified that he participated in the attempted kidnapping of a certain Winston. (T. 11053-11054).   He saw Lugo buying spy equipment. (T. 11056).

35

Delgado learned from Doorbal that he was looking into the kidnapping of a Hungarian couple in order to extort money from them. He later discussed it with Lugo. On May 24th, Lugo called him and asked him if he knew how to drive a Lamborghini. The next day, Delgado met with Doorbal and Lugo and Doorbal's apartment and Lugo told him that Doorbal had killed the man in a struggle. Lugo had to sedate the girl who was screaming. Lugo used a horse tranquilizer. The girl was tied up. As Lugo was explaining what had happened Delgado saw Doorbal come downstairs with the girl over his shoulder. Lugo explained that the man was not supposed to get killed. Rather, they were supposed to extort money from him. Delgado saw that Doorbal injected her with a tranquilizer in order to calm her down. Lugo and Doorbal started questioning the girl about the code to Griga's house and the location of a safe. A while later, Delgado learned that they were going to kill the girl and dispose of the bodies. John Raimondo, a corrections officer, arrived at the house and he grabbed the girl and retaped her. She was injected again. Raimondo left. Doorbal turned up the air conditioner because of the stink inside the apartment. Lugo left to go to Griga's house. He called to say he could not get in. Delgado left and was told to come back the next day. He was told by Lugo that he wanted to get rid of the bodies. Doorbal told Delgado that the girl was in a wardrobe box. The following day, Delgado returned with a U-Haul truck and the men placed Griga's body inside a couch taken from Schiller's house. They carried the couch and the box into the U-Haul truck. The men drove to the

36

warehouse in Hialeah.  At the warehouse, they unloaded the couch and box.  Lugo discussed with Doorbal items they needed to buy at the Home Depot, including a chain saw, knife and hatchet.  Delgado later went to the store to buy some oil for the chain saw.  At the warehouse, Delgado saw Lugo and Delgado lay out the bodies.  The bodies were sprayed with Windex to clean them of blood.  Then Lugo and Delgado bought a window fence to place over the barrels in order to allow for cutting up the bodies.  Lugo and Doorbal used an electric chain saw to cut the bodies.  About 5 minutes later, the chain saw stopped because the girl's hair got stuck around the chain.  Delgado started hearing thumps in the room when the men started using the hatchet.  Delgado remained as a look-out. Delgado later saw pieces of the bodies sticking out of the barrels. The legs were pushed down and the barrels were sealed.  They had placed the heads, hands and feet of the bodies into buckets. Delgado later returned the U-Haul truck.  Doorbal asked Delgado to clean up the apartment where Griga had been killed.  After Delgado dropped Doorbal off he returned to the warehouse and Lugo told him he was burning the heads, hands and feet.  Delgado later helped clean out Doorbal's apartment. (T. 11056-11140).  The following day, Delgado met with Doorbal who told him that he had to cut off the fingertips and yank out the teeth with a wrench so that they would not leave any evidence.  Doorbal said Lugo had left for the Bahamas.  On June 3, 1995, the police came to see Delgado.  After his arrest, Delgado decided to cooperate.  He gave the police a full statement.  He pled guilty on various charges and learned he

37

was a target in a federal Medicare fraud investigation. (T. 11180-11189).

Dr. Roger Middleman, Chief Medical Examiner of Dade County, testified that in June, 1995, he performed autopsies on two headless bodies. The bodies did not have hands or feet. Dr. Middleman proceeded to conduct the autopsies and took pictures for his records. Dr. Middleman determined that the female had breast implants and he compared his findings with the medical records of Dr. Grimminger who had made the implants on Kristina Furton. Dr. Middleman could not determine any trauma to her body other than the cutting on her limbs and her head. Dr. Middleman also examined the torso of a male. Middleman compared the X-rays of the torso to those of Frank Griga and was able to make an identification. The Medical Examiner's Office also sent out DNA samples for analysis. Dr. Middleman did not find any significant trauma marks on the male other than the cuts. In July, 1995, Dr. Middleman received some buckets at the Medical Examiner's Office. There were two skulls inside the buckets. Dr. Middleman also uncovered portions of hands and feet. It appeared that some type of acid had been used on the heads. Dr. Middleman was able to match the heads with the torsos he had previously examined. Xylazine was detected in both the male and female bodies. Dr. Middleman opined that had the female been aware that she was to receive an injection she would have been in mental disarray or psychic horror. Dr. Middleman determined that the male had substantial blunt trauma to the head. Dr. Middleman concluded that the female probably died as a result of the

38

Xylazine.  The male probably died as a result of the blunt trauma to the head and/or exsanguination and/or strangulation. (T. 11639-11677).

## ISSUES PRESENTED

### (I)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE IMPROPER JOINDER OF COUNTS

### (II)

WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTIONS FOR RACKETEERING

### (III)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER OPENING STATEMENT

### (IV)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL WHERE COUNSEL FOR CO-DEFENDANT DOORBAL WAS ABLE TO QUESTION WITNESSES ADVERSELY TO DEFENDANT

### (V)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF EVIDENCE CONCERNING DEFENDANT'S CONVICTION AND PROBATION IN A FEDERAL CASE

### (VI)

WHETHER THE TRIAL COURT ERRED WHEN IT PROHIBITED DEFENSE COUNSEL FROM QUESTIONING DEFENDANT'S EX-WIFE ABOUT THE FACT THAT SHE APPEARED AT THE STATE ATTORNEY'S OFFICE WITH A LAWYER

### (VII)

WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL AND REQUEST FOR DISCOVERY CONCERNING THE PROSECUTION'S FAILURE TO DISCLOSE VICTIM SCHILLER'S FEDERAL CRIMINAL INVESTIGATION AND CASE AND THE PROSECUTION'S FAILURE TO DISCLOSE AN INVESTIGATION INVOLVING THE MEDICAL EXAMINER

## (VIII)

WHETHER DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER CLOSING ARGUMENT

## (IX)

WHETHER DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO THE CUMULATIVE EFFECT OF THE CUMULATIVE ERRORS

## (X)

WHETHER DEFENDANT IS ENTITLED TO RESENTENCING BASED UPON THE PROSECUTOR'S IMPROPER PENALTY PHASE ARGUMENTS

## (XI)

WHETHER THE TRIAL COURT'S SENTENCE OF DEATH SHOULD BE VACATED SINCE DEATH WAS A DISPROPORTIONATE SENTENCE IN THIS CASE

## (XII)

WHETHER THE TRIAL COURT'S SENTENCING ORDER HAS ERRORS THAT, BOTH INDIVIDUALLY AND CUMULATIVELY, REQUIRE REVERSAL OF DEFENDANT'S DEATH SENTENCE AND A REMAND FOR RESENTENCING BY THE TRIAL COURT

## (XIII)

WHETHER THE TRIAL COURT ERRED IN ORDERING ALL SENTENCING TERMS AND MINIMUM/MANDATORY TERMS TO RUN CONSECUTIVELY TO EACH OTHER

## (XIV)

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING AN UPWARD DEVIATION IN THE SENTENCING GUIDELINES AND ORDERING ALL TERMS OF IMPRISONMENT TO BE RUN CONSECUTIVE TO EACH OTHER

## (XV)

WHETHER CAPITAL PUNISHMENT AS PRESENTLY ADMINISTERED VIOLATES THE STATE AND FEDERAL CONSTITUTIONS

## SUMMARY OF ARGUMENT

1) Defendant was denied a fair trial by the improper joinder of counts. The prosecution joined charges involving the kidnapping

40

and attempted murder of one victim in one location at one particular time with charges pertaining to the murder of two different victims at a different time and place. Joinder resulted in mutual contamination and prejudice in the guilt and penalty phases. 2) There was insufficient evidence to support Defendant's convictions for racketeering. There was insufficient evidence of an ongoing organization, formal or informal, and certainly little evidence that the various associates in the "organization" functioned as a continuing unit. There was certainly no temporal continuity between these offenses charged. Furthermore, the means, methods and circumstances were different in each of the episodes. 3) Defendant was denied a fair trial by the prosecutor's improper opening statement. The prosecutor's opening statement was improperly argumentative and deprived Defendant of a fair trial. These comments clearly amounted to argument discrediting the defense, attacking the character of the defendants and expressing personal views and opinions. The series of improper comments amounted to fundamental error. Moreover, the cumulative effect of the prosecutor's comments cannot be considered harmless error. 4) Defendant was denied a fair trial where counsel for co-defendant Doorbal was able to question witnesses adversely to Defendant. Counsel for co-defendant Doorbal engaged in repeated cross-examination of witnesses which wholly undermined Defendant's case. In effect, counsel for Doorbal played the part of a second prosecutor in the court proceedings. 5) Defendant was denied a fair trial when the prosecution was permitted to introduce evidence of

41

Defendant Lugo's conviction and probation termination in federal court.  Introduction of evidence pertaining to Defendant's federal conviction and probation was improper and prejudiced Defendant. 6) The court erred in prohibiting the defense from cross-examining witness Torres about the fact that she appeared at the State Attorney's Office under subpoena with her lawyer.  This prohibition concerning Torres' possible bias amounted to a denial or significant diminution of Defendant's constitutional right of confrontation and his right to full cross-examination. 7) The trial court erred in denying Defendant's motion for new trial and request for discovery concerning the prosecution's failure to disclose Marcelo Schiller's federal criminal investigation and pending indictment and the prosecution's failure to disclose an investigation involving the medical examiner who testified at trial.  At a minimum, the court should have permitted defense counsel to conduct preliminary discovery on the matter in order to properly perfect the record.  Any evidence detracting from Schiller's credibility would have had an obvious impact on the deliberating jury, both in the guilt and penalty phases.  There is no question that the State had knowledge of the Mittleman investigation in view of the fact that the State Attorney's Office itself investigated Mittleman, who provided critical testimony for the prosecution. 8) Defendant was denied a fair trial by the prosecutor's improper closing argument.  The prosecutor unfairly attacked Defendant's character; employed inappropriate and inflammatory language; injected matters outside of the proper scope

of the jury's deliberations; impermissibly highlighted the her own personal belief as to Defendant's guilt and by extension as to the credibility of the State's witnesses; and invited jurors to place themselves in the place of the victim when deliberating on this case. 9) Should issues raised by Defendant, or those issues which Defendant adopts from the co-defendant, Noel Doorbal's Brief, constitute harmless error, the cumulative effect of the cumulative errors rendered Defendant's convictions questionable and entitles Defendant to a new trial. 10) Defendant is entitled to resentencing based upon the prosecutor's improper penalty phase arguments.  The prosecutor misled jurors into believing that as a result of their oath and their duty in this case they were obligated to recommend the death penalty in this case; improperly argued to the jury non-statutory aggravating circumstances; inappropriately alluded to matters that were not relevant to the impostion of the death penalty; employed dehumanizing language; improperly commented on life imprisonment and Defendant's ability to enjoy life as a result thereof; unlawfully asked jurors to place themselves in Defendant's place and point out that they took different paths in life although they may have encountered the same life experiences as Defendant; improperly argued that the jury was required to return a recommendation of the death penalty because of societal or religious reasons; and improperly argued to jurors that they should show Defendant no mercy in the context of noting that Defendant showed no such mercy to the victims. 11) In view of the totality of the mitigating factors in this case, imposition of the death

penalty would be disproportionate. Delgado, an equally or more culpable codefendant, received a sentence of just 15 years after reaching an agreement with the State involving both the Schiller and Griga/Furton episodes. Delgado was fully and materially involved in both sets of crimes. Moreover, the record shows that Defendant himself did not commit the murders. Additionally, Defendant presented evidence that he had been the victim of child abuse, that Defendant had shown great care and love for his family, that Defendant's execution would have a negative impact on Defendant's family, that Defendant possesses skills that could help others should he be imprisoned rather than executed, that Defendant had exhibited appropriate courtroom behavior, that Defendant assisted the police locate the barrels containing the torsos of the victims which was beneficial to the State, and that Defendant's mandatory incarceration for life would keep him out of society. Imposition of the death penalty would be disproportionate. 12) The trial court committed several errors in its sentencing order which, individually and cumulatively, require reversal of Defendant's death sentence and a remand for resentencing. The court erred in finding that Defendant was previously convicted of another capital felony or of a felony involving a threat of violence to the person; erred in finding that the murder of Furton was committed for financial gain; erred in finding that the crime for which Defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; erred in finding that the crime for which

44

Defendant is to be sentenced was especially heinous, atrocious or cruel as to victim Furton; erred in finding that the capital felony was a homicide and was committed in a cold, calculated and premeditated (CCP) manner without a pretense of moral or legal justification; and erred in failing to give Defendant's mitigating circumstances sufficient weight. 13) The court ordered the minimum/mandatory terms on Counts XI and XII to run consecutively to each other. Both counts arose out of the same incident or transaction. In addition, the trial court erroneously failed to order that the minimum-mandatory terms be served first when it imposed its sentences. 14) The court abused its discretion when it granted a upward guidelines departure. Defendant maintains that grounds used by the court for departure were inherent in the crimes scored. In this connection, Defendant also asserts that the extent of the departure was excessive and improper. 15) Capital punishment is unconstitutional in view of the paradoxical constitutional commands of non-arbitrariness and need for jury discretion to consider all mitigation. Moreover, capital punishment today may be unconstitutional because of the inordinate delays between sentencing at trial and actual execution, inherent in the legal system.

<u>ARGUMENT</u>

<u>(I)</u>

DEFENDANT WAS DENIED A FAIR TRIAL BY THE IMPROPER JOINDER OF COUNTS

Defendant was denied a fair trial by the improper joinder of counts. Prior to trial, defense counsel unsuccessfully moved for

45

dismissal of the RICO counts from the indictment and for severance of the counts from the homicide counts. (R. 2529-2535; R. 2536-2546). The court should have granted severance of counts. The joinder of these counts deprived Defendant of a fair trial. The evidence of the Griga/Furton episode tainted and prejudiced the evidence concerning the Schiller episode and vice versa. The Schiller episode occurred between November and December, 1994. The Griga/Furton episode occurred in late May, 1995. The victims were different in the two episodes. The means and circumstances were different in the two episodes. The two sets of conduct were not based on the same act or transaction nor were they based on two or more connected acts or transactions as required by Rule 3.150(a), Florida Rules of Criminal Procedure. In short, the they were not related in an episodic sense. See Rule 3.152(a)(1), Florida Rules of Criminal Procedure.[5] In the present case, the prosecution joined charges involving the kidnapping and attempted murder of one victim in one location at one particular time with charges pertaining to the murder of two different victims at a different time and place. This was error. The primary purpose of requiring separate trials on unconnected charges is to assure that evidence adduced on one charge will not be misused to dispel doubts on the other and so effect a mutual contamination of the jury's consideration of each distinct charge. Ghent v. State, 685 So.2d

---

[5]    Joinder and consolidation are governed by the same principles. See State v. Conde, 743 So.2d 78, 79 (Fla. 3d DCA 1999) (quoting Macklin v. State, 395 So.2d 1219, 1221 n.2 (Fla. 3d DCA 1981)).

72, 73 (Fla. 1st DCA 1996). In <u>Crossley v. State</u>, 596 So.2d 447 (Fla. 1992), this Court warned that courts should be careful that there is a meaningful relationship between the charges of two separate crimes before permitting them to be tried together. <u>Id</u> at 450. In fact, severance should be granted liberally where prejudice is likely to follow from refusing to sever. <u>Sosa v. State</u>, 639 So.2d 173, 174 (Fla. 3d DCA 1994). Practicality and efficiency should not outweigh a defendant's right to a fair trial. <u>Id</u>. The fact that a defendant may be involved in a series of crimes involving similar circumstances does not warrant joinder. <u>See State v. Fudge</u>, 645 So.2d 23 (Fla. 2d DCA 1994). Joinder is not warranted where the criminal offenses are based on similar but separate episodes, separated by time, which are connected only by similar circumstances and the accused's alleged guilt. <u>May v. State</u>, 600 So.2d 1266 (Fla. 5th DCA 1992). For joinder to be appropriate the crimes in question must be connected in some significant way. <u>Ellis v. State</u>, 622 So.2d 991, 1000 (Fla. 1993). In determining whether offenses are connected, a court may consider whether offenses are connected by temporal and geographical association, the nature of the crimes, and the manner in which they are committed. <u>Garcia v. State</u>, 568 So.2d 896 (Fla. 1990). Offenses are "related," and, therefore, triable together where they are based on the same act or transaction or on two or more connected acts or transactions. Rule 3.151(a), Florida Rules of Criminal Procedure. This Court has noted that the "connected acts or transactions" requirement of this rule means that the acts

47

joined for trial must be considered in an "episodic sense." Fotopoulos v. State, 608 So.2d 784, 789-90 (Fla. 1992); Wright v. State, 586 So.2d 1024 (Fla. 1991). See also Spencer v. State, 645 So.2d 377, 381-382 (Fla. 1994)(joinder proper where crimes are causally linked). Even where counts are properly joined, a defendant is entitled to severance of counts upon a showing that such is necessary to achieve a fair determination of the defendant's guilt or innocence. Id at 790. In the present case, the two separate criminal actions charged against Defendant were not connected in time and place. These separate acts did not constitute one criminal episode. The crimes here were entirely independent. See, e.g., Porter v. State, 671 So.2d 184 (Fla. 2d DCA 1996)(severance of offenses proper even when occurring on same day). In fact, that the defendants may have utilized items or articles taken during the Schiller episode in the Griga/Furton episode does not justify joinder. See, e.g., Jones v. State, 497 So.2d 1268 (Fla. 3rd DCA 1986)(fact that defendant used stolen car from one crime in the commission of another crime did not allow for joinder). Moreover, joinder of these offenses resulted in unfair prejudice and undermined Defendant's right to a fair determination of his guilt or innocence. This Court in Crossley, supra, recognized that the danger of improper joinder is that the evidence of one case will improperly bolster the evidence of the other cases. This Court in Garcia v. State, supra, pointed out that the purpose of severance is to prevent mutual contamination. This is precisely the danger that became reality in this cause. Indeed,

48

consolidation resulted in prejudice to Defendant both in the guilt (spillover) and penalty phases (heightened premeditation to support the CCP aggravator). There is no question that the same jury heard the entire evidence for both phases. Limitations on consolidation have been imposed in order to assure that evidence adduced on one charge will not be misused to dispel doubts on the other, and so effect a mutual contamination of the jury's consideration of each distinct charge. Paul v. State, 385 So.2d 1371 (Fla. 1980); Crossley v. State, supra. The Court in Paul noted that interests in practicality, efficiency, expense, convenience and judicial economy do not outweigh **a defendant's right to a fair determination of guilt or innocence.**[6] Defendant is entitled to a new trial.

<u>(II)</u>

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTIONS FOR RACKETEERING

There was insufficient evidence to support Defendant's convictions for racketeering. Prior to trial, defense counsel moved for dismissal of the racketeering counts from the indictment and for severance of the counts from the homicide counts. (R. 2529-2535; R. 2536-2546). Defense counsel argued that the racketeering counts should be dismissed because they were not supported by the facts in the case. The court denied the motion but deferred ruling until the judgment of acquittal motion. (T. 2146-2159; T. 2172-

---

[6]     Erroneous joinder of offenses is not rendered harmless by the fact that the evidence of improperly joined offenses would have been admissible as similar fact evidence. See Beal v. State, 620 So.2d 1015, 1017-1018 (Fla. 1st DCA 1993); Ellis v. State, supra, at 1000 (Fla. 1993); State v. Conde, supra, at 80 (citing various cases).

49

2174).   The court later denied the motions for judgments of acquittal. (R. 4148; T. 11776).   Florida enacted the Racketeer Influence and Corrupt Organization Act [RICO] in 1977. Chapter 895, Florida Statutes.   The purpose of the Act was to provide a stricter punishment for various types of illegal activity.   The Florida RICO law was patterned after the federal RICO law.   Florida courts have looked to the federal courts for guidance in construing RICO provisions. See State v. Nishi, 521 So.2d 252 (Fla. 3d DCA 1988); State v. Bowen, 413 So.2d 798 (Fla. 1st DCA 1982).   In United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the U.S. Supreme Court ruled that under the RICO Act the Government must prove the existence of an "enterprise" and the connected "pattern of racketeering activity." The Court noted that an enterprise is an entity or a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of rackeetering activity is a series of criminal acts as defined by the statute.   The Court noted that "enterprise" is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. A "pattern of racketeering activity" is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.   Proof of one of these elements does not necessarily establish the other.   In other words, "enterprise" is not the "pattern of racketeering activity," as it is an entity separate and apart from the pattern of activity in which it engages. Id. 452 U.S. at 583-584, 101 S.Ct. at 2528-2529.

In Gross v. State, 765 So.2d 39 (Fla. 2000), this Court recently adopted a "broad" approach to the definition of "enterprise," in interpreting Florida's RICO statute. This Court ruled that the State may prove the enterprise element without having to prove an ascertainable structure, that is, a structure independent of the predicate acts. Id. at 45-46. Consequently, in order to prove an enterprise, the prosecution must prove (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit. Id. at 45. A "pattern of racketeering activity" requires that the similarity and interrelatedness of racketeering activity exist and proof of a continuity of a particular criminal activity. Bowden v. State, 402 So.2d 1173, 1174 (Fla. 1981). A pattern of racketeeting activity is not established merely by proving the predicate acts. Rather, the prosecution must show that the predicate acts were related and that they amounted to or posed a threat of continued criminal activity. See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 236-240, 109 S.Ct. 2893, 2899-2901, 106 L.Ed.2d 195 (1989); Schremmer v. State, 578 So.2d 392, 393 (Fla. 3d DCA 1991). Structural continuity exists where an unchanging pattern of roles is necessary and is utilized to carry out the predicate acts of racketeering. United States v. Lemm, 680 F.2d 1193, 1199 (8th Cir. 1982). The evidence adduced at trial did not support Defendant's convictions for racketeering. There was insufficient evidence of an ongoing organization, formal or informal, and certainly little evidence that the various associates in the "organization"

51

functioned as a continuing unit. Clearly, there was no pattern of racketeeting activity established merely because the defendants were engaged in certain criminal acts. The prosecution did not show that the predicate acts were related and that they amounted to or posed a threat of continued criminal activity. The Schiller conduct occurred in November and December, 1994. The Griga/Furton conduct occurred in late May, 1995. There was certainly no temporal continuity between these offenses. Furthermore, the means, methods and circumstances were different in each of the episodes. There was no proof that the claimed "organization" functioned as a continuing unit; rather, at best the State proved random, unrelated criminal acts involving different victims, at different times and days, and with different modus operandi. There clearly was no series of related predicate acts extending over a substantial period of time. As the Supreme Court noted in H.J. Inc. v. Northwestern Bell Telephone Co., supra, continuity may be proven by a series of related predicate acts extending over a substantial period of time. However, predicate acts extending over a few weeks or months and threatening no future criminal conduct does not satisfy the requirement of continuity. Id. 492 U.S. at 242, 109 S.Ct. at 2902. This Court has ruled that continuity exists where an unchanging pattern of roles is necessary and utilized to carry out the predicate acts of racketeering. Gross v. State, supra, at 46. In this case, there was no unchanging pattern of roles. The two main predicate offenses occurred by trial and error with no discernible pattern or even similarity. Based upon

the foregoing, Defendant's convictions for racketeering should be reversed.

(III)

DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER OPENING STATEMENT

Defendant was denied a fair trial by the prosecutor's improper opening statement. At trial, the assistant state attorney made the following comments:

> MS. LEVINE: "...A planned series of awful crimes that started with choosing a sufficiently rich victim, kidnaping him, torturing them and taking everything they had, murdering them and then dismembering them to hid the evils of their crimes." (T. 4842).

> MS. LEVINE: "You see, Frank Griga and Kriztina Furton were not the first victims for these men. They started sometime earlier." (T. 4843).

> MS. LEVINE: "But the gym wasn't a good investment. And it was losing money. And draining his family assets. Reason enough for him [Mese] to join Mr. Lugo in these evil crimes." (T. 4843).

> MS. LEVINE: "They set their sights on finding victims, preying on them, and they did it by working in Mese's gym." (T. 4844).

> MS. LEVINE: "Now they needed their crew there. Their hired guns." (T. 4848).

> MS. LEVINE: "...And they carried him [Schiller], still covered, into the awaiting van. Marc had no idea what ordeal he would soon suffer, worse than one can imagine in any war crime." (T. 4851).

> MS. LEVINE: "...For four weeks, like an Iranian hostage, days without food or water." (T. 4852).

> MS. LEVINE: "It's not a good deal. It's not a bad deal. It's a deal and we make no excuse for it. This case is about the facts in evidence that show that each one of these three men are responsible for the crimes they committed. This case is not about Jorge Delgado. It is about Lugo, Mese and Doorbal. Those with the idea and

those with the know how and those with the plan.   Those
that actually did these horrible crimes." (T. 4871).

MS. LEVINE: "And they chopped out their whole faces and
then they separated those parts, and because they were
going to make a human barbecue." (T. 4878).

MS. LEVINE: "That they are guilty of each and every crime
committed against Marc Schiller.  Whether you like Marc
Schiller or not.  And his robbery, his kidnaping, and his
attempted murder.  And the burglary to his home.  And the
laundering of his property.  And the fraudulent deeds
notarized and also the most gruesome, the most gruesome,
horrible of murders." (T. 4882-4883).

The   prosecutor's   opening   statement   was   improperly
argumentative and deprived Defendant of a fair trial.  T   h   e
assistant state attorney repeatedly argued the case as if she were
presenting a closing argument.  The prosecutor's arguments during
his opening "statement" were clearly improper.   The cumulative
effect of her arguments deprived Defendant of a fair trial.   The
purpose of opening statement is a very narrow and specific one. See
United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 1082, 47
L.Ed.2d 267 (1976)(Burger, C.J., concurring).  An opening statement
may not be used to discredit a legal defense. See Taylor v. State,
640   So.2d   1127   (Fla.   1st   DCA   1994)   (prosecutor's   comment
discrediting defense of insanity as a "cop-out" reversible error).
Moreover, an opening statement may not be used by a prosecutor to
argue his case, attack the credibility of witnesses or to express
personal opinions. See First v. State, 696 So.2d 1357 (Fla. 2d DCA
1997)(prosecutor's comment in opening branding defendant's alibi
witness a "liar" argumentative, expression of personal opinion and
reversible error).   On opening statement, a prosecutor may not
attack the character of the defendant. See Traina v. State, 657

54

So.2d 1227 (Fla. 4th DCA 1995); <u>Post v. State</u>, 315 So.2d 230 (Fla. 2d DCA 1975). <u>See also</u> <u>Kearse v. State</u>, ____ So.2d ____, 25 Fla.L.Weekly S507, S515-S516 (Fla., June 29, 2000)(Anstead, J., dissenting). In the present case, the prosecutor improperly argued the "awful," "evil," "horrible," and "gruesome, the most gruesome...of murders" and nature of the crimes (T. 4842; T. 4843; T. 4871; T. 4882-4883); the fact that the defendants were "preying" on their victims (T. 4844); the fact that offense was worse than "any war crime" (T. 4851); that the offense amounted to an "Iranian hostage" situation (T. 4852); and that the defendants prepared for a "human barbecue" (T. 4878). These comments clearly amounted to argument discrediting the defense, attacking the character of the defendants and expressing personal views and opinions. The series of improper comments amounted to fundamental error. Moreover, the cumulative effect of the prosecutor's comments cannot be considered harmless error. This Court is not considering here a single, isolated remark. Rather, the record shows **a pervasive and improper argument** during opening statement. Thus, this case is clearly distinguishable from "single-remark" cases. See <u>Heath v. State</u>, 648 So.2d 660, 663 (Fla. 1994)(single remark in opening); <u>State v. Marshall</u>, 476 So.2d 150 (Fla. 1985)(single comment on defendant's failure to testify); <u>Dailey v. State</u>, 594 So.2d 254, 257-58 (Fla. 1992)(single comment on right to remain silent); <u>Dixon v. State</u>, 630 So.2d 1242, 1243 (Fla. 3d DCA 1994)(single comment by witness); <u>Duest v. State</u>, 462 So.2d 446, 448 (Fla. 1985)(single incident where prosecutor insulted defense counsel); <u>Mabery v. State</u>, 303

55

So.2d 369, 370 (Fla. 3d DCA 1974), cert. den., 312 So.2d 756 (Fla. 1975)(single remark concerning defendant's duty to prove his innocence). Defendant is entitled to a new trial.

### (IV)

DEFENDANT WAS DENIED A FAIR TRIAL WHERE COUNSEL FOR CO-DEFENDANT DOORBAL WAS ABLE TO QUESTION WITNESSES ADVERSELY TO DEFENDANT

Defendant was denied a fair trial where counsel for co-defendant Doorbal was able to question witnesses adversely to Defendant. Prior to trial, Defendant filed a motion for severance of defendants. (R. 2514-2528). Defendant also joined a motion to preclude dual juries. (R. 2562-2564). At a pretrial hearing, defense counsel argued that joinder of Lugo and Doorbal would result in an unfair trial for Lugo. An argument was also made against dual juries hearing the same evidence. The court denied the motions. (T. 2160-2161; T. 2174; T. 2179-2180; T. 2198-2199; T. 2294-2315). At trial, counsel for co-defendant Doorbal was allowed to question witnesses adversely to Defendant's interests. In McCray v. State, 416 So.2d 804 (Fla. 1982), this Court set forth the general principles of joinder and severance, noting that a trial court should order severance whenever necessary to promote a fair determination of the guilt or innocence of one or more defendants. Id. at 806(citing Rule 3.152(b), Florida Rules of Criminal Procedure). This Court recognized that a fair determination may be achieved when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's

acts, conduct and statements and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence. Id. See also Johnson v. State, 720 So.2d 232, 236 (Fla. 1998). In the present case, counsel for co-defendant Doorbal engaged in repeated cross-examination of witnesses which wholly undermined Defendant's case. In effect, counsel for Doorbal played the part of a second prosecutor in the court proceedings, reinforcing the prosecution's evidence against Defendant. The antagonistic posture assumed by co-defendant Doorbal to Defendant at trial rendered the trial proceedings unfair. The device of separate juries employed by the trial court did not protect Defendant's rights because counsel for Doorbal questioned the witnesses before both juries reviewing the evidence and testimony.

At trial, during the cross-examination of Attila Weiland, counsel for Doorbal was allowed to question the witness about the fact that Lugo took the lead in discussing business with Griga and that Lugo had given the laptop computer gift to Griga (T. 5068-5069). During the cross-examination of Beatrice Weiland, counsel for Doorbal was allowed to question the witness about the fact that Doorbal looked up to Lugo; that Doorbal conceded that everything he had ever got or had was because of Lugo; that Doorbal he loved Lugo and that as between both defendants Lugo was more intelligent; that Lugo was Doorbal's boss; that Doorbal took Lugo's lead in coming up with ideas (T. 5121-5124); that Doorbal was learning computers from Lugo (T. 5125); and that Lugo had free access to Doorbal's

apartment and that Lugo had his business items in Doorbal's apartment (T. 5129-5130). During the cross-examination of Det. Deegan, counsel for Doorbal questioned her as to the fact that she believed that Jorge Delgado, Daniel Lugo and Orlando Caceres masterminded the incident with Mark Schiller. (T. 5236). During the cross-examination of Det. McColman, counsel for Doorbal questioned the detective about certain real estate documents and other papers seized in Doorbal's apartment pertaining to Daniel Lugo. (T. 5669-5670; T. 5673-5674). Counsel for Doorbal questioned the detective about Lugo's federal probation. (T. 5674). He also pointed out that no passports contained Doorbal's photograph in contrast to Lugo's passports. (T. 5675). During the cross-examination of Det. Hoadley, counsel for Doorbal questioned the detective about the dart found in Doorbal's apartment and the fact that a dart gun was found in Lugo's apartment. (T. 5764-5765). During the cross-examination of Manuel Salgar, counsel for Doorbal questioned Mr. Salgar about his contacts with Lugo at Schiller's residence and the fact that Salgar only picked out Lugo's photograph when shown photographic displays by the police. (T. 6271-6272). During the cross-examination of Det. Hernandez, counsel for Doorbal questioned the detective about Susan Canfield's identification of Lugo as the person she saw sitting at poolside at Schiller's residence. (T. 6300-6301). During the cross-examination of Sgt. Santos, counsel for Doorbal questioned the sergeant about items of evidence found in the Lugo residence, re-emphasizing that Griga's driver's license, the $30,000 check to Delgado, a napkin

belonging to Griga, account information on Griga and the various firearms, syringes, the substance Rompun and the bloody clothes were found in Lugo's apartment. (T. 6520-6525; T. 6529-6537; T. 6543-6546; T. 6548). Counsel also asked Sgt. Santos about a letter from Investigators, Inc. and Marcelo Schiller versus Mese, Mese & Associates, Mese, Delgado, Lugo, Caceres and Torres. (T. 6540). During the cross-examination of Marcelo Schiller, counsel for Doorbal asked Schiller about whether Delgado and Lugo fraudulently put some of Schiller's property in their names or the names of other persons. (T. 6878). Doorbal's counsel asked Schiller about the fact that he recognized Lugo's voice during his captivity. (T. 6884-6885). Counsel asked Schiller about his identification of Lugo in a photographic line-up. (T. 6889). Doorbal's attorney had the judge read to the jury documents implicating Lugo in Schiller's captivity (Exhibits 861, 862 and 863), over the objections by Lugo's attorney. (T. 6895-6897). Counsel for Doorbal later asked Schiller about the fact that he believed Lugo, Mese and Delgado were the master-minds of the crime. (T. 7053-7054). Doorbal questioned the private investigator about the papers found in Lugo's office at Mese's business. (T. 7298-7302; T. 7306-7310). He questioned Du Bois about the fact the the demand letters were made in reference to Lugo, among others. He also brought out that Mese said he represented Lugo, but not Doorbal. (T. 7314; T. 7315). During the cross-examination of Lillian Torres, counsel for Doorbal questioned her about Lugo's involvement and knowledge about the stock market (T. 7555-7557); about the fact that Lugo stayed with

59

Doorbal for a while (T. 7558-7559); about the fact tha Lugo "used,"
"deceived," and "betrayed" her when he asked her to sign documents
(T. 7559-7560); about the fact the Lugo was a strong, self-
confident, persuasive individual- a leader (T. 7561-7562). Counsel
for Doorbal questioned Ilma Avila of Central Bank concerning checks
written by Lugo. Counsel asked her to compare Doorbal's signatures
and had her conclude that Doorbal's endorsement signatures were
different. (T. 7726-7730). Counsel for Doorbal questioned Mario
Sanchez about a bracelet with Lugo's name on it. (T. 7936). He
asked him about Sanchez's description of Lugo as the "Big Boss
Man." (T. 7987-7988). Counsel for Doorbal questioned Stevenson
Pierre about the fact that Lugo could have worn blue denim shirt in
evidence. (T. 8301). He questioned Pierre about Pierre's
friendship with Lugo and Lugo's post-arrest phone calls. (T. 8326-
8329). Counsel questioned Pierre about Lugo's alleged involvement
in medicaid fraud. (T. 8340-8341). He questioned Pierre about the
similarity of the signatures of Lugo and Doorbal. (T. 8369-8370).
Counsel questioned Michael Ovedia, owner of a mailbox business,
about Lugo's authorization for people and institutions to get mail
at the business. (T. 8566-8567). He questioned him about the fact
that a box for Schiller was opened by Lugo in March, 1994. (T.
8573-8574). Counsel for Doorbal questioned Frank Murphy, the
Merrill Lynch stockbroker, about Lugo's assertiveness and
persuasiveness. (T. 8789). He questioned Murphy about Lugo's
ability to convince Murphy to open an improper account. (T. 8791).
He asked Murphy about Lugo's familiarity with stock trading. (T.

8799).   He questioned Murphy about Lugo's $1,000,000 investment into the account. (T. 8801).   Counsel for Doorbal questioned Christopher McFarland, the forensic accountant, about Lugo's payments to Delgado and others and his control over the accounts McFarland analyzed. (T. 9007-9008). Counsel for Doorbal questioned Elena Petrescu about Lugo's ownership of a gun, Lugo's purchase of surveillance equipment, Lugo's gifts to Petrescu, Lugo's knowledge of the stock market, Lugo's probations status, Lugo's request that Petrescu act as his alibi for Schiller, Lugo's enlistment of Petrescu help on the Griga matter, Lugo's kidnapping of the Hungarian couple, Lugo's instructions to Petrescu on how to act with the police upon her return from the Bahamas, and Lugo's manipulative behavior and lies. (T. 9835-9925).   Counsel for Doorbal questioned Virginia Jackson about her identification of Lugo as the purchaser of certain items at Home Depot in May, 1995. (T. 10209-10210).  Counsel for Doorbal questioned Mario Gray about Lugo's persuasive skills. (T. 10511-10512).   He asked Gray about Lugo's attempt to recruit people for Medicare fraud. (T. 10513). Counsel questioned Gray about the fact that Lugo was the "boss." (T. 10522).   And he asked Gray about his criminal conviction as a result of his relationship with Lugo. (T. 10526-10527).   Counsel asked him if Gray had been told by Lugo not leave fingerprints behind at the warehouse. (T. 10559-10561).   During the cross-examination of Jorge Delgado, counsel for Doorbal questioned Delgado about Lugo's role in picking up Schiller's vehicle (T. 11233), in informing Delgado about Schiller's business activities

61

(T. 11234), in establishing the watch shifts on Schiller (T. 11235), in informing Delgado about the amounts to be paid to various individuals (T. 11235-11236), in informing Delgado about Schiller's car accident (T. 11236-11237), and in placing Delgado in jeopardy by directing that he negotiate with Gene Rosen on the sale of the deli (T. 11237-11238). Counsel also asked Delgado about the fact that Lugo kept much of his belongings in Doorbal's apartment (T. 11264-11265), that Lugo informed him about the attempted murder of Schiller (T. 11320-11321), and that Lugo paid him large quantities of money (T. 11325-11329). Counsel asked Delgado about Lugo's probationary status. (T. 11338-11339). Counsel questioned Delgado about Lugo's promises to supply Delgado with an alibi and a lawyer. (T. 11345).

It is apparent from the foregoing that Defendant Lugo was denied a fair trial by co-defendant's questioning of witnesses adversely to Defendant.[7] The trial court should have granted severance of the parties below. The repeated and prejudicial questioning of witnesses by Doorbal's counsel pervaded the entire trial and amounted to a "second prosecutor" in the proceedings. By denying severance, "the trial court forced Defendant to stand trial before two accusers: the State and his co-defendant." Crum v. State, 398 So.2d 810, 811-12 (Fla. 1981). See also Rowe v. State, 404 So.2d 1176 (Fla. 1st DCA 1981). The situation among the defendants at trial deteriorated immediately. Defendant Lugo was

---

[7]    Even the trial court acknowledged the inimical nature of co-defendant Doorbal's position in the case vis-a-vis Defendant. (T. 11714; T. 11857).

labelled the mastermind by Doorbal and was linked repeatedly to the State's evidence by recapitulation and reiteration.   Counsel for Doorbal was, in effect, "an echo" of the prosecution on all major points of testimony and evidence against Defendant.   This duplication of effort by counsel for Doorbal developed into a second front with which Defendant had to contend throughout the trial.  Compare Daniels v. State, 634 So.2d 187 (Fla. 3d DCA 1994) (no basis for severance due to antagonistic defenses where defendants did not blame each other and all defendants worked closely together with common strategy).   Defendant is entitled to a new trial.

(V)

DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF EVIDENCE CONCERNING DEFENDANT'S CONVICTION AND PROBATION IN A FEDERAL CASE

During the course of Detective McColman's direct examination, the State sought to introduce evidence of Defendant Lugo's conviction and probation termination in federal court.  The defense objected. (T. 5539-5540).  The State asserted that the evidence was relevant on the issue of money laundering.  The court ruled that the evidence was admissible and relevant. (T. 5540).  At trial, the State introduced evidence pertaining to Lugo's federal probation and the termination of the probation. (T. 5566-5571; T. 7225; T. 7226).   Subsequently, prosecutor questioned Det. Romagni about whether the checks found at Sun Gym that were made payable to Lugo were ever shown to Lugo's federal probation officer. (T. 5953). The State renewed the line of questioning concerning Lugo's federal

63

prior on the redirect examination of Edward DuBois. The prosecutor was able to delve into the facts of the federal conviction. (T. 7417; T. 7421). The prosecutor questioned Lugo's ex-wife about his prior prison term. (T. 7537). The check payable to the U.S. Courts was mentioned by the Central Bank manager and the State's forensic accountant. (T. 7699-7700; T. 8934; T. 8988-8989). The prosecutor questioned Frank Murphy, a Merrill Lynch stockbroker, about Lugo's probation. (T. 8718). Subsequently, the prosecutor called Dan Westlake, U.S. Probation Officer, who testified about Lugo's federal criminal conviction and ensuing probation. (T. 9102-9104; T. 9127-9140; T. 9149-9160; T. 9164-9167; T. 9171-9189). Elena Petrescu testified that Lugo told her he was on probation and his convicted status. (T. 9674-9675; T. 9865-9866). Jorge Delgado testified about Lugo's probation. (T. 11055). Introduction of evidence pertaining to Defendant's federal conviction and probation was improper and prejudiced Defendant. It is abundantly clear that testimony concerning Defendant's federal case was not sporadic or isolated, but sustained and continual. Indeed, the matter became a feature of the trial. The rule in Florida, a defendant may be asked whether he has been convicted of a crime and, if so, how many times. The prosecution's inquiry along this line must otherwise stop. Leonard v. State, 386 So.2d 51 (Fla. 2d DCA 1980)(citations omitted). See also Mead v. State, 86 So.2d 773, 774 (Fla. 1956); Lockwood v. State, 107 So.2d 770, 772 (Fla. 2d DCA 1959); Gavins v. State, 587 So.2d 487, 489 (Fla. 1st DCA 1991). Questions about what crimes these convictions involved or any of the particular

64

facts surrounding the offenses are not allowed. See Anderson v. State, 546 So.2d 65, 67 (Fla. 5th DCA 1989)(citing Jackson v. State, 498 So.2d 906, 909 (Fla. 1986); Botte v. Pomeroy, 497 So.2d 1275, 1280 (Fla. 4th DCA 1986), rev. den., 508 So.2d 15 (Fla. 1987)). See also Meyers v. State, 561 So.2d 1304, 1305 (Fla. 3d DCA 1990)(prosecutor "exceeded all permissible bounds by repeatedly asking the defendant about the details of his prior convictions"). See also Section 90.610(1), Florida Statutes. Defendant in this case did not even testify. Moreover, evidence or testimony concerning a collateral crime is inadmissible. Under Section 90.404(2)(a), Florida Statutes, evidence of other crimes is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The State argued below that the federal case was connected through money laundering. However, there was no need to show that Defendant had been convicted in federal court and had been placed on probation in order to prove that he had utilized certain appropriated funds. Certainly, there was no need to explore the particulars of the prior offense whatsoever. By its very nature, other crimes evidence is presumptively harmful. Holland v. State, 636 So.2d 1289, 1293 (Fla. 1994); Jackson v. State, 627 So.2d 70, 71 (Fla. 5th DCA 1993). Even where the court determines that other crimes evidence is relevant to the charged crime, the court may still exclude the evidence on the grounds that its prejudicial impact outweighs its probative value. Williams v. State, 621 So.2d 413,

65

415 (Fla. 1993); State v. Richardson, 621 So.2d 752, 755 (Fla. 5th DCA 1993)(citing Henry v. State, 574 So.2d 73, 75 (Fla. 1991), State v. Vazquez, 419 So.2d 1088, 1090 (Fla. 1982), and Straight v. State, 397 So.2d 903, 909 (Fla.), cert. den., 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981)).  Unfair prejudice results where the prosecution makes the collateral offense a feature instead of an incident of the trial. State v. Richardson, supra, at 755 (citing Heiney v. State, 447 So.2d 210, 213 (Fla.), cert. den., 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984)); Bush v. State, 690 So.2d 670 (Fla. 1st DCA 1997).  It is impermissible to make a defendant's involvement in the collateral crime a main "feature" or theme in the prosecution of the case-in-chief. Williams v. State, 117 So.2d 473 (Fla. 1960); Ashley v. State, 265 So.2d 685 (Fla. 1972); Matthews v. State, 366 So.2d 170 (Fla. 3d DCA 1979).  It is important to note that in this case the trial court did not instruct the jury on the use of the collateral crimes evidence. Additionally, Defendant did not adduce any part of the collateral evidence.  Clearly, introduction of Defendant's federal conviction and probation denied Defendant's right to a fair trial and his right to due process.  Defendant is entitled to a new trial.

(VI)

THE TRIAL COURT ERRED WHEN IT PROHIBITED DEFENSE COUNSEL FROM QUESTIONING DEFENDANT'S EX-WIFE ABOUT THE FACT THAT SHE APPEARED AT THE STATE ATTORNEY'S OFFICE WITH A LAWYER

During Lillian Torres' cross-examination, defense counsel tried to ask Ms. Torres about the fact that she appeared at the State Attorney's Office under subpoena with her lawyer.  The State

66

asked for a sidebar objecting to this line of questioning. The court ruled that defense counsel could only ask whether she appeared pursuant to subpoena and understood that she would not be prosecuted as long as she told the truth. (T. 7562-7573). Later, the prosecutor questioned Torres about the concepts of perjury and telling the truth. (T. 7578-7579). The court did not permit defense counsel to ask Torres about the fact she was there with her lawyer who had told her she could have faced charges. (T. 7580-7581). The order of the trial court prohibiting defense counsel from fully cross-examining Ms. Torres on this matter was error. It is permissible to inquire of a witness about any pending criminal case, or potential criminal liability, as part of cross-examination. See Jean-Mary v. State, 678 So.2d 928 (Fla. 3d DCA 1996)(citing Breedlove v. State, 580 So.2d 605, 608 (Fla. 1991). This rule applies even where there is no specific evidence of any agreement between the witness and the state. Jean-Mary, supra, at 929. An integral part of a full and accurate cross-examination on this point involved the fact that Ms. Torres visited the State Attorney's Office with her lawyer, who had informed her of potential criminal charges. The Sixth Amendment to the United States Constitution provides the "accused shall enjoy the right... to be confronted with the witnesses against him." This right is likewise recognized under Article I, Section 16, Florida Constitution. A primary interest secured by the confrontation clause is the right of cross-examination. Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The

67

standard in reviewing a limitation on cross-examination is whether the excluded testimony would have given the jury a different impression of the witness' credibility. United States v. De Parias, 805 F.2d 1447, 1452 (11th Cir. 1986), cert. den., 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987).  The unconstitutional limit of cross-examination is not cured simply by acknowledging that other means of impeachment were possible and permitted. McKinzy v. Wainwright, 719 F.2d 1525 (11th Cir. 1983).  The purpose of cross-examination is to disprove, weaken or modify the testimony of the witness on direct examination. See Coco v. State, 62 So.2d 892 (Fla. 1953).  Cross-examination may not be limited simply to narrow facts elicited on direct examination.  Considerable latitude should be permitted on cross-examination. Padgett v. State, 64 Fla. 389, 59 So. 946 (1912).  Cross-examination may be utilized to demonstrate improper bias. Hair v. State, 428 So.2d 760, 762 (Fla. 3d DCA 1983).  Bias is never classified as a collateral matter which lies beyond the scope of inquiry. United States v. Robinson, 530 F.2d 1076, 1079 (D.C. Cir. 1976)(quoting 2 Weinstein's Evidence Para. 607[03], at 607-17 (1975)).  The credibility, bias or prejudice of a prosecution witness should be of paramount concern to a jury in the exercise of its fact-finding function and cross-examination in these areas should not be unduly restricted. See, e.g., Lutherman v. State, 348 So.2d 624 (Fla. 3d DCA 1977); D.C. v. State, 400 So.2d 825 (Fla. 3d DCA 1981).  By prohibiting the defense from cross-examining Torres as to her possible bias amounted to a denial or significant diminution of Defendant's

68

constitutional right of confrontation and his right to full cross-examination. Based on the foregoing, Defendant is entitled to a new trial.

### (VII)

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL AND REQUEST FOR DISCOVERY CONCERNING THE PROSECUTION'S FAILURE TO DISCLOSE VICTIM SCHILLER'S FEDERAL CRIMINAL INVESTIGATION AND CASE AND THE PROSECUTION'S FAILURE TO DISCLOSE AN INVESTIGATION INVOLVING THE MEDICAL EXAMINER

The trial court erred in denying Defendant's motion for new trial and request for discovery concerning the prosecution's failure to disclose Marcelo Schiller's federal criminal investigation and pending indictment and the prosecution's failure to disclose an investigation involving the medical examiner who testified at trial. At trial, Marcelo Schiller was asked about his Medicare business, the legality of his money, and his possible involvement in Medicare fraud. He denied any fraud or illegality. (T. 6875-6876; T. 6949-6953; T. 6983-6984; T. 7002-7003; T. 7020-7030). Indeed, at one point, when counsel for Lugo tried to ask Schiller about why the defendants would try to get him to confess to Medicare fraud the prosecutor objected to the line of questioning and the court prohibited further questioning on the matter. (T. 6953). During closing argument, the prosecutor made the following comments about Schiller's supposed Medicare fraud:

MS. LEVINE: "George Delgado he tells you Lugo lured him in and said, you know, you're owed $200,000. I looked at your books. Schiller owes you $200,000. That made Delgado really mad. I got cheated, plus now I've got a Medicare fraud problem because George Delgado found out what was going on from Danny Lugo. Danny Lugo told him he was committing Medicare fraud.

69

Marc Schiller, to this day, I don't know if he's committing Medicare fraud. And, frankly, I don't care. Because you know what? Even if he was the lowest of drug dealers, if he's the lowest of low, you cannot take the law into your own hands and treat somebody like this and kill them or try and kill them because they either owe you money or you think they got their money illegally." (T. 12461).

MS. LEVINE: "The cross examination of George Delgado was relatively short, for as long as he testified on direct... So they ask him little pieces of information that basically has nothing to do with the crimes. Like you're being investigated for Medicare fraud. Who cares? That's a federal government problem. You can be on that jury, if you want. This case is not about Medicare fraud. It is not about Marc Schiller's Medicare fraud or George Delgado's Medicare fraud. Don't let somebody make that the issue." (T. 12535).

After the trial in this cause, Defendant filed a motion for new trial. The defense maintained that Schiller was arrested by federal authorities outside the state courtroom right after his testimony at Defendant's sentencing hearing. The defense also argued that the State knew about the existing federal investigation into Schiller's Medicare fraud and his pending federal indictment and failed to inform defense counsel. Mr. Fleisher, counsel for Mese, noted that Jeffrey Tew, counsel for Schiller, was prepared to testify that in 1995 he had discussed with the prosecutor, Gail Levine, the unfreezing of Schiller's funds and had been told that the money was "dirty." The defense requested an opportunity to engage in discovery to determine the extent of the State's information and knowledge of Schiller's Medicare fraud investigation so as to perfect a Brady claim concerning a material witness. Defense counsel also argued that the State failed to disclose an investigation involving Dr. Mittleman, the Medical

70

Examiner who testified at trial. (T. 13333-13348; T. 13350-13351; T. 13353-13365). The prosecutor responded that Dr. Mittleman had been the subject of a State Attorney investigation and an administrative investigation. According to Ms. Levine, Dr. Mittleman had been cleared in the criminal investigation and the administrative investigation had not resulted in any action. (T. 13348-13350; T. 13368-13369). Ms. Levine also indicated that she was aware of the federal investigation insofar as her questioning of Jorge Delgado, who implicated Schiller in Medicare fraud. Delgado told Ms. Levine that Schiller was involved in Medicare fraud and she shared that information with the federal authorities. Ms. Levine explained that Schiller denied any wrongdoing to her and she turned over records to the federal government. (T. 13365-13368). The trial court found that the State did not commit a discovery violation with regard to the Schiller matter. The court further concluded that even if there were a discovery violation the violation was trivial and non-prejudicial. The court noted that Schiller was cross-examined on the matter and Delgado was examined on the matter. The court did not find anything that would undermine the verdict in the case. Insofar as the Mittleman issue, the court assumed there had been a discovery violation, but that the violation was inadvertent and trivial, especially in light of Mittleman's minimal involvement in the case. The court denied the motions for new trial. (R. 5726-5727; T. 13370-13372).

In order to establish a violation of the <u>Brady</u> rule,[8] requiring disclosure of favorable evidence to the accused if it is material to guilt or punishment, a defendant must prove (1) that the state possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could he have obtained the evidence himself with any reasonable diligence; (3) that the prosecution suppressed favorable evidence; and (4) that had the evidence been disclosed to the defense a reasonable probability existed that the outcome of the proceedings would have been different. <u>Downs v. State</u>, 740 So.2d 506, 513 (Fla. 1999) (quoting <u>Melendez v. State</u>, 718 So.2d 746, 748 (Fla. 1998)). <u>See also</u> <u>Bryan v. State</u>, 748 So.2d 1003, 1008 n.3 (Fla. 1999); <u>Routly v. Singletary</u>, 33 F.3d 1279, 1285 (11th Cir. 1994); <u>United States v. Massey</u>, 89 F.3d 1433 (11th Cir. 1996); <u>United States v. Fernandez</u>, 136 F.3d 1434 (11th Cir. 1998); <u>Sims v. Singletary</u>, 155 F.3d 1297 (11th Cir. 1998).[9]  In the present case, there is no question that (1) the state possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could he have obtained the evidence himself with any reasonable diligence; (3) that the prosecution suppressed favorable evidence; and (4) that had the evidence been disclosed to the defense a

---

[8]    <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[9]    Impeachment evidence as well as exculpatory evidence falls within the <u>Brady</u> rule. <u>Breedlove v. State</u>, 580 So.2d 605, 606 (Fla. 1991)(citing <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)); <u>Way v. State</u>, 760 So.2d 903, 910 (Fla. 2000).

reasonable probability existed that the outcome of the proceedings would have been different.[10]   At a minimum, the court should have permitted defense counsel to conduct preliminary discovery on the matter in order to properly perfect the record on the issues outlined in Downs, supra. After all, the defense should have been permitted an opportunity to demonstrate whether, in fact, suppression of the evidence occurred.   While defense counsel had some knowledge about Schiller's possible medicare fraud activities [as evidenced by their examinations at trial], the defense had no knowledge about the impending federal criminal case and indictment. It defies logic to suggest that the State Attorney's Office had no knowledge of this matter, especially where Schiller was arrested outside the courtroom shortly after the prosecution had finished with his testimony in the case.   Indeed, at the hearing below the prosecutor acknowledged that she was aware of the federal investigation insofar as her questioning of Jorge Delgado, who implicated Schiller in Medicare fraud.   Apparently, Delgado told Ms. Levine that Schiller was involved in Medicare fraud and she shared that information with the federal authorities.[11]   It is

---

[10]   Indeed, the Schiller federal criminal investigation and impending indictment were proper areas for cross-examination since his denials were arguably perjury. See, e.g., United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995). See also United States v. Arnold, 117 F.3d 1308 (11th Cir. 1997); Routly v. State, 590 So.2d 397 (Fla. 1991); Phillips v. State, 608 So.2d 778 (Fla. 1992); Craig v. State, 685 So.2d 1224 (Fla. 1997)(knowing use of perjury).

[11]   A prosecutor has an obligation to learn of any favorable evidence known to the others acting on the government's behalf in the case including the police. Way v. State, 760 So.2d 903, 910 (Fla. 2000)(citing Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

clear that evidence of Schiller's federal case and impending indictment would probably have affected the outcome of the proceedings. Schiller, after all, was the **main witness of the prosecution**. Schiller was a witness, in fact, who had not struck a side deal with the prosecution, as had Jorge Delgado. Any evidence detracting from Schiller's credibility would have had an obvious impact on the deliberating jury, both in the guilt and penalty phases. The Schiller incident was part and parcel of the prosecution's case as the State vehemently objected to any severance thereof. [See Issue I, supra].[12] Likewise, the State's failure to reveal the Mittleman investigation was a <u>Brady</u> violation. There is no question that the State had knowledge of the Mittleman investigation in view of the fact that the State Attorney's Office itself investigated Mittleman. Despite the trial court's view of Mittleman's testimony, Dr. Mittleman gave critical testimony concerning Furton's awareness that she was to receive an injection and her mental disarray or psychic horror. Dr. Mittleman also determined that causes of death in this case, describing substantial blunt trauma and the use of Xylazine, as well as exsanguination and/or strangulation. Based on the foregoing, Defendant's convictions should be reversed. At a minimum, this

---

[12] The question with respect to a <u>Brady</u> claim is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a "fair trial," understood as a trial resulting in a verdict worthy of confidence. <u>Sims v. Singletary</u>, 155 F.3d 1297, 1311 (11th Cir. 1998)(citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

Court should remand for full discovery on the <u>Brady</u> issues and a comprehensive hearing as requested by defense counsel below.

(VIII)

DEFENDANT WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S IMPROPER CLOSING ARGUMENT

Defendant was denied a fair trial by the prosecutor's improper closing argument. A prosecutor is charged with the responsibility of seeking justice not to obtain convictions. <u>See</u> <u>Cochran v. State</u>, 280 So.2d 42, 43 (Fla. 1st DCA 1973). In <u>Thompson v. State</u>, 235 So.2d 354, 357 (Fla. 3d DCA 1970), the Third District cited with approval this Court's opinion in <u>Stewart v. State</u>, 51 So.2d 494 (Fla. 1951), wherein it was noted that a prosecutor is clothed with quasi judicial powers and it is consonant with the oath they take to conduct a fair and impartial trial. <u>See also</u> <u>Washington v. State</u>, 86 Fla. 533, 98 So. 605, 609 (1923)(prosecuting attorney should not consider himself "merely as attorney of record for the state, struggling for a verdict").

During closing argument in the guilt phase, the prosecutor made the following improper arguments:

> MS. LEVINE: "You know, probably if you had a chance to think about this case, you were sitting around and talking with your friend, it would sound like a real work of fiction, almost a bad television movie. Although the blunders, all the gratuitous violence, who would think that these horrible things could happen in our world? Such horrible things, how could they be real? Such evil from a man, a man that would go to any length to get anything he wanted and only think of himself, just himself, and his own personal wealth." (T. 12456).

* * *

> MS. LEVINE: "And you don't have to like Marc Schiller. And, frankly, this case is-- isn't about Medicate fraud,

75

and it's not about Marc Schiller.  It's about Frank and
Krisztina, and how this defendant got away with doing
what he did to Marc Schiller and then decided to do it to
Frank and Krisztina.  Frankly, he was hell on wheels."
(T. 12462).

* * *

MS. LEVINE: "They have their victim.  It's a human life.
It doesn't matter, it's just Marc Schiller.  Wouldn't
treat a dog like this, but it's just Marc Schiller.  We
don't know where his money came from, so we don't have to
like him.  We can treat him like garbage... And the
torture starts.  Like an Iranian hostage, he's hog tied."
(T. 12464).

The foregoing comments were improper and rendered Defendant's

trial unfair.  The prosecutor unfairly attacked Defendant's

character.  The prosecutor's clear assaults on Defendant by noting

the "gratuitous violence," the "horrible things.. in our world,"

the "evil" from Lugo and describing Lugo as "hell on wheels" were

impermissible character attacks.  It is improper for a prosecutor

to attack the character of a defendant.  See Perez v. State, 689

So.2d 306, 307 (Fla. 3d DCA 1997).  See also Green v. State, 427

So.2d 1036 (Fla. 3d DCA), rev. den., 438 So.2d 834 (Fla. 1983);

Peterson v. State, 376 So.2d 1230 (Fla. 4th DCA 1979)(improper for

prosecutor to refer to "pushers," and the "slime" in which they

dwell).  Moreover, these comments were employed simply to appeal to

the fears and prejudices of the jury and were highly inappropriate,

inflammatory and prejudicial.  It is undeniable that the State

improperly injected matters outside of the proper "scope of the

jury's deliberations" and "violated the prosecutor's duty to seek

justice." Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985).  In

addition, these comments constituted error because they invited the

76

jury to convict Defendant for a reason other than his guilt of the crimes charged. See Northard v. State, 675 So.2d 652 (Fla. 4th DCA 1996)(citing Bass v. State, 547 So.2d 680 (Fla. 1st DCA), rev. den., 553 So.2d 1166 (Fla. 1989), and Ryan v. State, 457 So.2d 1084 (Fla. 4th DCA 1984), rev. den., 462 So.2d 1108 (Fla. 1985)).

The prosecutor made the following additional improper remarks:

> MS. LEVINE: "The people that did this are guilty of first degree murder, and we know who did it. It's this man. Daniel Lugo, the leader. He led this series, this terror of crimes." (T. 12458).

The foregoing comments were improper and rendered Defendant's trial unfair. The argument impermissibly highlighted the prosecutor's personal belief as to Defendant's guilt and by extension as to the credibility of the State's witnesses when counsel stated: "[W]e know who did it. It's this man." A prosecutor may not express his personal belief in the guilt of a defendant. See Harris v. State, 414 So.2d 557 (Fla. 3d DCA 1982). Similarly, a prosecutor may not express his personal confidence in the veracity of a State's witness. Pacifico v. State, 642 So.2d 1178, 1183-1184 (Fla. 1st DCA 1994); Bass v. State, supra, at 682; George v. State, 539 So.2d 21 (Fla. 5th DCA 1989). See also Ruiz v. State, 743 So.2d 1, 5 (Fla. 1999)(prosecutor may not imply that if defendant were not guilty he would not be in trial). This is so because a jury can be expected to attach considerable significance to a prosecutor's expressions of personal beliefs. Pacifico v. State, supra (citing Singletary v. State, 483 So.2d 8, 10 (Fla. 2d DCA 1985)).

77

The prosecutor made the following additional improper arguments:

> MS. LEVINE: "Imagine with tape over your mouth and a hood over your head, imagine it on Krisztina. Not on yourselves, on Krisztina and what Krisztina is going through." (T. 12496).

The foregoing comments were improper and rendered Defendant's trial unfair. The argument was obviously employed to inflame the passions of the jurors so that their verdict would reflect an emotional response to the crime. See Bertolotti v. State, supra, at 134. The prosecutor below invited jurors to place themselves in the place of the victim when deliberating on this case. This invitation improperly injected inflammatory and prejudicial matters for the jury's decision and amounted to a "golden rule" argument. See Jackson v. State, 522 So.2d 802, 809 (Fla. 1988); Garron v. State, 528 So.2d 353 (Fla. 1988); Rhodes v. State, 547 So.2d 1201 (Fla. 1989); Urbin v. State, 714 So.2d 411 (Fla. 1998).

The prosecutor made the following additional improper comments:

> MS. LEVINE: "And who's the biggest liar? Daniel Lugo. The biggest. He lies to his probation officer and he lies well, because that probation officer buys it. That's pretty experienced guy, a guy that's been doing that kind of work for a long time." (T. 12480).
>
> MS. LEVINE: "You want to know who's a liar? Luis Lugany (phonetic) with his world identity card. Luis Lugany with his Celan passport. Joseph D. Lugo, with his world service authority passport... And Daniel J. Lugo with his American passport." (T. 12540).
>
> MS. LEVINE: "But Lugo, he's a great liar. He can lie to his wife. He can lie to federal probation. He can lie to Sabina. He can lie to Frank Murphy. He can lie to the bank. He can lie to Manuel Salgar, David Jacobson, Frank Fawcett, Judi Bartusz, Eszter Lapolla, the people from Lakes Postal.. He can lie to the man from La Gorce

78

Properties, Camillo Blanco, the life insurance people. He can lie to his ex-wife, the passport office. He can lie to anybody he wants. He's a great liar. And he is one very guilty killer." (T. 12547).

MS. LEVINE: "Daniel Lugo is the reason for these crimes. He is the crimes. Everything is his plan. Everything is his thought and he has a special way of getting people to do things for him. He is the liar." (T. 12570).

The foregoing comments were improper and rendered Defendant's trial unfair. The prosecutor's repeated references to Defendant as a "liar" were clearly improper. In Bass v. State, supra, at 682, the First District noted that exhorting a jury to convict the accused because he lied constitutes an open invitation to the jury to convict a defendant for a reason other than his guilt. The prosecutor obviously invited jurors to determine Defendant's guilt because he lied. In Gore v. State, 719 So.2d 1197 (Fla. 1998), this Court specifically condemned this type of argument. Id. at 1200-1201. See also Ruiz v. State, supra, at 5-6.

Where defense counsel fails to object at trial to improper prosecutorial comments, fundamental error may arise where the comments go to the foundation or merits of the cause of action. See Gonzalez v. State, 588 So.2d 314, 315 (Fla. 3d DCA 1991). An appellate court may review the prosecutor's statements under the concept of fundamental error. Bonifay v. State, 680 So.2d 413, 418 (Fla. 1996). This Court may review the record and take into consideration the context of the closing argument. See Crump v. State, 622 So.2d 963, 972 (Fla. 1993). The appellate courts in this state have reversed numerous cases based upon a fundamental error arising from improper prosecutorial arguments. See

Porterfield v. State, 522 So.2d 483, 487 (Fla. 1st DCA 1988)(prosecutor's allusions to defendant's failure to testify subject to review even without contemporaneous objection); Rosso v. State, 505 So.2d 611, 612-613 (Fla. 3d DCA 1987)(prosecutor's statements regarding defendant's failure to testify and derogatory comments concerning defendant's insanity defense subject to review even without contemporaneous objection); Aja v. State, 658 So.2d 1168 (Fla. 5th DCA 1995)(prosecutor's comments on matters not introduced as evidence at trial subject to review even without contemporaneous objection); Fuller v. State, 540 So.2d 182, 184-185 (Fla. 5th DCA 1989)(prosecutor's comments derogatory of defendant as "shrewd" and "diabolical" and attacking defense counsel subject to review even without contemporaneous objection); Pacifico v. State, supra, at 1182-1184 (prosecutor's comments regarding jury's duty to convict, pejorative terms characterizing defendant, expressing personal beliefs as to credibility or veracity of witnesses, and referring to matters not in evidence, subject to review even without contemporaneous objection).

Based on the foregoing, Defendant's convictions should be reversed.                              (IX)

DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO THE CUMULATIVE EFFECT OF THE CUMULATIVE ERRORS

Should this Honorable Court find that the issues raised by Defendant, or those issues which Defendant adopts from the co-defendant, Noel Doorbal's Brief, constitute harmless error, Defendant would tender that the cumulative effect of the cumulative errors renders Defendant's convictions questionable and entitles

80

Defendant to a new trial. See Jones v. State, 569 So.2d 1234 (Fla. 1990); Lusk v. State, 531 So.2d 1377 (Fla. 2d DCA 1988).

(X)

DEFENDANT IS ENTITLED TO RESENTENCING BASED UPON THE PROSECUTOR'S IMPROPER PENALTY PHASE ARGUMENTS

Defendant is entitled to resentencing based upon the prosecutor's improper penalty phase arguments.[13]   During his penalty phase remarks, the assistant state attorney made the following comments:

> MS. LEVINE: "You all agreed when you took your oath that in an appropriate case, if the aggravating factors outweighed the mitigating factors, you could return a recommendation for death.  This is done in every single case where the death penalty is imposed.  It's not just new to this case.  It's a big burden.  It's an awesome responsibility. But these are horrible, horrible murders for which there is no other sentence.

> MR. GURALNICK: Objection, your Honor.  There is an other sentence.

> THE COURT: Overruled.  Deal with it in closing." (T. 13087-13088).

The prosecutor misled jurors into believing that as a result of their oath and their duty in this case they were obligated to recommend the death penalty in this case.  This was improper. See Urbin v. State, 714 So.2d 411 (Fla. 1998); Garron v. State, 528 So.2d 353 (Fla. 1988); Brooks v. State, 762 So.2d 879 (Fla. 2000).

> MS. LEVINE: "Lugo goes in to get the duct tape so they can tape up Frank and Krisztina.  Tape them up like animals when they're people." (T. 13090).

* * *

---

[13]    The stakes of a capital sentencing hearing require the courts to give "heightened scrutiny" to the prosecutor's conduct. See Williams v. Chrans, 945 F.2d 926, 950 (7th Cir. 1991).

MS. LEVINE: "What happens to her?  She's just garbage.
She's going into a packing box in another hour... She's
cold and dead.  And now, now he's really got garbage,
huh?  Human beings that he treats like garbage."

MR. GURALNICK: Objection.  May I approach?

THE COURT: Come on around." (T. 13095).

At sidebar, the defense moved for mistrial, noting that the
dismemberment of the bodies was irrelevant to the imposition of the
death penalty.  The prosecutor argued that the dismemberment of the
bodies was relevant to the "mitigation... the character of the
evidence." (T. 13096).    The court ruled that argument on
dismemberment was irrelevant to the HAC aggravator, but was
permissible under the CCP aggravator. (T. 13097-13098).    The
prosecutor proceeded to argue that the purchase of the chain saw
was part of the plan of the defendants. (T. 13098).    In the
foregoing comments, the prosecutor improperly argued to the jury
non-statutory aggravating circumstances.    The assistant state
attorney clearly alluded to matters that were not relevant to the
imposition of the death penalty.  As defense counsel pointed out the
dismemberment of the bodies was not to be considered by the jurors
in deciding the death penalty.  Moreover, the comments regarding
treating the victims like animals and garbage were dehumanizing and
improper. See Urbin v. State, supra; Brooks v. State, supra.

The assistant state attorney also made the following comments:

MS. LEVINE: "Life in prison is not enough for him [Lugo]
because he's different.  Life in prison is for every
single first degree murderer or those that are different
get the death penalty... It's for different cases.  It's
for this case and it's for this defendant...  The
diabolical nature of this crime, the planning, what it
took commit these crimes for financial gain makes this

case different.  Makes life in prison with the ability to
see his family, to see his children, to read newspapers,
to go to the yard to workout, to do whatever he wants to
do.  Same thing he's been doing for three years.  He
deserves a punishment that's different, that fits the
crime." (T. 13099-13100).

The foregoing comments alluding to life imprisonment were
impermissible.  In Hodges v. State, 595 So.2d 929 (Fla. 1992), this
Court found similar remarks as improper.  In Hodges, the prosecutor
argued, in part:

"What about life imprisonment?  What can a person do in
jail for life?  You can cry.  You can read.  You can
watch TV.  You can listen to the radio.  You can talk to
people.  In short, you are alive.  People want to live.
You are living.  All right?..." Id. at 933.

This Court recognized that these types of remarks were
inappropriate.  Id. at 933-934.  See also Taylor v. State, 583 So.2d
323 (Fla. 1991).  Moreover, the prosecutor improperly labelled the
crimes "diabolical," and asked for "punishment that fits the
crime."  These dehumanizing remarks were improper.  See Urbin v.
State, supra; Brooks v. State, supra.

The prosecutor also stated:

MS. LEVINE: "Everybody has obstacles in their life.
Every single one of us is responsible for what we become.
And especially when you have the love of two parents."
(T. 13102).

The foregoing comments were impermissible.  It was improper to
ask jurors to place themselves in Defendant's place and point out
that they took different paths in life although they may have
encountered the same life experiences as Defendant.

The prosecutor further argued:

MS. LEVINE: "This case screams out for the most severe
punishment.  In any society, in any religion, it is the

83

worst.   He's the worst of the worst because he had a chance and he chose not to use it." (T. 13113).

The prosecutor improperly argued that the jury was <u>required</u> to return a recommendation of the death penalty because of societal or religious reasons.    The prosecutor's allusion to religion was especially inappropriate. <u>See</u> <u>Farrell v. State</u>, 686 So.2d 1324, 1328 (Fla. 1996); <u>Bonifay v. State</u>, 680 So.2d 413, 418 n.10 (Fla. 1996); <u>Lawrence v. State</u>, 691 So.2d 1068, 1074 (Fla. 1997).   The impact of these statements was to impress upon the jury that they had no choice but to impose the death penalty.   The prosecutor's argument undermined any argument for the jury to exercise its unique ability to confront and examine the individuality of the defendant.    The jury was disuaded from considering "[those] compassionate or mitigating factors stemming from the the diverse frailties of humankind." <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).   The prosecutor's remarks    also    constituted    an    impermissible    "message    to    the community"   argument.    This Court recently reiterated the long-standing rule prohibiting these types of comments in capital cases. In <u>Campbell v. State</u>, 679 So.2d 720 (Fla. 1996), this Court considered the following prosecutorial remarks:

> "'The death penalty is a message sent to certain members of our society who choose not to follow the rules.   It's only for one crime, the crime of first degree murder.   It is for those who choose to violate the sacredness and sanctity of human life.'" <u>Id</u>., at 724.

This Court found these remarks to be impermissible as an obvious appeal to the emotions and fears of the jurors. <u>Id</u>. (citing <u>Bertolotti v. State</u>, 476 So.2d 130, 133 (Fla. 1985)).   These

84

remarks together with other improper comments, concluded the Court, "played to the jurors' most elemental fears" and possibly affected the jury's sentencing deliberations, in that some jurors may have "voted for death not out of a reasoned sense of justice but out of a panicked sense of self-preservation." Campbell, supra, at 724. The courts must go to extraordinary measures to ensure that defendants sentenced to death are "afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982)(O'Connor, J., concurring). It is undeniable that the State improperly injected matters outside of the proper "scope of the jury's deliberations" and "violated the prosecutor's duty to seek justice." Bertolotti v. State, supra, at 133.

The prosecutor further argued:

MS. LEVINE: "Daniel Lugo is a cold-blooded murderer. He deserves no leniency and he deserves no mercy. He took Frank Griga's thirty-three year old life and Krisztina Furton's thirty-three year old life-- twenty-three year old life. He took it without blinking an eye and then flew to the Bahamas." (T. 13113).

The prosecutor improperly argued to jurors that they should show Defendant no mercy in the context of noting that Defendant showed no such mercy to the victims. This was error. See Urbin v. State, supra; Brooks v. State, supra. Based on the foregoing arguments, individually and cumulatively, Defendant's sentence of death should be vacated and the case remanded for resentencing.

85

(XI)

THE TRIAL COURT'S SENTENCE OF DEATH SHOULD BE VACATED
SINCE DEATH WAS A DISPROPORTIONATE SENTENCE IN THIS CASE

It is necessary in capital cases that this Court engage in a
thoughtful, deliberate proportionality review to consider the
totality of circumstances in a case, and to compare it with other
capital cases. Sinclair v. State, 657 So.2d 1138 (Fla. 1995); Urbin
v. State, 714 So.2d 411 (Fla. 1998). As this Court noted in
Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988), any review of the
proportionality of the death penalty in a particular case must
begin with the premise that death is different. In State v. Dixon,
283 So.2d 1, 7 (Fla. 1973), this Court upheld Florida's amended
capital punishment statute, recognizing that the death penalty is
reserved for only the most aggravated and unmitigated crimes. This
Court has stated the proportionality review involves consideration
of the totality of the circumstances and a comparison with other
capital cases. It is not a counting process of factors. See Porter
v. State, 564 So.2d 1060, 1064 (Fla. 1990). Proportionality review
is a unique and highly serious function of this Court, the purpose
of which is to foster uniformity in death-penalty law. Tillman v.
State, 591 So.2d 167 (Fla. 1991). The trial court considered the
issue of proportionality. The judge found that Jorge Delgado's
sentence in the case was justified given his relatively minor
involvement, as compared to Defendant, and his invaluable
assistance to the prosecution. Likewise, the State waived the
death penalty as to co-defendant Carl Mese, who, though
instrumental in notarizing and forging documents, had a much more
minor role in the offenses. (R. 5510-5511). In view of the

86

totality of the mitigating factors in this case, imposition of the death penalty would be disproportionate.  When a codefendant is equally as culpable or more culpable than the defendant, the disparate treatment of the codefendant may render the defendant's punishment disproportionate. See Larzelere v. State, 676 So.2d 394, 406 (Fla. 1996).  Thus, an equally or more culpable codefendant's sentence is relevant to a proportionality analysis. Id.  In this case, Jorge Delgado reached an agreement with the State whereby he received a 15-year sentence in a plea on charges involving both the Schiller and Griga/Furton episodes. (T. 11185-11186).  In short, Delgado was fully and materially involved in both sets of crimes. As he himself testified, he fully participated in both episodes. The record does not support a "minor" role for Delgado.  The contrast between his 15-year sentence and Defendant's two death sentences could not be greater. In addition, the record shows that Defendant himself did not commit the murders.  Rather, the testimony established that Doorbal killed Griga in a struggle and apparently killed Furton by over-drugging her.  Doorbal, not Lugo, physically participated in the deaths of Griga and Furton.  This was not a situation where one defendant [Lugo] completely dominated and directed another [Doorbal] during the commission of the crimes. Compare Sexton v. State, ___ So.2d ___, 25 Fla.L.Weekly S818, S823 (Fla., October 12, 2000)(record showed that the defendant ruthlessly used his own simple-minded and abused son as his murder weapon of choice to kill the victim).  Indeed, it appears the Doorbal actually committed the murders **contrary to the supposed**

87

**plan**. Under these circumstances, imposition of the death penalty against Lugo is disproportionate. Notably, the trial court did not address this issue in its sentencing order. Moreover, in view of the mitigating circumstances that Defendant did not commit the murders with his own hands, that Defendant had been the victim of child abuse, that Defendant had shown great care and love for his family, that Defendant's execution would have a negative impact on Defendant's family, that Defendant possesses skills that could help others should he be imprisoned rather than executed, that Defendant had exhibited appropriate courtroom behavior, that Defendant assisted the police locate the barrels containing the torsos of the victims which was beneficial to the State, and that Defendant's mandatory incarceration for life would keep him out of society, imposition of the death penalty would be disproportionate.

### (XII)

THE TRIAL COURT'S SENTENCING ORDER HAS ERRORS THAT, BOTH INDIVIDUALLY AND CUMULATIVELY, REQUIRE REVERSAL OF DEFENDANT'S DEATH SENTENCE AND A REMAND FOR RESENTENCING BY THE TRIAL COURT

The trial court committed several errors in its sentencing order which, individually and cumulatively, require reversal of Defendant's death sentence and a remand for resentencing. The penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it warrants the ultimate punishment. It is of vital importance that the decisions made in that context be, and appear to be, based on reason rather than caprice or emotion. See Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). There

is an acute need for reliability in capital sentencing proceedings. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)(Burger, C.J.).   In capital sentencing proceedings, as in a criminal trial, the interests of the defendant are of such magnitude that they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. Addington v. Texas, 441 U.S. 418, 423-424, 99 S.Ct. 1804, 1807-1808, 60 L.Ed.2d 323 (1979).   Findings in support of the death penalty must be of unmistakable clarity. King v. State, 623 So.2d 486, 489 (Fla. 1993).

The trial judge found the following aggravating factors: 1) Defendant was previously convicted of another capital felony or of a felony involving a threat of violence to the person (R. 5493-5495); 2) The crime for which Defendant is to be sentenced was committed while he was engaged and/or an accomplice in the commission of and/or an attempt to commit the crime of kidnapping (R. 5495-5496); 3) The crime for which Defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (R. 5496-5498); 4) The crime for which Defendant is to be sentenced was committed for financial gain (R. 5498-5499); 5) The crime for which Defendant is to be sentenced was especially heinous, atrocious or cruel as to victim Furton (R. 5499-5502); 6) The capital felony was a homicide and was committed in a cold, calculated and premeditated manner without a pretense of moral or legal justification (R. 5502-5503). The court rejected the statutory mitigator of no significant

89

history of prior criminal activity (R. 5504-5505); the statutory mitigator of extreme mental or emotional disturbance (R. 5505); the statutory mitigator of the victim as participant in Defendant's conduct or the victim's consent to such conduct (R. 5505); the statutory mitigator that Defendant was an accomplice in the capital felony and his participation was relatively minor (R. 5505); the statutory mitigator that Defendant acted under extreme duress or under substantial domination of another (R. 5505); the statutory mitigator that Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (R. 5506); the statutory mitigator concerning Defendant's age (R. 5506); and the statutory mitigator involving any other aspect of Defendant's character or record or circumstances of the offense. (R. 5506).   The court likewise rejected four non-statutory mitigating circumstances offered by the defense.   The court found that Defendant was as culpable of the killings as if he had committed them with his own bare hands. (R. 5506-5507).   The court also found that the defense had not shown evidence that Defendant had been the victim of child abuse.   The court did find, however, that Defendant had shown great care and love for his family. The court gave this factor little weight. (R. 5507-5508).   The court also found that Defendant's execution would have a negative impact on Defendant's family and gave this factor little weight. (R. 5508).   Finally, the court rejected the argument that Defendant possesses skills that could help others should he be imprisoned rather than executed.   The court found no evidence to

support this factor and, even if established, would give it very little weight. (R. 5508-5509). The court also considered certain non-statutory mitigators not raised by the defense. The court found that Defendant had exhibited appropriate courtroom behavior. (R. 5509). The court also found that Defendant's offer to show the police the location of the barrels containing the torsos of the victims was beneficial to the State and gave this factor very little weight. (R. 5509-5510). The court considered the fact that Defendant's mandatory incarceration as a mitigating circumstance and gave it little weight. (R. 5510).

The court erred in finding that Defendant was previously convicted of another capital felony or of a felony involving a threat of violence to the person. Defendant maintains that he only had one federal fraud conviction prior to the conviction in the instant case and the statute permitting significant prior criminal history as an aggravator gives no guidance regarding the term "significant," leaving juries and judges with unfettered discretion and permitting arbitrary and capricious decisions. In addition, felony murder aggravator is unconstitutional if applied against Defendant for the murder of Mr. Griga because the facts show that Griga's murder was not premeditated by Defendant. Moreover, the court erred in finding that the murder of Furton was committed for financial gain inasmuch as only Griga's murder was arguably committed for pecuniary gain. The court erred in finding that the crime for which Defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an

91

escape from custody. This aggravator applies to witness elimination. Consalvo v. State, 697 So.2d 805, 819 (Fla. 1996). However, in such cases, the mere fact of a death is not enough to invoke this factor. Rather, proof of the requisite intent to avoid arrest and detection must be very strong. The evidence must prove that the sole or dominant motive for the killing was to eliminate a witness. Id. Here, the evidence shows that Doorbal, not Lugo, killed Furton, apparently by repeated injections of Xylazine. Defendant Lugo was not even present at the victim's death. The testimony indicates that Furton was providing the defendants with information which the defendants were using to obtain Griga's assets. As such, there is no evidence to show that the sole or dominant motive for Furton's killing was to eliminate her as a witness. The court erred in finding that the crime for which Defendant is to be sentenced was especially heinous, atrocious or cruel as to victim Furton because this factor only applies to those murders which evince extreme and outrageous depravity as shown by a desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. Robertson v. State, 611 So.2d 1228, 1233 (Fla. 1993). See also Wickham v. State, 593 So.2d 191 (Fla. 1991). In the absence of evidence to demonstrate that a defendant intended to torture a victim, the heinous, atrocious and cruel aggravating factor should not be applied. See, e.g., McKinney v. State, 579 So.2d 80 (Fla. 1991). There must be additional facts, beyond the number of wounds, to raise the crime to the shocking level required by this factor. Id. There must be evidence

that the defendant deliberately intended to inflict a high degree of suffering or pain. See Buckner v. State, 714 So.2d 384 (Fla. 1998); Hamilton v. State, 678 So.2d 1228 (Fla. 1996). In the present case, the State did not present evidence to show that Defendant deliberately intended to inflict a high degree of suffering or pain to the victim or that the victim suffered a high or unusual level of pain, or that she was subjected to a heightened level of suffering as a result of the crime. In this respect, the record is unclear whether Furton was fully conscious at all times after Doorbal administered the various injections. Of course, acts done after the killing cannot make the murder especially heinous, atrocious or cruel. Jackson v. State, 451 So.2d 458 (Fla. 1984); Halliwell v. State, 323 So.2d 557 (Fla. 1975). The State failed to prove this factor beyond a reasonable doubt. The court erred in finding that the capital felony was a homicide and was committed in a cold, calculated and premeditated (CCP) manner without a pretense of moral or legal justification. The CCP factor has four elements. In Walls v. State, 641 So.2d 381 (Fla. 1994), this Court ruled that under Jackson[14], CCP can be established where the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic or a fit of rage, that the murder be the product of a careful plan or prearranged design to commit murder before the fatal incident, that heightened premeditation, which is to say, premeditation over and above what is required for

---

[14]     Jackson v. State, 648 So.2d 85 (Fla. 1994).

93

unaggravated first-degree murder, and that the murder must have no pretense of moral or legal justification. Walls, supra, at 387-388. The state of mind of the perpetrator is critical to an analysis of the evidence for CCP. A killing in a fit of rage is inconsistent with the CCP factor. Crump v. State, 622 So.2d 963 (Fla. 1993); Richardson v. State, 604 So.2d 1107 (Fla. 1992); Mitchell v. State, 527 So.2d 179 (Fla. 1992). In addition, the CCP factor is reserved primarily for execution or contract murders or witness elimination killings, Hansbrough v. State, 509 So.2d 1081, 1086 (Fla. 1987); Maharaj v. State, 597 So.2d 786 (Fla. 1992); Pardo v. State, 563 So.2d 77 (Fla. 1990), or other carefully planned murders. See, e.g., Zakrzewski v. State, 717 So.2d 488 (Fla. 1998)(defendant left work, bought a machete and concealed it at his home, and then methodically killed his wife and two children later that evening with the weapon); Cruse v. State, 588 So.2d 983 (Fla. 1991)(defendant's advanced procurement of weapon and ammunition indicative of CCP factor); Johnson v. State, 608 So.2d 4 (Fla. 1992)(defendant left house armed intending to commit robbery and hurt anyone who got in his way supported CCP). Although CCP can be established by circumstantial evidence, it must be inconsistent with any reasonable hypothesis which might negate the aggravating factor. Woods v. State, 733 So.2d 980, 991 (Fla. 1999); Mahn v. State, 714 So.2d 391, 398 (Fla. 1998). Simply proving a premeditated murder for purposes of guilt is not enough to support the CCP factor. Rather, greater deliberation and reflection is needed. Walls v. State, supra, at 388. Without more, the manner of

death does not establish the greater premeditation needed for CCP. The CCP factor requires a finding of more contemplative, more methodical, more controlled intent to kill than necessary to establish conviction. Buckner v. State, 714 So.2d 384, 389-390 (Fla. 1998). Even a manner of death which requires a period of time to accomplish its end does not necessarily provide the perpetrator with the needed time for calm reflection. For example, smothering the victim with evidence that the process required several minutes did not, alone, qualify the crime for the aggravating factor of CCP. See Capehart v. State, 583 So.2d 1009 (Fla. 1991). See also Holton v. State, 573 So.2d 284 (Fla. 1990)(strangulation). In addition, multiple wounds do not prove the heightened premeditation required. See Hamilton v. State, 547 So.2d 630 (Fla. 1989)(multiple wounds to two victims); Caruthers v. State, 465 So.2d 496 (Fla. 1985)(victim shot 3 times); Blanco v. State, 452 So.2d 520 (Fla. 1984)(victim shot 7 times). Additionally, strangulation and asphyxiation without a prior plan to kill does not qualify. Hardwick v. State, 461 So.2d 79 (Fla. 1984). In the present case, there is insufficient evidence to prove that Defendant planned to kill Griga and Furton. Rather, the record shows that Doorbal, not Lugo, took the initiative in killing Griga and then killing Furton without Lugo's hands-on participation; indeed, contrary to the originally alleged plan. Here, there is no post-arrest statement by Defendant admitting a plan to kill the victims. Compare Asay v. State, 580 So.2d 610 (Fla. 1991)(defendant's later statement that he planned to kill

95

before murder sufficiently showed heightened premeditation). Moreover, the other crimes on which Defendant was convicted should not have been used to support the CCP factor. In <u>Power v. State</u>, 605 So.2d 856 (Fla. 1992), this Court, for example, ruled that circumstances of previous crimes, standing alone, can never establish that the capital murder was aggravated by a cold, calculated and premeditated manner. <u>See also</u> <u>Finney v. State</u>, 660 So.2d 674 (Fla. 1995)(collateral crimes); <u>Wuornos v. State</u>, 676 So.2d 966 (Fla. 1995)(collateral crimes). In the present case, the State did not prove CCP beyond a reasonable doubt. There has been no showing that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic or a fit of rage; there was no showing that the murder was the product of a careful plan or prearranged design to commit murder; and there was no showing of "heightened premeditation," that is, premeditation over and above what is required for unaggravated first-degree murder. In the light most favorable to the prosecution, the evidence showed that there was a plan to extort money from the victims. The killings occurred as a result of Doorbal's frenzy, panic, fit of rage or total incompetence. In the case of Griga, in fact, no long period of time passed between his sequestration and his death. Under these circumstances, the CCP factor was not supported by the evidence in this case. Indeed, it amounted to "double counting" when the same factor was used for financial gain.

The trial judge also failed to give Defendant's mitigating circumstances sufficient weight. In a capital sentencing proceeding, it is within the trial judge's discretion to reject either opinion or factual evidence in mitigation where there is record support for conclusion that is untrustworthy. Farr v. State, 656 So.2d 448 (Fla. 1995). However, rejection of mitigating factor cannot be sustained unless supported by competent substantial evidence refuting existence of factor. Maxwell v. State, 603 So.2d 490 (1992). See also Knowles v. State, 632 So.2d 62 (1993). In this case, it was established that Defendant did not himself kill Griga or Furton; that Defendant was not a totally immoral person and had exhibited great acts of kindness to others in the past; that Defendant's execution would have a tremendous negative impact upon his family; that Defendant possesses skills that could help others should he be imprisoned rather than executed; that Defendant had exhibited appropriate courtroom behavior; that Defendant assisted the police locate the barrels containing the torsos of the victims which was beneficial to the State; and that Defendant's mandatory incarceration for life would keep him out of society.

The need to carefully examine and scrutinize the imposition of a death sentence is underscored by the **finality** of such sentence. See Justice Barkett's dissenting opinion in Hamblen v. State, 527 So.2d 800 (Fla. 1988)(Barkett, J., dissenting)[15] Defendant respectfully requests that this Court carefully review the entire

---

[15]    See also Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

record and consider each of the issues raised herein.  Defendant
requests that this Court vacate his sentences of death and remand
the case for resentencing.

### (XIII)

THE TRIAL COURT ERRED IN ORDERING ALL SENTENCING TERMS
AND MINIMUM/MANDATORY TERMS TO RUN CONSECUTIVELY TO EACH
OTHER

The court ordered the minimum/mandatory terms on Counts XI and
XII to run consecutively to each other.  This was error.  Count XI
charged armed kidnapping of Marcelo Schiller.  Count XII charged
armed robbery of Marcelo Schiller.  The 3-year minimum-mandatory
terms were imposed as a result of Defendant's use of a firearm on
both counts.  Since both counts arose out of the same incident or
transaction, the trial court could not impose consecutive
minimum/mandatory terms.  See State v. Christian, 692 So.2d 889
(Fla. 1997); Dixon v. State, 610 So.2d 35 (Fla. 2d DCA 1992); Abreu
v. State, 610 So.2d 564 (Fla. 3d DCA 1992).  In addition, the trial
court erroneously failed to order that the minimum-mandatory terms
be served first when it imposed its sentences to run consecutively
to terms of imprisonment with no minimum-mandatory terms.

### (XIV)

THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING AN
UPWARD DEVIATION IN THE SENTENCING GUIDELINES AND
ORDERING ALL TERMS OF IMPRISONMENT TO BE RUN CONSECUTIVE
TO EACH OTHER

The court granted an upward deviation in the sentencing
guidelines for all non-capital offenses and ordering all terms of
imprisonment to be run consecutive to each other.  The court set
out three principle grounds for the deviation: (1) the capital

98

offenses; (2) the heinous, atrocious and cruel nature of the Furton murder; and (3) the extraordinary physical and emotional trauma suffered by Furton and Schiller. It appears that the trial court engaged in "double counting" of this circumstance, in view of the fact that the judge used the same factor in its death sentence. (R. 5493-5495). While capital offenses may be used as grounds for an upward departure, Defendant maintains that the other grounds were inherent in the crimes scored. In this connection, Defendant also asserts that the **extent** of the departure was excessive and improper.[16] The sentences, run consecutive to the death sentences, included five life terms as well as four 30-year terms. In total, Defendant's sentence consisted of two death sentences, five life terms, and 210 years imprisonment, running consecutively.

### (XV)

CAPITAL PUNISHMENT AS PRESENTLY ADMINISTERED VIOLATES THE STATE AND FEDERAL CONSTITUTIONS

Although this Court has repeatedly rejected constitutional challenges to capital punishment, this Court has never specifically considered the argument advanced by former Justice Blackmun in his dissent in Callins v. Collins, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), that capital punishment is unconstitutional in view of the paradoxical constitutional commands of non-arbitrariness and need for jury discretion to consider all mitigation. This Court has also not addressed the issue suggested

---

[16]    The sentencing guidelines scoresheet prepared for the non-capital offenses provided for 698 months imprisonment (about 58 years). (R. 5490-5492).

by Justice Stevens' opinion respecting denial of certiorari in Lackey v. Texas, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995), subsequent proceeding, 115 S.Ct. 1818 (1995), that capital punishment today may be unconstitutional because of the inordinate delays between sentencing at trial and actual execution, inherent in the legal system.  In light of the foregoing, this Court should reconsider whether, at least as currently administered, capital punishment violates the United States and/or Florida Constitutions.

CONCLUSION

Daniel Lugo respectfully requests that this Honorable Court enter an order reversing his convictions.  This Court should vacate his death sentence and remand for resentencing.  Defendant is entitled to resentencing on his non-capital offenses.

Respectfully submitted,

J. RAFAEL RODRIGUEZ
Specially Appointed Public
Defender for Daniel Lugo
6367 Bird Road
Miami, FL 33155
(305) 667-4445
(305) 667-4118 (FAX)
By: _____
    J. RAFAEL RODRIGUEZ
    FLA. BAR NO. 302007

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to Sandra Jaggard, Esq., Office of the Attorney General, 444 Brickell Avenue, Suite 950, Miami, Florida, 33131-2407, on this 15th day of December, 2000.

_____
J. RAFAEL RODRIGUEZ

100