# APPENDIX B

IN THE SUPREME COURT OF FLORIDA

CASE NO. SC93,994

DANIEL LUGO,

Appellant,

vs.



THE STATE OF FLORIDA,

Appellee.

---

ON APPEAL FROM THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
CRIMINAL DIVISION

---

BRIEF OF APPELLEE

ROBERT A. BUTTERWORTH
Attorney General
Tallahassee, Florida

LISA A. RODRIGUEZ
Assistant Attorney General
Florida Bar No. 0109370
Office of the Attorney General
Rivergate Plaza -- Suite 950
444 Brickell Avenue
Miami, Florida 33131
PH. (305) 377-5441
FAX (305) 377-5655

ET 365786933 US
ET 365786947 US

## TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . 49

ARGUMENT

    I.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
        IN REFUSING TO SEVER COUNTS WHERE THE CRIMES
        CHARGED WERE CONNECTED ACTS AND PART OF AN
        ORGANIZED SCHEME OF CRIMINAL ACTIVITY. . . . . . 50

    II.  THE TRIAL COURT PROPERLY DENIED DEFENDANT'S
        MOTION FOR JUDGMENT OF ACQUITTAL ON THE
        RACKETEERING COUNT. . . . . . . . . . . . . . . . 54

    III. THE PROSECUTOR'S OPENING STATEMENT WAS AN
        ACCURATE REFLECTION OF THE EVIDENCE EXPECTED
        AT TRIAL AND DEFENDANT'S OBJECTIONS WERE NOT
        PRESERVED. . . . . . . . . . . . . . . . . . . . 59

    IV.  DEFENDANT WAS NOT PREJUDICED BY THE USE OF
        DUAL JURIES DURING THE TRIAL OF HIS AND CO-
        DEFENDANT DOORBAL'S CASES. . . . . . . . . . . . 61

    V.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
        BY ADMITTING EVIDENCE RELATED TO DEFENDANT'S
        FEDERAL CONVICTION AND PROBATION. . . . . . . . . 65

    VI.  TRIAL COURT DID NOT ABUSE ITS DISCRETION BY
        EXCLUDING EVIDENCE THAT DEFENDANT'S EX-WIFE
        APPEARED AT THE STATE ATTORNEY'S OFFICE WITH
        HER LAWYER . . . . . . . . . . . . . . . . . . . 66

    VII. THE TRIAL COURT PROPERLY DENIED DEFENDANT'S
        MOTION FOR NEW TRIAL. . . . . . . . . . . . . . . 68

    VIII. ANY ERROR IN COMMENTS DURING THE STATE'S GUILT
        PHASE CLOSING ARGUMENT WAS NOT PRESERVED AND
        DOES NOT REQUIRE REVERSAL. . . . . . . . . . . . 72

IX.   DEFENDANT'S CLAIM OF CUMULATIVE ERROR IS
      WITHOUT MERIT. . . . . . . . . . . . . . . . . . 77

X.    ANY ISSUE WITH REGARD TO COMMENTS DURING THE
      STATE'S PENALTY PHASE CLOSING ARGUMENT IS
      UNPRESERVED AND MERITLESS. . . . . . . . . . . . 78

XI.   DEFENDANT'S SENTENCE OF DEATH WAS
      PROPORTIONATE. . . . . . . . . . . . . . . . . . 82

XII.  DEFENDANT'S SENTENCING ORDER WAS SUPPORTED BY
      COMPETENT SUBSTANTIAL EVIDENCE AND PROPERLY
      CONSIDERED ALL MITIGATORS AND AGGRAVATORS
      APPLICABLE TO DEFENDANT'S CASE. . . . . . . . . 88

XIII. THE TRIAL COURT ABUSED NO DISCRETION IN
      ORDERING ALL OF DEFENDANT'S TERMS AND
      MINIMUM/MANDATORY TERMS TO RUN CONSECUTIVELY
      TO EACH OTHER. . . . . . . . . . . . . . . . . . 98

XIV.  THE TRIAL COURT ABUSED NO DISCRETION IN
      DEVIATING FROM THE SENTENCING GUIDELINES AND
      ORDERED ALL TERMS OF IMPRISONMENT TO RUN
      CONSECUTIVE TO EACH OTHER. . . . . . . . . . . . 99

XV.   DEFENDANT'S CLAIM THAT CAPITAL PUNISHMENT AS
      PRESENTLY ADMINISTERED IS WITHOUT MERIT. . . . . 100

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 100

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . 101

# TABLE OF CITATIONS

CASES                                                          PAGE

Alston v. State,
723 So. 2d 148 (Fla. 1998) . . . . . . . . . . . . . . .  88

Arango v. State,
411 So. 2d 172 (Fla. 1982) . . . . . . . . . . . . . . . 100

Banks v. State,
700 So. 2d 363 (Fla. 1997) . . . . . . . . . . . . . . .  94

Bates v. State,
750 So. 2d 6 (Fla. 1999) . . . . . . . . . . . . . . . .  94

Bateson v. State,
761 So. 2d 1165 (Fla. 4th DCA 2000) . . . . . . . . . .  51

Bejerano v. State,
760 So. 2d 218 (Fla. 5th DCA 2000) . . . . . . . . . . .  51

Beltran-Lopez v. State,
583 So. 2d 1030 (Fla. 1991) . . . . . . . . . . . . . .  92

Bertolotti v. State,
476 So. 2d 130 (Fla. 1985) . . . . . . . . . . . . . . .  77

Blanco v. State,
706 So. 2d 7 (Fla. 1997),
cert. denied, 119 S. Ct. 96 (1998) . . . . . . . . . . .  85

Breedlove v. State,
413 So. 2d 1 (Fla. 1982) . . . . . . . . . . . . . . 73,74
                                                           78

Brown v. State,
721 So. 2d 274 (Fla. 1998) . . . . . . . . . . . . . 88,94

Bryan v. State,
533 So. 2d 744 (Fla. 1988) . . . . . . . . . . . . . . .  66

Bunney v. State,
603 So. 2d 1270 (Fla. 1992) . . . . . . . . . . . . . .  99

Campbell v. State,
571 So. 2d 415 (Fla. 1990) . . . . . . . . . . . . . 85,97

iv

Cave v. State,
727 So. 2d 227 (Fla. 1998) . . . . . . . . . . . . . 84,90

Chandler v. State,
702 So. 2d 186 (Fla. 1997) . . . . . . . . . . . . . 77,80

Cole v. State,
701 So. 2d 845 (Fla. 1997) . . . . . . . . . . . . . 89

Craig v. State,
510 So. 2d 857 (Fla.1987) . . . . . . . . . . . . . 76

Crossley v. State,
596 So. 2d 447 (Fla. 1992) . . . . . . . . . . . . . 51

Crump v. State,
622 So. 2d 963 (Fla. 1993) . . . . . . . . . . . . . 54

Domis v. State,
755 So. 2d 683 (Fla. 4th DCA 1999) . . . . . . . . . 51

Downs v. State,
740 So. 2d 506 (Fla. 1999) . . . . . . . . . . . . . 78

Elledge v. State,
346 So. 2d 998 (Fla. 1977) . . . . . . . . . . . . . 89

Fernandez v. State,
730 So. 2d 277 (Fla. 1999) . . . . . . . . . . . . . 59,81

Fotopoulos v. State,
608 So. 2d 784 (Fla. 1992) . . . . . . . . . . . . . 51,53

Fudge v. State,
645 So. 2d 23 (Fla. 2nd 1994) . . . . . . . . . . . 52,53

Gore v. State,
706 So. 2d 1328 (Fla. 1997) . . . . . . . . . . . . 92

Gross v. State,
765 So. 2d 39 (Fla. 2000) . . . . . . . . . . . . . 54,57
                                                    58

Grossman v. State,
525 So. 2d 833 (Fla. 1988) . . . . . . . . . . . . . 100

Guzman v. State,
721 So. 2d 1155 (Fla. 1998) . . . . . . . . . . . . 94

Harvey v. State,
617 So. 2d 1144 (Fla. 1st DCA 1993) . . . . . . . . . . . 58

Heath v. Alabama,
474 U.S. 82 (1985) . . . . . . . . . . . . . . . . . . 71,73

Heiney v. State,
447 So. 2d 210 (Fla. 1984) . . . . . . . . . . . . . . . 54

Hooper v. State,
476 So. 2d 1253 (Fla. 1985) . . . . . . . . . . . . . . 81

Hudson v. State,
538 So. 2d 829 (Fla.),
cert. denied, 493 U.S. 875 (1989) . . . . . . . . . . . 84

Huff v. State,
762 So. 2d 476 (Fla. 2000) . . . . . . . . . . . . . . . 100

Jean-Mary v. State,
678 So. 2d 928 (Fla. 3rd DCA 1996) . . . . . . . . . . 67,68

Johnson v. State,
660 So. 2d 637 (Fla.1995) . . . . . . . . . . . . . 87,100

Jones v. State,
411 So. 2d 165 (Fla. 1982) . . . . . . . . . . . . . . . 59

Jones v. State,
748 So. 2d 1012 (Fla. 1999) . . . . . . . . . . . . . . 89

Kearse v. State,
770 So. 2d 1119 (Fla. 2000) . . . . . . . . . . . . . . 97

Kelvin v. State,
610 So. 2d 1359 (Fla. 1st DCA 1992) . . . . . . . . . . 59

Kilgore v. State,
688 So. 2d 895 (Fla. 1996) . . . . . . . . . . . . . . 77,80

Killings v. State,
583 So. 2d 732 (Fla. 1st DCA 1991) . . . . . . . . . . . 61

Knight v. State,
746 So. 2d 423 (Fla. 1998),
cert. denied, 514 U.S. 1085 (1995) . . . . . . . . . . 86,87
                                                        89

Larzelere v. State,
676 So. 2d 394 (Fla. 1996) . . . . . . . . . . . . . . 83

Lifred v. State,
643 So. 2d 94 (Fla. 4th DCA 1994) . . . . . . . . . . 98

Mahn v. State,
714 So. 2d 391 (Fla. 1998) . . . . . . . . . . . . 89,94

McCray v. State,
416 So. 2d 804 (Fla. 1992) . . . . . . . . . . . . 62,64

McDonald v. State,
743 So. 2d 501 (Fla. 1999) . . . . . . . . . . . . 77,80

Moore v. State,
701 So. 2d 545 (Fla. 1997) . . . . . . . . . . . . 78,80

Murray v. State,
491 So. 2d 1120 (Fla. 1986) . . . . . . . . . . . . . 98

Occhicone v. State,
570 So. 2d 902 (Fla. 1990) . . . . . . . . . . . . . 78

Porter v. State,
564 So. 2d 1060 (Fla. 1990),
cert. denied, 498 U.S. 1110 (1991) . . . . . . . . . 85

Puccio v. State,
701 So. 2d 858 (Fla. 1997) . . . . . . . . . . . . . 83

Ray v. State,
755 So. 2d 604 (Fla. 2000) . . . . . . . . . . . . . 65

Rhodes v. State,
638 So. 2d 920 (Fla. 1994) . . . . . . . . . . . . 60,61

Rodriguez v. State,
753 So. 2d 29 (Fla. 2000) . . . . . . . . . . . . 65,87
                                                     96

San Martin v. State,
717 So. 2d 462 (Fla. 1998) . . . . . . . . . . . . . 59

Scott v. Dugger,
604 So. 2d 465 (Fla. 1992) . . . . . . . . . . . . . 83

Shellito v. State,
701 So. 2d 837 (Fla. 1997) . . . . . . . . . . . . 76

Shimek v. State,
610 So. 2d 632 (Fla. 1st DCA 1992) . . . . . . . . . . . 51

State v. DiGuilio,
491 So. 2d 1129 (Fla. 1986) . . . . . . . . . . . . 61,66
                                                      77,82

State v. Henry,
456 So. 2d 466 (Fla. 1984) . . . . . . . . . . . . 85

State v. Lucas,
600 So. 2d 1093 (Fla. 1992) . . . . . . . . . . . . 58

Tibbs v. State,
397 So. 2d 1120 (Fla. 1981),
affd, 457 U.S. 31 (1982) . . . . . . . . . . . . 54

Urbin v. State,
714 So. 2d 411 (Fla. 1998) . . . . . . . . . . . . 82

U.S. v. Hernandez,
921 F.2d 1569 (11th Cir. 1991) . . . . . . . . . . . . 62

U.S. v. LaChance,
817 F.2d 1491 (11th Cir. 1987) . . . . . . . . . . . . 62,64

Velez v. State,
596 So. 2d 1197 (Fla. 1992) . . . . . . . . . . . . 62

Vickery v. State,
539 So. 2d 499 (Fla. 1st DCA 1989) . . . . . . . . . . . 51

Wike v. State,
698 So. 2d 817 (Fla. 1997) . . . . . . . . . . . . 92

Willacy v. State,
696 So. 2d 693 (Fla.),
cert. denied, 522 U.S. 970 (1997) . . . . . . . . . . . 88,90

Wuornos v. State,
644 So. 2d 1000 (Fla. 1994) . . . . . . . . . . . . 96,100

## STATUTES

Section 895.02(4), Florida Statutes . . . . . . . . . . . 51

Section 895.03(3), Florida Statutes (1997)  . . . . . . . . . .  55

## STATEMENT OF THE CASE AND FACTS

In the early 1990's, Marcelo Schiller started his own accounting firm, Dadima Corporation, and branched out into providing medical supplements to Medicare patients. (T. 6615-33, 10926)[1] Schiller hired Jorge Delgado to work for his company, and the two became friends. (T. 6616, 10923-24) Schiller's company earned nearly $1,000,000.00 a year. (T. 6624) Eventually, Schiller decided that the Medicare business was too much work and sold that portion of the business to Delgado. (T.6624-25, 10962) Schiller retained the accounting portion of his business and renamed his company D.J. & Associates, while the Medicare portion sold to Delgado kept the name Dadima Corp. (6626-27, 10963) For some time, Schiller continued to consult with Dadima Corp., which Delgado later renamed J&R Medical. (T. 6627-28)

Delgado started to associate with Defendant, whom he had met at Sun Gym. (T. 6631, 10964) Delgado and Lugo became inseparable, and Defendant began accompanying Delgado to Schiller's home. (T. 6629) Through Defendant, Delgado later met Noel Doorbal and John Mese. (T. 10965, 10973-74) Schiller noticed that Delgado had begun to behave like Defendant, whom Schiller considered unsavory, and expressed this concern to Delgado. (T. 6630-32, 6636, 10970)

In January of 1994, Schiller had a business lunch with Delgado and a banker from Central Bank. (T.6634-36) The banker repeatedly

---

[1]    The parties will be referred to as they stood in the trial court. The symbols "R." and "T." will refer to the record on appeal and transcript of the proceedings, respectively. The symbol "S.R." will refer to the supplemental record.

questioned Delgado about other bank accounts and appeared concerned over the accounts. (T. 6635-36) Delgado refused to answer, appearing visibly upset. (T. 6635-36). As they left the restaurant, Schiller asked Delgado what was wrong, and Delgado yelled at Schiller, advising that it concerned a private matter between himself and Defendant. (T. 6636) Consequently, Schiller advised Delgado that he was terminating their business relationship. (T. 6636, 10970) Thereafter, Delgado hired Mese to be his accountant on Defendant's advice. (T. 10974-75).

In 1994, Schiller owned a house, was purchasing a condo, owned two Scholzsky's Deli franchises, and had an accounting business and had two $1,000,000.00 life insurance policies. (T.6647-59) Additionally, Schiller had a total of $1.2 million in accounts in the Cayman Islands and Switzerland. (T. 6985) Schiller's house had an alarm system, and Schiller had provided his alarm code to Delgado. (T. 6650)

In late September of 1994, Defendant told Delgado that Schiller had been cheating Delgado with the billing in the Medicare business. (T. 10976) Delgado confronted Schiller with Defendant's allegations, and Schiller denied everything. (T. 10977). Defendant then suggested kidnaping Schiller to get the money. (T. 10978). Delgado consented to the plan; however, he told Defendant that he did not want to be directly involved with the kidnaping. (T. 10978). Defendant then enlisted Stevenson Pierre and Carl Weekes, both of whom worked at Sun Gym to assist in the kidnaping of Schiller in exchange for $100,000.00. (T. 8175-76)

Two days later, the group met, and Delgado informed them about Schiller's home, family and cars. (T. 8180-86) It was then determined that they would stake out Schiller and learn his routine. (T. 8184-86). Defendant directed the meeting, divvying up each man's role in the kidnaping scheme and played the "General" of the operation. (T. 8180-82) Defendant, Doorbal, Pierre and Weekes, or Delgado surveilled Schiller's home, his children's school and the deli but did not see Schiller's cars. (T. 8184-88)

The afternoon of the second stakeout, they learned that Schiller had a new car. (T. 8191) They went back to the deli, found Schiller and followed him; however, this attempt failed when Schiller's car eluded them. (T. 8191-2). (T. 8193) The group then decided that they needed proper equipment to "perfect the abduction of Schiller" and went to the Spy Shop and purchased handcuffs, walkie talkies, and stun guns. (T. 8193-94).

The following Monday afternoon, they again found Schiller at the deli. (T. 8195-96) However, when Schiller drove by, Pierre failed to accelerate quickly enough to catch Schiller. (T. 8197)

A third attempt was made to take Schiller by parking right next to where Schiller usually parked at the deli and waiting for him to arrive. (T. 8266) When Schiller arrived, he got out of his car but lingered, seemingly looking for something in his car. (T. 8206) Doorbal and Weekes started to reach out for Schiller but Pierre advised that someone was looking, so they stopped. (T.8207) Afterward, Defendant, Doorbal, Pierre, and Weekes met Delgado at a fast food restaurant to regroup and decided to invade Schiller's

3

home on Halloween. (T.8207-10) However, this attempt was called off, and two other attempts failed as well. (T.8211-17) A further attempt to ambush Schiller when he arrived at the deli failed because a van they were using would not start. (T. 8217) After this attempt, Pierre was dropped off at his home while the rest of the group remained together. (T. 8219)

On November 15, 1994, Sanchez went to the gym and met Doorbal, who asked to speak with him. (T. 7796-97) They went outside to a van Doorbal had rented where Weekes was waiting, and Doorbal told Sanchez that a drug dealer owed him money and asked Sanchez's help collecting it. (T.7797-7800) Doorbal offered to pay Sanchez $1,000, and Sanchez initially declined but eventually agreed to go along as an "intimidating presence." (T. 7802-09)

Sanchez accompanied Doorbal and Weekes to Schiller's deli, found Schiller's car and parked near it. (T. 7807-7815) After 30 minutes, Schiller came out of the back door of his deli, and Doorbal and Weekes identified him to Sanchez. (T. 7821) Doorbal and Weekes got out of the van and grabbed Schiller, and Weekes started zapping him with a stun gun. (T. 7820-23) After a struggle, Doorbal and Weekes pulled Schiller toward the van, and Sanchez pulled him inside. (T. 7824)

Once inside the van, Weekes handcuffed Schiller, and a gun was placed to his head, duct tape over his eyes and a blanket over his head. (T. 7825-27, 7829, 6654) Weekes grabbed Schiller's jewelry and wallet en route. (T. 7830-32) Doorbal drove Schiller to a warehouse rented by Delgado where Sun Gym had stored its equipment.

(T. 7832-33, 10989-91) During the 20 minute ride, his captors kicked, pummeled and shocked Schiller with the taser gun repeatedly. (T. 7829-30, 6653-56) During the drive, Doorbal called two people and said "the eagle has landed." (T. 6656, 7833, 7850-51) When they arrived at the warehouse, Doorbal made a third similar phone call. (T. 7851-52) One of these calls was made to Pierre. (T. 8820) About ten minutes later, Defendant and Pierre arrived, Pierre opened the warehouse door, and Doorbal drove the van inside. (T. 8821) Meanwhile, Defendant had called Delgado, who also joined the group at the warehouse. (T. 10993-94)

Once inside the warehouse, Schiller was removed from the van and placed face down on a piece of cardboard. (T. 10994, 8221, 6656-57) Schiller's shoes were removed, his feet were manacled and the manacles were attached to his handcuffs. (T. 6656-57) While in this position, a bat was put in his face, and he was told that his face would be broken if he moved. (T. 6657-58) After some time, the manacles were removed, and Schiller was taken into room and placed on another piece of cardboard. (T. 6657-58)

Doorbal drove Sanchez home, while Defendant and Delgado went to retrieve Schiller's car from the deli and Pierre and Weekes stayed back at the warehouse to watch Schiller. (T. (T. 7864-65, 8222, 8223, 10995)

The kidnappers demanded a list of his assets, and when he did not comply, he was slapped, zapped with the taser and beaten with the butt of a gun. (T. 6659-60, 8224-25) Based on information provided by Defendant and Delgado, Weekes questioned Schiller

5

regarding his financial assets. (T. 8224, 6659-60) When Schiller failed to cooperate or provide the requested information, Doorbal tortured him. (T. 8824, 6660-61) His captors placed a gun to Schiller's head, stated that they were going to play Russian Roulette, spun the cylinder of the gun and pulled the trigger twice. (T. 6659-60) As they were doing this, the kidnappers were reading an accurate list of Schiller's assets to him. (T. 6660) Initially, the kidnappers tried to conceal their voices but eventually faltered. (T. 8225, 6661-62) At that point, Schiller recognized Defendant's voice. (T. 6662) Schiller was forced to call his wife and tell her that he was going on a business trip. (T. 6662, 8228, 10998)  When they stopped torturing him after about 90 minutes, Schiller asked to go to the bathroom but was forced to wet himself and remain in his soiled clothing for two weeks. (T. 7338-39, 6664)

When he was returned to the room, the captors told Schiller that if he did not cooperate, his wife and children would be taken as well, and his wife would be raped in front of him. (T. 6664-65) They also continued to torture him. (T. 6664) After about 30 minutes, Schiller agreed to cooperate if they allowed his wife and children to leave the country. (T. 6665) Because of his captors' detailed knowledge of his assets and old house alarm code, Schiller realized that Delgado had to be involved. (T. 6665-66)

The next morning, Defendant arranged the 24-hour schedule for his crew to guard Schiller, dividing shifts between Delgado, Pierre, Weekes and Doorbal. (T. 8229) Schiller was instructed to

6

contact his travel agent and arrange for his wife and children to travel to Columbia to be with her family. (T. 6668, 8231, 10999) Defendant demanded Schiller make several phone calls and told Schiller what to say, including a call to Schiller's wife to instruct her to leave. (T. 8231, 10999) By the third day of captivity, the tape on Schiller's face had loosened due to sweat. (T. 6669-70) When the captors realized that the tape was loosening, they added more tape until Schiller's face was covered from the forehead to the cheeks. (T. 6671)

On November 18, 1994, Schiller was finally given some food. (T. 6674) The next day, the captors began demanding that Schiller sign papers. (T. 6673, 11000-05) Thereafter, Schiller would be chained in a bathroom that was not air conditioned and left without water. (T. 6673-74) In the evening, Schiller was often placed in a box and kept there for the duration of the night. (T. 6674) On occasion, Schiller would be permitted to use the bathroom, but other times, he was forced to soil himself. (T. 6674) At one point, Schiller reached for a cigarette from a nearby pack and was kicked in the head. (T. 6676) After that, his captors would intentionally walk Schiller into walls periodically to ensure he could not see. (T. 6676-77)

Around Thanksgiving, Manuel Salgar, Schiller's neighbor, noticed that Schiller appeared to have moved. (T. 6259-61) After Thanksgiving, Salgar saw a U-Haul truck in front of Schiller's house and met Defendant, who introduced himself as "Tom" or "Mike." (T. 6261-62, 6264) Defendant told Salgar that he was with the

7

Secret Service, that they had taken over the house and were planning to use it for foreign dignitaries. (T. 6262-63)

While they were at the house, they removed money and papers from the safe. (T. 8238) The money from the safe was divided between Weekes, Pierre and Doorbal. (T. 8238) The credit cards taken from Schiller were used by Defendant, Delgado and Weekes to order merchandise. (T. 8257-58, 11020) Schiller's BMW was taken to the warehouse. (T. 8258) Defendant then had Dan Pace alter the VIN on the car and get it painted black. (T. 8258-29, 11020)

During Schiller's second week of captivity, the captors began having him call his bankers. (T. 6677-78) One of the bankers became suspicious, and Schiller's captors put a gun to his head, spun the cylinder, pulled the trigger and told Schiller he was dead if there were any further problems. (T. 6677-78) Schiller was forced to sign documents, including checks. (T. 6679)

The documents Schiller was signing transferred the ownership of his property to D&J International, a company Defendant had established to launder this money, and Lillian Torres, Defendant's ex-wife. (T. 8239-43) Mese was involved in notarizing the paperwork to legitimatize these transactions and in laundering the money, for which he was paid. (T. 8242-43, 11005-08)

By this time, the captors had placed a hood over Schiller's head without removing the tape, which had cut into Schiller's face creating painful sores that bled. (T. 6687) When Schiller complained about the tape, one of the captors took him to the bathroom, removed the old tape, placed a sanitary napkin on

8

Schiller's face and re-taped it. (T. 6688) Toward the end of the second week, Schiller was taken to the bathroom, given a pail of dirty water, soap and a toothbrush and allowed to clean himself. (T. 6689) Schiller was then given a clean set of clothes and allowed to change. (T. 6689)

During the third week of captivity, the captors claimed that Schiller had hidden his ownership of a house that he had previously sold. (T. 6690-91) A gun was placed in Schiller's mouth, and the trigger was pulled. (T. 7364) During this week, Schiller was forced to sit in the hatchback of his car for 6-7 hours a day. (T. 6691-92) At this time, Doorbal, who had always wanted to kill Schiller, and Delgado, who was afraid Schiller would trace the assets to him, convinced Defendant, who had been ambivalent on the issue, that Schiller must be killed. (T. 11011, 8244) The plan was to make it look like Schiller had been out on a picnic, gotten drunk and had a car accident. (T. 11011)

At the end of this week, Schiller was informed that he had to be drunk to be released. (T. 6692) When Schiller protested that he did not drink, he was told that he had a choice of being drunk or drugged, and he decided to cooperate. (T. 6692) Schiller was then told that Delgado was going to Gene Rosen, Schiller's attorney, and that he was to call Rosen and tell him to give Delgado power of attorney for the deli, which Schiller had previously been forced to close. (T. 6693-94, 11009-11010) The captors began to give Schiller shots of liquor to drink, which they described as training. (T. 6696, 8245) At the end of third week, Schiller was again given a

pail of dirty water and a toothbrush, allowed to clean himself and given a change of clothes because one of the captors had complained that Schiller smelled. (T. 6696-97)

During the fourth week of captivity, Schiller was made to call all of his friends and tell them that he was running away with a new girlfriend, Lillian Torres. (T. 6697-98) After these calls had been made, Schiller was again permitted to clean up and was given clothes that he recognized as having been taken from his house. (T. 6698-99) Schiller was then given a bottle of liquor to drink. (T. 6701) Within 10 minutes of drinking this, Schiller was falling off his chair and soon passed out. (T. 6701)

Schiller was placed in the passenger seat of his car, which Defendant was driving and in which Doorbal was riding. (T. 8247-48) Defendant drove the car into a pole, and Schiller was moved to the driver's seat. (T. 8248) Defendant and Doorbal got out of the car, poured gasoline on it, and set it on fire. (T. 8248) They then got into another car Weekes had driven to the scene. (T. 8248-49, 11012) As they were driving away, Weekes noticed that Schiller had exit his car; thus, upon Defendant and Doorbal's order, Weekes twice ran Schiller over with his vehicle. (T. 8249, 11013)

Defendant called Pierre and told him to see if there was police activity in an industrial area on 36th Street. (T. 8245) Pierre went to the area and found Schiller's car crashed into a pole and on fire. (T. 8246) A police officer told Pierre that this was a drunk driving accident. (T. 8246)

When Schiller awoke after having passed out in the warehouse,

10

he was strapped to a board in the hospital, unable to move his feet and vomiting blood. (T. 6701-03, 6823) His pelvis was broken, his bladder was ruptured, he was covered in cuts, bruises and burns, and he had an incision from his chest to his pubic region. (T. 6701-03) He had lost almost 40 pounds. (T. 6825) Schiller called Rosen, told him what happened and had him contact Schiller's family. (T. 6820-21) Because Schiller was afraid that his captors might try to finish him off if they realized he had survived, he was transferred by air ambulance to New York. (T. 6822)

A day or two after they tried to kill Schiller, Defendant set up a meeting between himself, Pierre, Weekes, Delgado and Doorbal at the warehouse. (T. 8252) Delgado indicated that he had been contacted by Schiller's brother and that his involvement in the kidnaping was known. (T. 8251-52) Defendant called hospitals and determined where Schiller was. (T. 8253, 11013-14) The group then planned to go to the hospital and kill Schiller. (T. 11014, 8253) Doorbal, Weekes, Defendant and Pierre then went to the hospital but were unable to locate Schiller. (T. 11015, 8253) That weekend, Defendant and Pierre went to Schiller's house and moved all of the furniture to Delgado's warehouse. (T. 8255-56) Defendant, Doorbal and Delgado took the items that they wanted from Schiller's property. (T. 11018-19)

On Christmas Eve, Schiller was released from the hospital in New York but remained there with his sister. (T. 6822, 6825, 6924, 6705, 6707) Through Rosen and private investigator Ed Dubois, Schiller learned that his property had been taken. (T. 6830, 7105-

11

06, 6709) Schiller had Rosen contact the police and report the crime after the first of the year. (T. 6707-08, 6924-26) However, the police insisted that Schiller had to return to Miami to be interviewed, which Schiller was unwilling to do. (T. 6708, 6927) Schiller had not attempted to contact the police earlier because he was too traumatized. (T. 6710, 6840-43, 6928-33) Instead, Schiller left the country. (T. 6710)

Schiller had Dubois try to negotiate the return of his property and Rosen take legal action to have his house returned. (T.6712) In January 1995, Schiller provided Dubois with a detailed account of what had occurred and a deed and a change of beneficiary form. (T. 7100-01) Dubois noticed Mese's name on both of these documents. (T.7102-03) Dubois also received information regarding the transfer of Schiller's property to Sun Fitness Consultants, Inc., a corporation in which Mese was involved. (T.7105-06) Dubois then contacted Mese and set up a meeting with him. (T.7106-08)

At the meeting, Dubois told Mese that he represented Schiller, and Mese denied knowing Schiller. (T.7109) Dubois then presented Schiller's written account of his ordeal to Mese, which Mese read without any reaction. (T.7111-12) Dubois then confronted Mese with the deed and change of beneficiary form. (T.7113-14) Mese responded that he notarized documents all the time and that he had probably notarized these signatures. (T.7113, 11022-23) Mese acknowledged that he knew Delgado and Defendant through representing them and from Mese's gym. (T.7113) At Dubois' request, Mese agreed to set up a meeting between Dubois and Defendant and Delgado. (T.7113)

12

When Dubois arrived for this meeting, Dubois showed Mese a photo of Schiller and asked if Mese recalled notarizing his signature. (T. 7125) Mese responded that he could not recall. (T. 7125-26) After waiting for 2½ to 3 hours, Dubois was finally led into an office to meet Delgado. (T. 7126-29) Mese then left the office after informing Dubois that Defendant was unavailable. (T. 7130) Dubois confronted Delgado with Schiller's account of the kidnaping, and Delgado nonchalantly claimed that it was just a business deal. (T. 7131, 11024-25) Dubois angrily inquired if Delgado always conducted business by kidnaping and torturing people and informed Delgado that Schiller was alive. (T. 7131) Delgado then stated another meeting at which Defendant would be present was necessary. (T. 11026-27, 7133-34)(T. 7134) This meeting was arranged for the following day. (T. 7134)

When Dubois arrived for the next meeting, no one was there and he was seated in an office and Mese handed him a Sun Fitness file to review. (T. 7144-47) In the trash can in the office, Dubois found a number of documents related to Defendant, Doorbal and the corporations associated with Sun Gym and took them. (T. 7148-57, 7168, 7181-84)

Later, Mese informed Dubois that Delgado had arrived but that Defendant was unavailable. (T.7186) When Dubois attempted to discuss the Schiller incident, Delgado held up his hand and said that they would not discuss it. (T.7186-87) However, Delgado stated that they would return $1.26 million of Schiller's property in exchange for Schiller signing an agreement that this occurred

13

because of a business deal gone bad and that he would not contact the police. (T.7187-88, 7192-93) Delgado then dictated the proposed terms of the agreement to Dubois. (T.7194-95) Dubois agreed to discuss the deal with Schiller and get back to Delgado. (T. 7195) Several revisions to the agreement were made, including the addition of Mese and Defendant at Delgado's request. (T.7197-00) Thereafter, Schiller executed the agreement, and Dubois informed Mese. (T.7204)

When the check was not forthcoming, Dubois started a fax campaign to get it. (T.7206-07) Meanwhile, Defendant instructed Delgado to retain a lawyer named Joel Greenberg to review the contract. (T. 11029). Accordingly, Delgado hired Greenberg, and Dubois retained attorney Ed O'Donnell for Schiller's end. (T. 7210-11, 6835) Negotiations continued until March 1995, while Dubois gathered evidence and Schiller expressed his desire to go to the police. (T. 6714, 7230, 7212, 7250) After the exchange of various correspondence between the attorneys, Dubois and Schiller, no payment was forthcoming. (T.7250)

Finally, in April 1995, Schiller cut off the negotiations. (T. 6714) As a result, Dubois had Schiller prepare a statement regarding his kidnaping for the police and contacted a friend of his with the police to report the crimes. (T.7250-51) Arrangements were made for Dubois and Schiller to meet with an officer in the Strategic Investigations unit. (T.7272) Schiller flew to Miami and met Dubois and the police. (T.7272, 6714-15) The officer from the Strategic Investigations unit transferred the matter to the robbery

14

unit. (T.7273) After speaking to the police, who appeared skeptical, Schiller again left the country. (T.6715, 6716, 7273-74)

In late April 1995, Defendant then told Delgado that he had another potential victim whom Defendant wanted to kidnap and rob, named Winston Lee. (T.11053-54) Defendant solicited the assistance of Mario Gray for the proposed kidnaping and killing of Lee. (T. 10452-53) Defendant told his girlfriend Sabina Petrescu that he had an assignment from the CIA to kidnap a terrorist. (T.9689-91) He took Petrescu and Doorbal to do surveillance at Lee's home, claiming that he was a terrorist. (T.9689-90) Delgado also assisted Defendant in conducting surveillance on Lee. (T.11054) However, Lee was away too much, so the plan was abandoned. (T.11055)

Around the end of 1994, Doorbal met Beatrice Weiland at a strip club where she worked, and they started to date. (T.5085) While they were dating, Beatrice showed Doorbal her photo album. (T. 5112-15) In the album were three pictures of Frank Griga's Lamborghini. (T. 5112-15) Doorbal was very interested in the pictures of the car and asked about its owner. (T.5115-17)

Doorbal told Delgado that he had found a Hungarian couple with a lot of money to kidnap. (T.11056-57) They later discussed this with Defendant. (T. 11058) In May 1995, Defendant told Petrescu that he was going to kidnap a Hungarian man who drove a yellow Lamborghini or Ferrari. (T.9719-21) Doorbal and Defendant had a suitcase with handcuffs, syringes and duct tape to use in the kidnaping and later tried to enlist Petrescu to drive them to the victims' house (T.9724)

15

Beatrice introduced Doorbal to her ex-husband Attila Weiland in April 1995. (T.5037) At the beginning of May 1995, Doorbal, who had claimed to be a legitimate businessman, told Attila that he was looking for investors in a business dealing in phone lines and asked Attila to see if Griga might be interested. (T.5045-47) Attila contacted Griga, who indicated a willingness to meet Doorbal at Griga's home to discuss the business deal. (T.5047) Under the pretense of a business meeting, Doorbal and Defendant picked up Attila in Defendant's Mercedes, and they all went to Griga's home. (T. 5047, 5050) About 15 minutes later, Griga told Attila in Hungarian that he was not interested, Doorbal and Defendant were shown the house and Attila, Doorbal and Defendant left. (T. 5055-56)

One Sunday in May, Defendant put a bag containing items used for a kidnaping, including handcuffs and syringes, into his car, and he, Doorbal and Petrescu drove to Griga's home. (T. 5723-28, 9732, 9735-49) When they got to the house, Doorbal and Defendant, who both had guns, got out of the car and took a computer into Griga's house. *Id*. After 15 minutes, Doorbal and Defendant came back to the car, and Doorbal was angry that they had not followed through on their plan at that time. (T. 9750) However, after a few moments, Defendant phoned Griga to set up another meeting. (T. 9750-54) Defendant then advised Doorbal that they would meet Griga again later that day, and the two defendants calmed down. (T. 9750-54)

On May 24, 1995, Eszter Lapolla was living at the home of

16

Griga and Krisztina Furton, for whom she worked as a maid. (T. 4992-99) Around 5:00 p.m., Lapolla and Furton went to pick up Lapolla's daughter, and when they returned Griga was there with Doorbal and Defendant. (T.4995-96)

Around 6:00p.m. on May 24, 1995, Attila called Griga, who was busy and asked that Atilla call back later. (T. 5058-59) When Attila called back around 9:00p.m., Griga indicated that Doorbal and Defendant were there talking business. (T.5058-59)

Between 10:00 and 10:30p.m., Judi Bartusz went to Griga's home. (T. 4922-23) She noticed a gold Mercedes four-door in the driveway of the home. (T.4923) When she entered the home, Griga, Furton, Doorbal and Defendant were there and indicated that they were going to Shula's restaurant for dinner. (T. 4923-25) Furton was wearing a red leather dress, red jacket and red shoes and was carrying a red purse. (T. 4925, 4998) Griga had on jeans, crocodile boots and a silk shirt. (T.4929) Griga and Furton were planning to go to the Bahamas the next day, and they had planned to leave their dog in a kennel. (T. 4932) Bartusz saw Doorbal and Defendant leave the house in the Mercedes and Furton and Griga leave the house in Griga's Lamborghini. (T. 4978-79) Later, Defendant called Delgado and asked if he knew how to drive a Lamborghini and explained he was having problems driving one. (T.11059-60)

Lapolla never heard Griga or Furton return that night. (T. 5000) When Lapolla awoke the next morning, she noticed that Griga, Furton and Griga's Lamborghini were not at the house. (T.5000) Lapolla took her daughter to school, packed her things to move out

17

of the house as planned, wrote a note for Griga and Furton and left the house. (T.5000-01) Lapolla tried to call Griga and Furton for the next two days, but the calls went unanswered. (T.5001-02)

The day after the kidnaping, Delgado met Doorbal and Defendant at Doorbal's apartment. (T.11060-01) Defendant explained that he and Doorbal had planned to lure Griga and Furton to Doorbal's apartment. (T.11061, 10064) Once inside, Doorbal and Defendant separated Griga and Furton. (T.11061-62) They had planned to extort money from them before they died. (T. 11066) Defendant said that Doorbal had gotten into a scuffle with Griga and had strangled him. (T.11061-66) When Furton had seen the struggle, she had screamed, and Defendant had subdued and tranquilized her. (T.11066-67) Griga's body had then been placed in a tub. (T. 11061)

As Defendant finished explaining what had happened, Doorbal came downstairs, carrying Furton, who was bound and was wearing a hood. (T. 11067-68) Doorbal laid Furton on the stairs, and she awoke, screaming for Griga. (T. 11068) Doorbal retrieved syringe from the refrigerator and injected Furton in the ankle with more horse tranquilizer, which cause her to scream. (T. 11069) Defendant and Doorbal then questioned Furton about the codes at the house and the location of a safe. (T.11073) After about an hour, Furton stopped answering the questions and began to shake and scream. (T.11075-76) Doorbal then injected her again, which again caused her to scream. (T. 11076) At that point, John Raimondo arrived to kill Furton and dispose of both bodies. (T.11078-80) Raimondo awoke Furton, pulled her up by the handcuffs on her wrists and started to

18

tape her feet and wrists. (T.11080-81) This cause Furton to scream again, and Defendant ordered her to be injected yet again. (T.11082) After the third injection of tranquilizer to Furton, Raimondo left the apartment. (T. 11083)

At this point, Delgado went into the downstairs bedroom and saw that blood was on the walls, floor and objects in the room. (T. 11084) Defendant then left the apartment. (T.11086) He took Petrescu to Griga's home and tried to enter a code at the door, which did not work. (T. 9772-73) About an hour after he left, Defendant called the apartment. (T.11087) Defendant told Doorbal that the numbers did not work, to which Doorbal responded "the bitch is cold." (T. 9773-74, 11087-88) Defendant then told Delgado they needed to rent a moving van and buy a wardrobe box, and the two left. (T. 11090-91)

On May 26, 1995, Lapolla called Bartusz, indicated that something was wrong at Griga's home and asked her to come. (T. 4933, 4973-74) When Bartusz arrived at the house with Lapolla, she noticed that the dog had been left in the house, two drinking glasses, which were out on May 24, 1995, were still sitting on the coffee table, plane tickets for a trip to the Bahamas that Griga and Furton had planned to take on May 25, 1995, Griga's passport and Furton's wallet were in house and the bedroom was in disarray. (T. 4934-41) As this was all unusual, Bartusz notified the police that Griga, Furton and Griga's car were missing. (T. 4943-44)

That same morning, Delgado rented the van and went to Doorbal's apartment. (T.11092-93) Furton was placed in the wardrobe

box, and Griga was placed in a sofa and carried to the van. (T. 11093-98) Defendant then drove the van to a warehouse he had rented. (T. 11105-06) When they got to the warehouse, Griga's Lamborghini was already inside it, as were a number of drums. (T.11106-09) They unloaded the sofa and box from the van and placed them in a back corner of the warehouse. (T. 11107) Doorbal and Defendant then went to Home Depot and purchased two rolls of plastic sheeting, a propane torch, windex, shop towels, a hatchet, a fire extinguisher, tar, fans, a chain saw and a gas can (T.11109-51) Delgado left briefly and when he returned to the warehouse, the bodies had been laid out on plastic, and Defendant was wiping them off with Windex and shop towels. (T. 11119-20) When the bodies were clean, Doorbal tried to cut them up with the chain saw, but it quickly jammed on Furton's hair. (T. 11126-27) Doorbal and Defendant then used the hatchet to dismember the bodies. (T. 11127-28) The bodies were then packed into the drums, tar was added and the drums were soldered shut. (T.11128-30) Delgado then drove Doorbal home, and when he returned to the warehouse, there was a fire in one of the drums. (T.11133) Defendant stated that he was burning the heads, hands and feet. (T.11133) After a while, Defendant extinguished the fire, and they left for the night. (T.11133-35) They then went to Doorbal's apartment, took everything out of the downstairs bedroom, including the carpet, and put it in the storage room at Defendant's apartment. (T.11135-39)

The next day, Delgado went to Doorbal's apartment, and Doorbal, Doorbal's wife and Defendant were cleaning it. (T.11177-

20

78) Doorbal later came to Delgado's house and said that they had cut the fingertips off the hands and pulled the teeth out of the heads. (T.11180-81) Defendant had gone to the Bahamas to get Griga's money. (T.11181) They traded cars back, and Doorbal left. (T. 11181)

Sgt. Donna Ganz located Griga's Lamborghini in a wooded area off Okeechobee Road that was used for dumping. (T.5157-70) The radio had been removed from the car. (T.5160-61)

On May 28, 1995, Defendant asked Mario Gray to rent a moving truck for him and meet him at his warehouse, which Gray did. Inside the warehouse were garbage bags, 55 gallon drums, a black sofa and a television. Defendant then asked Gray if he knew of a good dump site, Gray gave Defendant a location, and Doorbal, Gray and Defendant drove to this site to look at it. (T.10463-73) On the way back, they stopped at a gas station, Gray was given a bag of credit cards, jewelry and ID's and told to dump them, which he did. (T. 10481-82) They then went back to the warehouse, loaded four drums into the moving van, drove back to the site and dumped the drums in groups of two about 100 meters apart. (T. 10483-90) They then drove to an apartment, picked up some carpet, drove back to the warehouse, and picked up the trash bags. (T.10492-10495) Gray then disposed of these items in a number of places, as instructed. (T.10494-95) Gray was then given the sofa and TV from the warehouse as payment. (T.10498-51)

In late May, Schiller was contacted by Dubois, who stated that someone else had been a victim of a crime similar to the crimes

against Schiller. (T.6716) At the request of the police, Schiller returned to Miami and gave a statement to the police. (T.6716-17)

On June 9, 1995, Defendant directed the police to the site where the drums had been dumped. (T.10653-61) Inside the drums, the police found two bodies from which the heads, hands and feet had been removed. (T.106661) In July 1995, the police went to an area of the Everglades based upon an anonymous tip and found 3 buckets containing two head, two sets of hands and feet, an axe, a hatchet and a knife. (T.10672-73) One of the heads had one tooth in it that matched Griga, and the other had no teeth left. (T.11635-37) Through DNA testing and the medical histories of the victims, the torsos and head were determined to be those of Griga and Furton. (T. 11635-37, 11540-45)

As a result, Defendant was charged with committing: conspiracy to commit RICO, RICO, two counts of first degree murder, two counts of kidnaping, attempted extortion, grand theft motor vehicle, attempted first degree murder, kidnaping with a weapon, armed robbery, burglary of an unoccupied dwelling, grand theft-second degree, grand theft motor vehicle, possession of removed identification plate, arson first degree, extortion, money laundering, forgery, uttering a forged instrument, conspiracy to commit a first degree felony. (R. 61-112).

On October 23, 1995, Defendant filed a Motion to Sever, requesting that he be severed from the trial of his co-defendants. (R. 330-31). Additionally, Defendant moved to have the RICO counts dismissed and/or severed, as well as the Furton/Griga related

22

counts severed from the Schiller related counts. (R. 2514-2535, 36-46)

At the hearing on Defendant's motion to sever counts, Defendant argued that the Schiller charges were dissimilar from the Griga/Furton charges because the latter victims were dismembered and discarded in tin drums in the Everglades where such did not occur in Schiller's case. (T. 995) Defendant argued that the Schiller case and the Griga/Furton case were separate and distinct unconnected acts and unrelated in an episodic sense. *Id*. The trial court denied Defendant's motion to sever counts. (R. 2220)

On November 24, 1997, Defendant argued a motion to dismiss the RICO counts on the basis that the there was no organization directing the killing of the Griga/Furton murders and Schiller kidnaping. (T. 2146-48) Defendant also renewed his motion to sever counts in the alternative. (T. 2147-49, 2159) The court granted a severance of the co-defendants' trials to the extent that a separate jury would deliberate and render a verdict for Defendant's case; however, the presentation of witness testimony would be consolidated in one trial. (T. 2174) On December 19, 1997, Doorbal contested the court's ruling of dual juries, and Defendant subsequently filed a motion to adopt Doorbal's motion to preclude dual juries.(T. 2294-2309, 2562-63) The trial court denied the motion. (T. 2294-2309)

At trial, Dan Westlake testified that he was Defendant's probation officer and that Defendant was required to pay $71,200.00 in restitution to terminate his probation. (T. 9103, 9129-34) On

January 10, 1995, Westlake met with Defendant at Mese's office with Mese present, and Mese told Westlake that he was buying a computer program from Defendant, which had a purchase price equal to the remainder of Defendant's restitution balance. (T. 9175) Based on Defendant's and Mese's representations, Westlake accepted the payment and concluded Defendant's restitution requirement. (T. 9176-80)

Atilla Weiland testified that he had met Griga through Beatrice and the Hungarian community and believed Griga was wealthy. _(T.5036-37) The total value of Griga's estate was approximately $10 million. (T.10390-91) Attila stated that when he learned that Griga and Furton were missing, he contacted Doorbal. (T.5061-62) Doorbal claimed that he left the victims to go see his girlfriend, that the victims had been speaking to his business partners and that they may have gone to the Bahamas. (T.5062-63) Attila averred that when he again spoke to Doorbal the next week and inquired about the victims, Doorbal told Attila that they were supposed to be friends in a threatening tone implying that Attila should drop the subject. (T.5064-65)

Beatrice testified that Doorbal and Defendant usually came to the strip club she worked at, and they always spent a lot of money at the club. (T. 5087) Beatrice saw no indication that Doorbal was afraid of Defendant. (T. 5094) Instead, Doorbal and Defendant appeared to have a brotherly relationship, and Doorbal indicated that he was grateful to Defendant for helping him get established in this country. (T. 5092-94) Beatrice explained that when she saw

Doorbal after she had learned that the victims were missing, she asked Doorbal to help her find them. (T.5119) Doorbal became very upset at this question and claimed not to know anything. (T.5119-20)

Agnes Sarisky testified that she lifted fingerprints from the drinking glasses left on the coffee table at the Griga's house and Griga's car. (T.5173, 5176) Brett Nichols testified that he lifted additional prints from the car. (T.5195-96) Nichols also examined Defendant's Mercedes after it was located at Ft. Lauderdale airport. (T.5264) Inside the Mercedes, Nichols found a parking ticket for Miami Airport for May 30, 1995, another parking ticket for June 2, 1995, handcuffs, a fully loaded Derringer .357 handgun, cellular phones, keys, an extra battery for a phone, music CD's, cassette tapes, a gun pouch that fit the Derringer, a pair of nun-chucks, a Berlitz Romanian cassette tape and a number of papers. (T.5265-80)

Det. Iris Deegan testified that she was assigned to investigate the kidnaping and extortion of Schiller on April 21, 1995. (T.5198-02) As part of her investigation, she spoke to Schiller and a neighbor Manuel Salgar. (T.5205-08) Salgar described two men who had been around Schiller's house at the time of the crime. (T.5208-12) One of the men was identified as Defendant. (T.5218-19) The other person was described a light skinned black man who was shorter and huskier than Defendant and who drove a 300ZX. (T.5209-5213) This man appeared to be Arabian. (T.5210)

Det. Salvador Garafalo testified that he was assigned as lead

25

detective in this matter on May 30, 1995. (T.5337-40) At that point, the Griga/Furton disappearance was transferred from missing persons, the Schiller kidnaping was transferred from robbery and both cases were consolidated. (T.5343, 5367) After speaking to Bartusz, Lapolla, the Weilands and Schiller and showing them photo arrays, Garafalo determined that Doorbal, Defendant and Delgado were suspects. (T. 5345-48) Garafalo then discovered the apartments rented to Doorbal and Defendant, the home they owned and the cars they drove, as well as the home and cars of Delgado. (T.5345-60) Garafalo and his team then sought search warrants for each of these dwellings and cars, which were granted. (T.5359-60) Garafalo then assembled a team of officers, which gathered on the morning of June 3, 1995, and simultaneously executed the warrants. (T. 5361-70) Based on information discovered during these searches, additional warrants were sought, obtained and executed for two warehouses, Sun Gym, Mese's office and his home. (T.5368-69)

Sgt. Luis Alvarez testified that he and Det. Hellman, Fabregas and Chadwick were assigned to execute the search warrant for Doorbal's apartment. (T. 5467-76) After the search warrant was read, Doorbal left the apartment with Fabregas and Hellman. (T. 5472) Alvarez noticed that a downstairs bedroom was empty, had a spotless carpet that appeared to be new and a closet with boxes in it. (T. 5475) As Doorbal's wife, Cynthia Eldridge, was at the apartment when the warrant was executed, Alvarez was reassigned to interview her while Det. Jim McColman and Lillian Gonzalez were assigned to continue the search. (T. 5475-76)

McColman continued the search of Doorbal's apartment and found a day planner/address book, various receipts, a premium notice for car insurance, a credit card statement, a computer book, two letters from Dubois to Joel Greenberg demanding the return of all property taken from Schiller, computer equipment stolen from Schiller, a VCR, a fax machine, a typewriter, documents related to the construction on property owned by Schiller, mail addressed to Schiller's residence, several cell phones, a pager, a knife, keys, a phone bill, Doorbal's credit cards, Schiller's business card, an airplane boarding pass in Schiller's name, receipts for purchases on Schiller's credit card, a warehouse lease, a receipt for changing the locks at Schiller's home, bank statements, corporate documents, documents regarding Defendant's probation, cancelled checks, photos of Lee's home, several foreign passports and identity cards bearing Defendant's photograph and names other than Daniel Lugo, Defendant's American passport, a statue taken from Schiller's house, binoculars, handcuffs, jewelry including items taken from Schiller, and cash. (T.5542-00, 5482-20, 6733-36)

After the initial search was concluded, the police learned that new carpeting had been installed in Doorbal's apartment and obtained a new search warrant for it. (T.5718-20) Det. Ray Hoadley executed this warrant and found more documents and checks in the apartment. (T. 5719-20) As a result, this search was discontinued, the apartment was secured and a third warrant was sought. (T.5720) When the third warrant was executed, Hoadley found Greenberg's business card, more jewelry receipts, various additional financial

documents, life insurance information regarding Schiller, correspondence addressed to Schiller, and documents regarding Schiller's home owners' association. (T.5721-44) Hoadley also found fresh carpeting in the downstairs bedroom, an area of new padding under this carpeting, an orange dart embedded in the wall of this bedroom, an animal tranquilizer, rope and catalogs addressed to Schiller. (T. 5744-48)

Alexandra Font testified that she leased Doorbal his apartment and saw him sign all the leasing documents. (T.5414-23) About a week before the police executed the search warrants, Doorbal came into the apartment office, said that his cat had soiled his carpeting and requested that the carpeting be replaced and the apartment be repainted. (T. 5423-25)

Joseph Verga testified that he leased a warehouse located on 78th street in Hialeah to Delgado in June 1993 and that Delgado continued to lease the apartment until November 1995. (T.5785-86) In November 1994, Delgado placed iron gating on the front window and door of the warehouse and changed the locks. (T.5797)

Eduardo Abril testified that he rented a warehouse located on 80th Street in Hialeah to Doorbal and Defendant on May 19, 1995. (T. 5807-21) At the time the lease was signed, Abril was storing tools in the warehouse and was given permission to remove the tool after they occupied the warehouse. (T.5826-27) When Abril went to get the tools several days after the lease was signed, he found a yellow Lamborghini in the warehouse. (T.5827)

When the check given for the initial rent and deposit did not

clear, Abril sent a letter to Defendant on May 24, 1995. (T.5823-24) Sometime thereafter, Abril noticed a van and several cars at the warehouse and approached to speak to Defendant. (T.5825) However, Defendant came out of the warehouse and spoke to him in the parking lot. (T.5825)

Nichols searched the warehouse leased to Doorbal and Defendant on June 7, 1995. (T.5838) Nichols found plastic lining, a gas can with gas in it, a broom, windex, pliers, a screwdriver, handcuffs, a black leather bag containing duct tape, solder, a hose, a fan, rope, cans, bottles, an owner's manual for a chain saw, a fire extinguisher, flint, goggles, some 55 gallon drums, an air compressor, hair stuck to the ground, a Swiss Army knife, a newspaper dated May 26, 1995, a bag for a propane torch, directions for a mask respirator, a mask respirator, a CD player, gardening gloves, marking tape, a putty knife, industrial strength gloves, batteries, lids to containers of asphalt, a floor scraper, mortar mix, suede gloves, a brass key, orange shop towels, iron grating and a laptop case. (T.5858-75) Nichols also lifted a total of 33 latent fingerprints. (T.5873, 5878-79) Additionally, Nichols treated the warehouse with luminol and discovered traces of blood. (T.5875-78) Finally, Nichols found Griga's automobile association card, a number of receipts in Griga's name and a handcart. (T.5877-79)

Det. Thomas Romagni testified that he executed the search warrant for Sun Gym. (T.5895-96) He found the ledger for the business, its tax returns, bank statements, a bank reconciliation,

annual reports, IRS notices, checks, Defendant's personnel file, a bag containing .380 caliber firearm registered to Mese and three silencers (T. 5899-28)

Det. John King testified that he executed the search warrant for Mese's accounting office in Miami Lakes. (T.5965-66) He found a file for Delgado and his wife, an employment file for Delgado, a file for Jomar properties and investments, a client list, a file for Defendant and his wife, a file for Schiller and his wife that included documents regarding an alleged sale of Schiller's home and property to D&J International, Inc. and a change of beneficiary on Schiller's life insurance policies, Mese's appointment book, and documents related to a tax lien on Sun Gym. (T.5967-95) Hoadley testified that he found a taser gun during the search of Mese's home. (T. 5463-64)

Sgt. Archie Moore testified that he executed the search warrant for Mese's accounting office in Miami Shores. (T.6024-25) He found Mese's appointment book. (T.6026) In mid June 1995, Moore also met with Gregory Lewis and received Griga and Furton's credit cards and ID's from him. (T.6031-36) Lewis had received the credit cards and ID's from a street person, who had found they behind an Amoco station in Allapattah. (T.6035-36, 6041-43)

Det. Charles Pointer testified that he executed a search warrant for Defendant's wife's home, which was owned by Doorbal. (T.6046-47, 6141-42) He found an address book, mail addressed to Doorbal including Smith Barney statements, a box containing a computer that had been shipped to Schiller, computer equipment,

30

clips for a semiautomatic firearm, documents related to Phoenix Trading Company, cards from strip clubs for Doorbal and Defendant, documents related to Sun Gym and related corporations, documents related to medical supply companies, driver's licenses for a number of people, a debit slip showing the transfer of $40,000 from Schiller to Doorbal, Schiller's bank statements, checks from Schiller's account to Mese, check registers for Doorbal's account and Defendant's account, stock options in Doorbal's name for Sun Gym, two-way walkie talkies, bullets, a loaded .38 caliber revolver, passport type photographs of Doorbal and jewelry. (T.6046-94)

Sgt. Mike Santos testified that he executed a search warrant for Defendant's apartment. (T.6403, 6405-13) He found a set of keys for a BMW, computer equipment, numerous financial documents, letters from Schiller to Mese demanding return of his property, a letter related to Schiller's purchase of the condo, an executed deed for Schiller's home, a letter from Blanco to Rosen cancelling the transfer of Schiller's condo to Torres, a final judgment quieting title in Schiller's home, several sheets of paper with lists of account numbers, alarm codes, names and phone numbers, a letter from Dubois to Greenberg demanding the return of Schiller's property, a letter from Ed O'Donnell to Mese and Delgado regarding the exchange of a contract for a cashier's check, a letter authorizing a wire transfer from Schiller to D & J Associates, and a computer printout listing Griga's bank accounts. (T. 6416-55,6464-66) Santos also discovered a television with blood spatter

31

on it, 30 syringes - some of which were filled, a vial labeled Rompun, a taser gun, a dart gun, duct tape, an eavesdropping device, a police baton, walkie talkies, a cell phone, a computer scanner with blood on it, Griga's driver's license, gloves with blood on them, bloody towels, bloody carpet, bloody carpet padding, bloody clothes, Griga's Rolex, the cowboy boots that Griga was wearing when he was last seen alive, and the red shoes, purse, jacket and jewelry Furton was wearing when she was last seen alive. (T.6466-91) Santos uncovered binoculars, a night scope, jewelry, a can of tear gas, a bag containing several guns, ammunition and darts for the dart gun, and a letter from Schiller to Delgado demanding return of his property. (T.6492, 6500-18)

Sharon Farugia testified that Schiller purchased a $1,006,021 whole life insurance policy from Met Life in July 1990, and a $1 million whole life insurance policy in November 1992. (T.6182-84) The beneficiary on both policies was his wife. *Id*. In 1994, Farugia received a call from Rosen indicating that changes had been made to the policies as a result of illicit activities and that Schiller wanted to revoke them. (T. 6186) Farugia researched the policies and found that a change of beneficiary had been filed in November 1994. (T.6187) This change made Lillian Torres the beneficiary, and the form had been notarized by Mese. (T.6187-88) Rosen then sent a letter confirming the cancellation of the change of beneficiary, the change was voided and the change form was returned to Rosen. (T. 6189-92)

Camillo Blanco testified that he was the chief financial

32

officer for the company that built La Gorce Palace condominiums. (T. 6229-31) Schiller purchased one of the condos in 1993 prior to construction for $359,000. (T.6230-32) In November 1994, Blanco received a phone call from Schiller, stating that he wanted to sell his condo. (T.6232-33) As a result, Blanco informed that Schiller that documents necessary to change the ownership had to be prepared and that a $1,000 fee would be charged to do so. (T.6232-34) Blanco then received a letter dated November 28, 1994 signed by Schiller and his wife that enclosed a $2,400 check on Schiller's account and stated that he wished to transfer the condo to Lillian Torres. (T. 6235-36) The necessary documents were prepared and returned to Blanco in quadruplicate on November 29, 1994, signed and notarized by Mese. (T.6235-40). However, Blanco did not execute the assignments because an installment payment was due on the purchase contract for the condo and he could not reach Torres or Schiller. (T.6243)

Subsequently, Blanco received phone calls from Schiller and his attorney. (T.6244-45) On February 6, 1995, Blanco sent a letter to Rosen, stating that he had received the documents transferring the condo, that he had later gotten calls indicating that the documents had been executed under duress and requesting that they be cancelled and that they transfer would not be effectuated. (T. 6245-46)

Kimberly Sparks of Penguin Pools testified that her company serviced the pool at Schiller's house. (T. 6591-94) At some point, Sparks was informed that Schiller was no longer living at the house

33

and that a person calling himself Dan Thomas was there. (T. 6595) Sparks contacted this person through a beeper number he had provided and entered into an agreement with him, Joseph Thomas and D.J. International to service the pool. (T. 6595-98) The check for the initial payment under this contract was signed by Defendant. (T. 6598-99)

Schiller testified that he never willingly gave any of his property to Defendant, Doorbal or Mese. (T. 6733-37) Schiller never met Mese. (T. 6633) As an accountant himself, he never used Mese's accounting services and never provided Mese with any of his financial documents. (T. 6633, 6737-38) Schiller stated that he was never in Doorbal's apartment and did not know how his property got there. (T. 6735-56, 6789-91) Schiller averred that he never knowingly executed the quit claim deed for his house, that his wife was in Columbia on the dated that it indicated that she signed it, that he did not know Lillian Torres and that he did not go to Mese's office to have the document notarized. (T. 6756-57)

Schiller recognized the computer equipment seized for Defendant's apartment as his but did not know how it got into Defendant's apartment. (T.6758-59) He identified the furniture found in Defendant's apartment as his. (T.6759-61) The BMW keys found in Defendant's apartment belong to his wife. (T.6761) Schiller recognized pictures of his wife's BMW although it had been repainted black. (T. 6762-64) Schiller did not have the car repainted and had no idea how his property and correspondence came to be in Defendant's apartment. (T.6767-73)

34

Schiller never knowingly wrote any checks to Mese. (T.6773-77) Schiller never saw the documents that were in his file at Mese's accounting office before trial. (T. 6778-79) Schiller never gave Doorbal, Defendant or Mese copies of his Columbian residence papers or his passport. (T.6780-81) Schiller used his driver's license for identification and never used his passport for that purpose. (T. 6781-82) Schiller did not attend a closing for the sale of his home to Torres, never met Mese, and did not have him prepare his taxes or do any other work for him. (T.6782-88) Schiller also never knowingly wrote checks to any corporation associate with Sun Gym, and never tried to buy the gym. (T. 6810-13)

Schiller testified that after he was kidnaped, he found that his IRA's and mutual funds, which had contained close to $100,000 were gone. (T.6813-14) The entire balance had been removed from his business account. (T.6814) His home had been emptied of furnishing. (T. 6851-52) Approximately $70,000 had been charged on Schiller's credit cards during his captivity. (T.6853-56)

Schiller acknowledged that he had signed a contract with Delgado that stated that Delgado would return Schiller's money. (T. 6831-32) He admitted that the contract stated that the exchange was a result of a failed business deal and that it averred that his account of abduction was false. (T.6832-33) He also agreed that the agreement provided that he would not go to the police. (T. 6833) However, Schiller asserted that the statements were untrue and that he always planned to report the crimes. (T.6833-34) He averred that he signed the agreement, believing it was an easy method of

obtaining the return of his property. (T.6834)

Ed Dubois, a private investigator, testified that he was hired by Rosen regarding Schiller. (T.7094-95) After speaking with Schiller, Rosen advised him to get out of the area and worry about contacting the police later. (T.7096) However, after Griga and Furton were missing, the police contacted Dubois, who provided the information he had learned, the documents he had found in the trash in Mese's office and documents he had found in Schiller's house. (T.7274-82)

Lillian Torres testified that she met Defendant at a gym in New York in 1986 and married him on October 19, 1987. (T.7530-31) They later moved to Florida and took custody of Torres' siblings' children. (T.7531-32) Defendant stayed home with the children and claimed to be working in the stock market. (T.7534) In 1991, they divorced, and Torres later learned that Defendant had gone to jail. (T.7537) When Defendant got out, he came to visit Torres and introduced her to Doorbal and Lucretia Goodridge, who was Doorbal's cousin and later married Defendant. (T.7537-38)

In May 1994, Defendant asked Torres to work for him at Sun Gym, which he claimed to own with Mese. (T.7539) After working there briefly, Torres quit but remained friendly with Defendant and went to an office he shared with Mese in Miami Lakes. (T. 7540-41) In November and December of 1994, Defendant began to give Torres a lot of money. (T.7546) He also took her to a house in Kendall in the last part of November and to hospital in December. (T.7543-45) Defendant had spy equipment in the car he was driving. (T.7345)

During this time, Defendant came to Torres' home and asked her to sign some papers, claiming that he was having trouble with his wife and did not want to have property in his name. (T.7346-47) Torres signed the papers, which Defendant kept covered, without reading them. (T. 7347-48) Torres never met Schiller, was not his fiancee and was not asked to act as such by Defendant. (T. 7348-49) One day, Defendant took her to a warehouse in Hialeah that had furniture and personal effects in it, some of which were given to Torres. (T.7351)

Off. William Spader testified that he examined a black BMW station wagon at a towing yard and determine that the public VIN had been altered. (T.7585-99) From the private VIN, Spader determined that the BMW belong to Schiller. (T.7597)

Loretta Ramsey identified the bank records from accounts at Central Bank of D&J International, Sabina Petrescu, Doorbal, Defendant and his wife, Carl Weekes and his wife, Delgado and his wife, Sun Gym, Inc. and Sun Fitness Consultants. (T.7634-39) Doorbal's account was opened on November 29, 1993, and Doorbal was the sole signator on that account. (T.7639) Doorbal and Defendant were the signators on the Sun Fitness Consultants account. (T.7644)

Ilma Avila identified Doorbal, Defendant, Mese and Delgado as customers at Central Bank's Palmetto Lakes office. (T.7646-52) Doorbal, Defendant and Delgado used to come into the bank together, so much so that the tellers nicknamed them the three stooges. (T. 7653-54) Avila personally opened the accounts for D&J International, Petrescu, Doorbal, Defendant and his wife and

Delgado and his wife and personally observed each of the signators sign the signature cards for each account. (T.7646-68, 7682-83) The documents regarding the Sun Fitness account showed that Mese was the president and secretary of this company and that the signators on the account were Doorbal and Defendant. (T.7684) The documents pertaining to the D&J International accounts had Defendant listed as president and secretary. (T. 7659) The Sun Gym account documents also showed that Mese was president and secretary. When this account was opened in April 1994, Mese and Defendant were signators on it, but the signators were changed to Mese and his wife in October 1994. (T.7693-97) The Sun Fitness account, D&J International account, the Sun Gym account and Doorbal's account all had post office boxes at the same mail facility as addresses. (T. 6787-94, 7656-57)

During April 1995, Doorbal received two wire transfers from Smith Barney: one in the amount of $50,000 and the other in the amount of $80,000. (T.7671-73) On March 24, 1995, Defendant initiated a wire transfer in the amount of $2,500 to Frank Fawcett in Boston. (T.7676-78) On December 13, 1994, Defendant wrote a check from D&J International in the amount of $45,000 to Sun Fitness, and on December 14, 1994, $45,000 from the Sun Fitness account was used to purchase a cashier's check payable to Mese's escrow account. (T. 7689-91) On November 28, 1994, two checks from D&J Associates, one in the amount of $560,000 and the other in the amount of $700,000, were deposited into the Sun Fitness account. (T.7691-93) On February 9, 1995, a check in the amount of $67,845

38

drawn on the D&J International account was deposited into the Sun Gym account. (T.7698-00) That same day, Mese purchased a cashier's check in that same amount payable to the U.S. Courts for the benefit of Defendant. (T.7700-03)

In April 1995, Doorbal approached Sanchez and offered him $5,000 to assist him again. (T.7882-83) Sanchez refused to be involved. (T.7883-84) The next day, Sanchez met Doorbal at the gym, Defendant came in, Doorbal and Defendant both insisted that Sanchez get involved, and Sanchez again refused. (T.7884-89) When Sanchez was in the gym with Doorbal thereafter, Doorbal stated that he intended to buy a yellow Lamborghini. (T.7889-90) Later, Doorbal changed his mind, and stated that he was getting a Dodge Viper. (T.7891)

Det. Gregory Smith testified that he searched Schiller's car and found that it had been burned. (T.8486-94) He impounded a shirt, a melted gas can and carpet samples from the car. *Id.* Vince McBee, a forensic chemist, tested the samples and found that gasoline was present in the carpet but not on the clothes. (T. 8590-93) William McAlister, an arson investigator, testified that the fire in Schiller's car started in the right rear area by the ignition of a flammable liquid with an open flame. (T.8599-10) McAlister also opined that it is difficult to burn a human body and that attempting to do so with an open fire would not burn the body completely and would result in a smoky fire. (T. 8614-17)

Michael Ovedia testified that he rented three mailboxes at his post center to Defendant, who was using the name Javier Hernandez,

on November 19, 1993. (T.8528-34) The boxes were under the name of Doorbal, Phoenix Investments and Regional Medical. (T. 8535-36) Later, Defendant rented an additional mailbox in Schiller's name, at which Torres was also authorized to receive mail. (T. 8538, 8542) Elle Ovedia testified that Defendant had her predate the form to March 1, 1994, but that the Schiller box was rented in November 1994. (T.8654-63)

Franklin Murphy testified that he met Defendant through Sun Gym, where Defendant was a personal trainer at the time and Murphy's wife was the manager. (T.8713-18) In April 1993, Defendant, who had stated that he was playing the market, opened a money market account at Merrill Lynch through Murphy, who was a broker there. (T. 8717-19) At the time Defendant stated that he and his wife worked for D&J International and made an initial deposit of $2,500. (T. 8722-23) In November 1993, Defendant deposited a check drawn on Mese's escrow account in the amount of $142,000 into this account. (T.8726-27)

In February 1994, Defendant brought Doorbal to Murphy to open his own investment account. (T.8726-27) Doorbal represented that he had inherited some money, and an account was opened for Doorbal, over which Defendant had power of attorney for the purpose of trading only. (T.8727-43) However, only Doorbal could withdraw funds from this account. (T.8730-31) The initial deposit into this account was $745,000. (T.8744) Because Doorbal had listed Defendant as his cousin, the compliance officer at Merrill Lynch would only authorize the granting of the power of attorney to Defendant if

40

Murphy confirmed Defendant's trades on Doorbal's account with Doorbal personally. (T. 8745-46)

Defendant also had Murphy open an account in the name of Thomas Lewis, who was allegedly from Haiti, with an initial deposit of $500,000. (T.8770-80) When Murphy attempted to contact Lewis, he learned that no such person existed. *Id.*

In December 1994, a $1 million check drawn on Sun Fitness Consultants was deposited into Doorbal's account. (T.8750) Defendant claimed that this money was earned through investment of moneys from a line of credit. (T.8751) The compliance officer became suspicious of this account, checked into Defendant and Doorbal and ordered that both account be closed. (T.8756-60) Murphy met with Defendant and informed him that the account had to be closed. (T.8761-64) The securities from the account were transferred to Smith Barney and the cash was removed from the account through a series of cash advances in amounts less than $10,000, many of which were made batches. (T.8765-69)

Christopher McFarland, a forensic accountant, testified that he reviewed Doorbal's brokerage account records, DJ and Associates' accounting records, D&J International's accounting records, Sun Fitness Consultants' records, Mese's escrow account records and banking statement from 46 accounts, including Schiller's accounts. (T. 8861-02) From these records, he traced the money taken from Schiller and determined that it was exchanged in a variety of financial transactions between Doorbal, Mese, Defendant and corporations owned by these individuals. (T.8902-13, 8928-22) In

41

McFarland's opinion, these transactions were conducted for the purpose of laundering this money. (T.8924-25, 8927-31) Defendant eventually used some of this money for personal expense and made payments to Torres, Petrescu, Weekes, Pierre, Delgado and Defendant's wife. (T.8962-63) Doorbal used part of the moneys he received for personal expense and payments to Torres, Petrescu, Pierre, Defendant's wife, Hector Ramos, Luis Tabalda, Manerva Defendant and Steven Meyerson. (T.8962-64)

Petrescu testified that she met Defendant at a strip club where she was working, and they became close. (T.9603-66) Defendant offered to pay for her living expenses so that she did not have to strip anymore and rented an apartment for her. (T.9645-51) Petrescu then began to live with Defendant and Doorbal at Defendant's wife's house. (T.9653)

Petrescu stated that Defendant told Petrescu that he worked for Delgado, that Schiller was wealthy and that Schiller had cheated Delgado. (T.9660) Defendant stated that he was going to fix it. *Id.* Defendant also told Petrescu that he was a stock broker and that he worked for the CIA. (T. 9654) Defendant gave Petrescu Schiller's BMW. (T.9658)

Defendant showed her surveillance equipment and told her that he had to travel for the CIA. (T. 9664-65) Defendant claimed that Doorbal was going with him on this trip. (T.9665-66) Defendant claimed Doorbal was a killer in his home country. (T. 9674)

A couple days after the Griga/Furton kidnaping, Doorbal came home and told Petrescu that they did not need the warehouse because

they were holding Griga and Furton at Doorbal's house. (T. 9767-68) Doorbal later complained that Doorbal's apartment was cold and smelly and asked Petrescu to help him clean up blood there. (T. 9768-71) A couple day later, Doorbal and Defendant brought a roll of carpet and other items with blood on them and put it in the storage room at the apartment. (T. 9780-84) During that week, Delgado also came to the apartment and left two bags of clothing. (T. 9784-86)

Daniel Sumner, a fingerprint examiner, testified that Doorbal and Defendant's fingerprints were on the glasses left at Griga's house. (T. 10291-10315) Doorbal's fingerprints were also found on items recovered from Defendant's warehouse, the bullets recovered from Defendant's apartment and Defendant's Mercedes. (T. 10315-10327)

Antonia and Christian Cabaleira testified that they lived next door to Doorbal. One night in May 1995, Antonia was awaked by a loud noise, checked her apartment but did not find anything that could have caused the noise. (T.10402-09, 10411-18) Christian also heard the noise, which sounded like a series of poundings. (T.10411-22) Betty Gonzalez, Doorbal's downstairs neighbor, also heard the noise at around 1:00 a.m. (T.10419-22)

John Rodriguez testified that the dry cleaning receipts found in Doorbal's car were for the cleaning of three pairs of jeans, which were submitted under the name of Taylor. He also identified the bloody denim shirt that was found in Defendant's apartment as something that he previously been given to his company for cleaning

under that same name. (T. 10425-34)

Mario Gray testified that he had been Defendant's neighbor at one point and that he had worked for Sun Gym briefly in 1994. (T. 10440-10449) Gray stated that he contacted Defendant in late April 1995, and asked for his help in finding a job. Defendant offered to pay him to find someone to test a dart gun on. (T.10449-54) Around May 23 or 24, 1995, Defendant asked Gray to help him dispose of a Lamborghini; however, when the tow truck driver would not let Doorbal and Defendant take the tow truck to the warehouse alone, Gray was told the job was off. (T. 10454-58)

Franklin Higgs testified that he was in jail with Doorbal in June 1995. (T. 10795-99) He testified that he overheard Doorbal say that his crime was supposed to be the perfect crime and that he was the one that "cut the bodies up with a chain saw" (T. 10801) Additionally, Higgs saw Doorbal demonstrate what Doorbal described as the most effective choke hold. (T. 10803)

Dr. Alan Herron, a veterinarian, testified that xylazine, which is sold under the name Rompun, is an animal tranquilizer. (T. 10870-79) Injection of Rompun is accompanied by a burning sensation. (T. 10880) Rompun slows respiration and heart rates and causes salivation and vomiting. (T.10880-81) Herron opined that the presence of Rompun in Griga's brain and liver tissues indicated that he was alive at the time he was injected. (T.10882-83) The level of Rompun in Furton's tissues was enough to kill several horses. (T.10883-90) There are no clinical uses for Rompun in humans. (T.10876-78)

Delgado testified that he leased a Mercedes for Defendant to use and that Doorbal took over the lease on his 300ZX. (T. 11046) Doorbal, Defendant and Delgado were all living off the money they had gotten from Schiller. (T. 11049)

The blood on the items recovered from Defendant's apartment were matched through DNA testing to Griga. (T. 11547-54) Based on an anthropological examination of the bone, Dr. Tony Falsetti determined that Furton's right hand had been removed with a chain saw and her right foot had been removed with a hatchet.(T.11556-84) Griga's skull showed signs of blunt force trauma inflicted at or near the time of death. (T. 12585-86) Griga's hands and feet had also been removed with a hatchet. (T. 12586-91) Both heads had been removed with the hatchet. (T. 11591)

Dr. Roger Mittleman, a forensic pathologist, testified that he received the drums containing the torsos of Furton and Griga. (T. 11639-43, 11650-51) As soon as the torsos were removed from the drums, they began to decompose rapidly. (T.11644, 11651) Breast implants and an IUD were found in Furton's body, which were traced to her medical records. (T.11646-49) X-rays of Griga's torso were also matched to his medical records. (T. 11652-57) Furton and Griga's torsos showed no signs of trauma other than the dismemberment and no evidence of a cause of death. (T. 11649, 11658)

Mittleman also received the buckets containing the heads, hands and feet. (T. 11658-59) The face and jaw had been removed from Furton's skull, it had been in a corrosive agent, only

45

fragments of teeth remained and the brain was decomposed. (T. 11659-64) The face had also been removed from Griga's skull, and there was evidence of blunt force trauma to the top of the skull. (T. 11664-65) The trauma could have been fatal and would have caused bleeding, that could have been fatal independently. (T. 11666) The fingertips had been removed from the hands. (T. 11668-69)

Xylazine was found in the livers, kidneys and brains of both bodies. (T. 11669-72) Xylazine suppresses respiration, heart rate and blood pressure in humans and has no medical use for humans. (T. 11670) The level of xylazine in Furton's body would have been fatal, and Griga may also have died from xylazine. (T. 11671-73) Because the xylazine was distributed throughout their body tissues, both Griga and Furton were alive when they were given the drug. (T. 11672-73)

Because of the condition of the bodies, Mittleman determined that the manner of death was homicide but was unable to determine definitively the cause of death for either victim. (T. 11673-77) However, Furton probably died from asphyxia either from an overdose of xylazine or strangulation, and Griga probably died from asphyxia from an overdose of xylazine or strangulation, the effects of the blunt force trauma to his head, exsanguination from the wound to his head or a combination of these factors. *Id.*

After deliberating, the jury found Defendant guilty as charged on all counts. (T. 127030-35) The trial court adjudicated Defendant in accordance with the verdict. (T. 12743-44)

46

During the penalty phase, the State presented victim impact testimony only. (T. 12958-92) Defendant presented the testimony of his mother, Carmen Lugo, who stated that Defendant's father once threw a bowl of cold spaghetti at Defendant and on a separate occasion beat Defendant with a hanger, and Santiago Cervacio, a friend of Defendant's. (T.13008-09, 13023, 13045-55) Additionally, Mrs. Lugo testified that Defendant's father was alcoholic before being forced to stop drinking due to diabetes. (T. 13019-23) Mrs. Lugo also testified that Defendant raised four abandoned children of his ex-wife's sister, who had died of AIDS. (T. 13015) Although Defendant divorced Torres, he remained supportive and loving toward her sister's children. (T. 13016-17) Cervacio reiterated that Defendant had been kind and loving father toward his four adopted children, as well as the two children he had with his second wife. (T. 13049-50, 13053-54) Cervacio also testified that he had observed Defendant to have a passive personality and had never seen Defendant commit a violent act against someone. (T. 13046) Mrs. Lugo and Cervacio both averred that Defendant was a loving and dutiful son to both his parents and would often get medicine for his father. (T. 13055, 13037, 13027)

After deliberating, the jury recommended that the trial court impose a death sentence for each murder by a vote of eleven to one. (T. 13173-74) The trial court found 5 aggravators applicable to both murders: prior violent felonies, including the contemporaneous murder of the other victim and the kidnaping, robbery and attempted murder of Schiller; during the course of a kidnaping; avoid arrest;

47

for pecuniary gain; and CCP. (R. 5552-61) The trial court also found the heinous, atrocious and cruel (HAC) aggravator applicable to the Furton murder. (R. 5561-63) The trial court accorded great weight to each of the aggravators. *Id.*

The trial court found no statutory mitigators, and considered Defendant's proposed four non-statutory mitigators, as well as three other mitigators *sua sponte*. (T. 5565-69) The trial court rejected Defendant's contentions that he was not the "hands-on killer," and that he could help others if imprisoned by teaching inmates computer skills. (R. 5567) The trial court gave little weight to: Defendant "was not a totally immoral person;" Defendant's execution will have a negative impact upon his family; Defendant exhibited appropriate courtroom behavior; and the fact that Defendant's mandatory sentence would be life in prison without the possibility of parole or the danger of Defendant committing other violent acts in society. (R. 5566-69) Additionally, the trial court gave very little weight to Defendant's contention that he assisted police in locating the victim's bodies. (R. 5568)

The trial court also sentenced Defendant to: 30 years imprisonment for the conspiracy to commit RICO, RICO, arson and extortion, life imprisonment for the kidnaping and attempted first degree murder; life imprisonment with a 3 year minimum mandatory provision for the armed robbery and armed kidnaping; 15 years imprisonment for the burglary, grand theft, each count of money laundering and conspiracy to commit a felony; 5 years imprisonment for the attempted extortion, each grand theft auto, each count of

forgery and uttering a forged instrument, possession of removed identification plate. (R. 5571-72) All of the sentences were to be served consecutively. (R. 5573)   This appeal follows.

## SUMMARY OF THE ARGUMENT

Trial court did not abuse its discretion to refusing to sever counts because the crimes charged were connected acts and part of an organized scheme of criminal activity. Trial court properly denied Defendant's motion for judgment of acquittal on Defendant's RICO charges because the State presented sufficient evidence to prove Defendant was the leader in an ongoing organization that operated as a unit for a common goal. Prosecutor's opening statement was an accurate reflection of the evidence expected and actually presented at trial. Defendant was not prejudiced by the use of dual juries because Doorbal merely adduced evidence on cross-examination cumulative to that already presented by the State. Trial court did not abuse its discretion by admitting Defendant's federal conviction and probation, as payment of his probationary restitution related to the money laundering counts. Trial court did not abuse its discretion by excluding evidence that Torres appeared at the State Attorney's Office with a lawyer, as Torres was never charged with any crimes related to the instant case. Defendant's motion for new trial was properly denied because Defendant was aware of Schiller's alleged involvement in Medicare fraud prior to trial and thus, such was not newly discovered evidence. Defendant's arguments related to the State's guilt phase closing were unpreserved and meritless, as the State's comments

49

were fair reflection of the evidence presented at trial. Defendant's claim of cumulative error is without merit when alleged cumulative errors are either procedurally barred or meritless. Defendant's arguments related to the State's penalty phase closing were unpreserved and meritless, as the State's comments were fair reflection of the evidence presented at trial. Defendant's sentence is proportionate in light of the overwhelming aggravators and lack of mitigators in his case relative to other cases in which the death penalty was upheld. Defendant's sentencing order was supported by competent, substantial evidence and properly considered all mitigators and aggravators in his case. Trial court abused no discretion in ordering all of Defendant's terms and minimum/mandatory terms to run consecutively because the terms related to separate criminal offenses. Trial court properly deviated from the sentencing guidelines on the basis of the unscored capital conviction. Defendant's claim that capital punishment as presently administered is unconstitutional is meritless and has repeatedly been refuted by this Court.

### ARGUMENT

#### I.

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO SEVER COUNTS WHERE THE CRIMES CHARGED WERE CONNECTED ACTS AND PART OF AN ORGANIZED SCHEME OF CRIMINAL ACTIVITY.**

Defendant argues that he was deprived of a fair trial by the trial court's failure to sever the homicide counts from the counts related to Schiller's abduction. Defendant contends the crimes were separate criminal acts and entirely independent. However, this

issue is meritless as all of Defendant's crimes were part of an ongoing racketeering enterprise.

"The decision to grant or deny a severance is within the sound discretion of the trial court." *Domis v. State,* 755 So.2d 683, 685 (Fla. 4th DCA 1999); *see also Fotopoulos v. State,* 608 So. 2d 784, 790 (Fla. 1992); *Crossley v. State,* 596 So. 2d 447, 450 (Fla. 1992); *Bateson v. State,* 761 So. 2d 1165, 1169 (Fla. 4th DCA 2000). The trial court's denial of Defendant's motion to sever in the instant case was not an abuse of discretion where the offenses were connected acts within an ongoing criminal scheme. Where the RICO count is properly pled, the court does not err in denying severance of the predicate acts. *Shimek v. State,* 610 So. 2d 632 (Fla. 1st DCA 1992); *Fotopoulos v. State,* 608 So. 2d at 790.

A RICO violation generally requires separate offenses: the commission of the predicate offenses, and the defendant's participation in a pattern of criminal activity. *Bejerano v. State,* 760 So. 2d 218 (Fla. 5th DCA 2000); *Vickery v. State,* 539 So. 2d 499 (Fla. 1st DCA 1989), *rev. denied* 549 So. 2d 1014 (Fla. 1989) Contrary to Defendant's assertion, there is no requirement that the predicate acts be identical. Rather, Section 895.02(4), Florida Statutes, requires only that there be "similar intents, results, accomplices, victims, or methods of commission." The evidence at trial established that Defendant plotted an ongoing scheme and organized a crew of criminal lackeys to attempt to abduct wealthy victims, extort their assets, and then murder the victims to avoid

detection. Defendant, Doorbal, Mese, and Delgado were the core players in both kidnaping and extortion plots, with a cast of rotating, secondary characters. In fact, the three plotted well in advance of both cases, how they would affect the abduction of their victims. (T. 11061-66, 8180-86) Both abductions were for the express purpose of obtaining the assets of the victims. (T.10976, 11066) In both cases, Defendant intended the eventual death of his victims to avoid arrest. (T. 11066, 11014, 8253) As all the victims were successive targets of Defendant's ongoing and continuous criminal operation, evidence of both the Schiller case and the Griga/Furton case were relevant to Defendant's RICO charges. Consequently, severance of the crimes was precluded by the State's obligation to present evidence of the chain of successive targets to establish Defendant had an ongoing criminal organization within the meaning of the Racketeer Influence and Corrupt Organization Act [RICO].

Defendant relies upon several cases in support of his argument that the trial court should have severed the Schiller counts from the Griga/Furton counts, all but one of which do not involve a RICO prosecution. Moreover, the single case involving a RICO prosecution cited by Defendant, *Fudge v. State*, 645 So.2d 23 (Fla. 2nd 1994), is clearly distinguishable from the instant case. In *Fudge*, the defendant was charged with a 47 charges arising from a rash of automobile highjackings and home invasions. The defendant in *Fudge* was charged with various criminal offenses including RICO. After the jury deadlocked on 26 counts and found the defendant not guilty

in 7 counts, the trial court granted a directed verdict of acquittal as to the racketeering charge. "She also granted a motion to sever, and, declaring that Mr. Fudge did not receive a fair trial due to the joinder of all of the unrelated incidents, granted a new trial." *Fudge*, 645 So.2d at 24. Here, Defendant was found guilty of all 46 counts, as charged in the indictment. (T. 12730-35) As noted by the trial court at the close of the evidence, Defendant's motive and plan to abduct not only Griga, Furton and Schiller but also Lee, Defendant's would-be victim, were all related and a part of a pattern of criminal activity. (T. 11746-50) Unlike *Fudge*, the Griga/Furton case and Schiller case were not unrelated incidents but rather part of an ongoing scheme of murderous extortion.

Furthermore, severance of properly joined counts is not necessary to promote the fair determination of defendants' guilt where even in separate trials evidence of each offense would be admissible in the other to show common scheme, motive, as well as the entire context out of which the criminal action occurred. *Fotopoulos v. State*, 608 So. 2d 784 (Fla. 1992). Here, the Schiller crimes and the Griga/Furton crimes were very nearly identical in several respects. Both crimes involved the kidnaping of wealthy victims after stalking them. Schiller was held in a warehouse for a month and his property extorted from him. Clearly, Defendant intended Schiller die when Schiller was made to consume alcohol, placed in a car which was set afire, and then run over twice by Defendant's getaway car. (T. 8247-49) Similarly, Griga and Furton

were kidnaped, and a warehouse had been rented to hold them while their property was extorted. The plan called for them to be killed and their bodies disposed of thereafter. Given the similarities in the crimes committed, the trial court did not abuse its discretion in refusing to sever the counts.

## II.

### THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE RACKETEERING COUNT.

It is well settled in Florida that generally appellate courts do not retry cases or re-evaluate testimony and evidence submitted to a jury. *See Tibbs v. State,* 397 So.2d 1120, 1123 (Fla. 1981), *aff'd* 457 U.S. 31 (1982).[2]

Defendant erroneously contends that the trial court improperly denied his motion for judgment of acquittal on his RICO counts. However, Defendant overlooks the overwhelming evidence adduced at trial that he directed an ongoing organization of mercenaries to plot the serial abduction and murder of wealthy victims for financial spoils.[3] In *Gross v. State,* 765 So. 2d 39, 45 (Fla.

---

[2]     Rather, the standard of review for the denial of a motion for judgment of acquittal is whether the verdict is supported by substantial, competent evidence. *See Crump v. State,* 622 So. 2d 963, 971 (Fla. 1993) And where there is substantial, competent evidence to support the verdict, the appellate court will not reverse a judgment based upon a verdict returned by the jury. *Heiney v. State,* 447 So.2d 210, 212 (Fla. 1984)(*citing Rose v. State,* 425 So.2d 521 (Fla. 1982)).

[3]     Section 895.03(3), Florida Statutes (1997), makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly , in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt."

2000), this Court held:

> that in order to prove an enterprise, the
> State need only establish two elements: the
> an ongoing organization, formal or informal,
> with a common purpose of engaging in a course
> of conduct, which (2) functions as a
> continuing unit.

In the instant case, ample evidence was presented that Defendant organized and directed a crew of thugs to carry out his criminal schemes. Indeed, he recruited the members of his posse from Sun Gym including: Delgado, Sanchez, Gray, Doorbal, Pierre, Weekes, Pace and Mese. (T. 6631, 10964, 10965-66, 10443-51,7952, 7780-82) Pierre recalled the organization of the group during his involvement with the Schiller abduction:

> The structure was more military, okay. You had
> Jorge Delgado, he was the intelligence. He was
> the one that was giving all the information
> that we needed to go in and conduct the
> abduction. And then you had [Defendant], who
> was, more or less, the general. And he was the
> one that was explaining and making all the
> plans and running everything. And then you had
> Noel Doorbal. He was there as the muscle, I
> would say. Second in command. And then you had
> myself and Weekes. We were -- You know, we
> were at the low end of the totem pole,
> actually.

(T. 8182)

Indeed, each member's share in the Schiller spoils adhered to this hierarchy; Pierre, who did not participate in the kidnaping but guarded Schiller at the warehouse, received $45,000.00; Weekes, who assisted in the kidnaping and also guarded Schiller received $110,000.00, while Delgado, who provided Defendant with the "intelligence information," received $141,000.00. (T. 8260, 8963)

The group routinely discussed how they would carry out their plan to abduct a prospective victim. Delgado and Pierre both testified to extensive reconnaissance performed to determine Schiller's schedule, as well as elaborate planning for the abduction and several failed attempts before the final successful kidnaping of Schiller. (T. 8148-88, 8191, 8207-17, 10984) Additionally, Defendant and his crew hashed out a similar plot to kidnap, rob, and then kill Lee. (T. 11053-54) Defendant recruited Petrescu and Doorbal to conduct surveillance of Lee's home and Delgado assisted in surveillance, as well. (T. 9689-90, 11054) Similarly, the Griga/Furton abduction was also planned and discussed at length. (T.11058). As Delgado testified, the clear and unambiguous purpose of the Schiller abduction, the failed Lee abduction, and the Griga/Furton abduction was to steal the victims' financial assets for Defendant and his co-horts' personal gain. (T. 11054, 11058)

Defendant's group jointly purchased the supplies necessary for the successful completion of all the steps in their blood-thirsty enterprise. In preparation for Schiller's abduction, the group went to the Spy shop and obtained handcuffs, walkie talkies, and stun guns. (T. 8193-94) Prior to one of the first unfruitful attempts to abduct Griga and Furton, Defendant and Doorbal stopped off at the supermarket to pick up duct tape en route to meet with the victims under the auspices of a business appointment. (T. 9739-50) After the eventual murders of Griga and Furton, Defendant and Doorbal went to the Home Depot to stock up on all the tools required to

dispose of the bodies and render them unidentifiable so that Defendant could avoid prosecution. (T. 111109-51) As Defendant and his co-defendants discussed and planned their attacks well in advance of the crimes and jointly procured the necessary tools to complete the perfect crime, a "jury could reasonably conclude that his associates shared the requisite common purpose of an ongoing organization." *See Gross v. State*, 765 So. 2d 39, 47 (Fla. 2000)(holding that defendants' discussion and advance coordination of their crimes and procurement of items necessary to complete their crime, including uniforms, was properly considered by jury in concluding that the defendants shared "requisite common purpose of an ongoing organization").

Likewise, the State established the second continuity element required to prove enterprise by presenting evidence that Defendant and his associates utilized a pattern of roles to carry out their crimes. As described by Pierre, Defendant was the ring-leader of the organization, directing and supervising the criminal activities. "[H]e was the one that was explaining and making all the plans and running everything." (T. 8182) Delgado also testified that Defendant's role was to "instruct everybody what to do and be involved in basically everything that dealt with kidnaping." (T. 10987) Delgado further testified that, in addition to originating the plot to kidnap Schiller, Defendant devised the plans involving Lee, Griga and Furton. (10978, 11054, 11058) As this Court ruled in *Gross*, sufficient evidence of the continuity element exists where "an unchanging pattern of roles is necessary and utilized to carry

out the predicate acts of racketeering." *Id.* at 46.

Defendant also argues that the State failed to prove RICO because no evidence existed that Defendant's organization posed a threat of continuing its grizzly shake-downs; however Defendant's conclusion is clearly refuted by the record. Delgado, Petrescu and Gray all testified that Defendant intended to carry out the abduction of Lee, after he kidnaped Schiller and prior to coming up with his plan for the abduction and murder of Griga and Furton. (T. 11054, 10452-53, 9689-92) Clearly, common sense dictates that Defendant's abduction and murder schemes ceased only because of his arrest in the Griga/Furton case.[4]

Finally, Defendant contends Defendant's RICO conviction should be reversed because his criminal activity only spanned six months. However, criminal conduct need not persist for a lengthy period of time. Indeed, a six-months period was held to be sufficient in *State v. Lucas*, 600 So. 2d 1093 (Fla. 1992), as was a four-month scheme in *Harvey v. State*, 617 So. 2d 1144 (Fla. 1st DCA 1993).

Thus, the trial court properly denied Defendant's motion for judgment of acquittal, as the State presented ample evidence that he directed an ongoing organization that planned the serial abduction and murder of wealthy victims for pecuniary gain.

## III.
### THE PROSECUTOR'S OPENING STATEMENT WAS AN ACCURATE REFLECTION OF THE EVIDENCE EXPECTED AT TRIAL AND

---

[4]     The lack of a threat of continuity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest. *See State v. Lucas*, 600 So. 2d 1093 (Fla. 1992).

**DEFENDANT'S OBJECTIONS WERE NOT PRESERVED.**

Defendant contends that he was denied a fair trial due to 11 allegedly improper comments by the prosecutor during opening statement. Defendant argues generally that the comments were improperly argumentative, discredited the defense, attacked Defendant's character, and expressed personal views and opinions. However, this issue is unpreserved and meritless.

In order to preserve an issue regarding a comment in opening, it is necessary to object at the time the comment is made. *See Kelvin v. State,* 610 So. 2d 1359, 1365 (Fla. 1st DCA 1992); *Jones v. State,* 411 So. 2d 165 (Fla. 1982); *San Martin v. State,* 717 So. 2d 462 (Fla. 1998). Here, Defendant did not object to any of the comments about which he complains. As such, this issue is unpreserved. Moreover, the prosecutor's opening statement was a fair and accurate portrayal of the evidence eventually presented. As such, the trial court did not abuse its discretion in permitting the comments.[5]

The gravamen of Defendant's complaints is that the State characterized the brutal nature of the crimes against Schiller, Griga and Furton, the organization with which these crimes were committed and the purpose behind the crimes. However, this was precisely the evidence the State intended to, and did, adduce at

---

[5]    The trial court has discretion in controlling opening statements. *Fernandez v. State,* 730 So. 2d 277, 281 (Fla. 1999)(concluding that the trial court has discretion in controlling opening statements, and appellate courts will not interfere unless an abuse of discretion is shown.)

trial.

The evidence presented at trial established that Defendant scoped out sufficiently wealthy victims for the express purpose of kidnaping them to divest them of all their assets. (T. 11066,10452-53, 9689-92, 1053-54) Furthermore, Defendant's method of extorting the money from his victims was physical torture. Schiller was manacled, shocked with a taser gun, beaten, denied the use of the toilet for several weeks, and subjected to Russian Roulette while Defendant forced Schiller to disclose a complete list of his financial assets. (T. 6656-57, 6659-60, 6659-60, 8224-25, 6674) Although Griga was accidently killed before Defendant could torture him and force him to turn over his assets, Furton was bound by her wrists and feet with a hood over her face and injected with horse tranquilizer while she screamed out for Griga and Defendant interrogated her. (T. 11067-68, 11068-69, 11073). Similarly, Defendant and his co-defendants attempted to cover up their abduction and murders by disposing of the victims: Schiller via an orchestrated car accident and fire, and Griga/Furton via dismemberment, deposit into tin drums, and finally dumping in Alligator Alley. (T. 8248-49, 11127-28, 10483-90) Just as the prosecutor indicated, Defendant attempted to hide the evidence of his crimes. While Defendant may have preferred that the State presented a sanitized version of the facts of his case, the "State is entitled to present its version of the facts in its opening statement." See Rhodes v. State, 638 So. 2d 920, 925 (Fla. 1994).

The evidence also showed that Defendant and his associates did

continuously hunt for potential victims for their kidnaping and extortion ring. Several months prior to the Griga/Furton murders, Defendant had performed reconnaissance on Schiller and Lee and plotted the abduction of those victims for the same purpose. (T. 9689-90, 11054, 11066, 10452-53, 9689-92, 1053-54) Evidence was presented that the gym was losing money when the crimes began. (T. 5105, 7539, 8716, 8716-17, 8172). Defendant did solicit his hirelings from the gym. (T. 8162, 8175, 8275-76) As such, The prosecutor's comment was a fair portrayal of the State's version of the facts. *Rhodes v. State*, 638 So. 2d 920, 925 (Fla. 1994); *Killings v. State*, 583 So. 2d 732 (Fla. 1st DCA 1991).

Even if any of the comments could be considered to be erroneous, any error was harmless. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986). The comments were brief in the context of this matter, which took approximately 5 months to try and produced a record in excess of 20,000 pages. The jury heard ample evidence of how Defendant and his cohorts plotted their crimes, recruited assistants, stalked their victims, kidnaped them, tortured them, took their property and finally killed and tried to kill them. Under these circumstances, it cannot be said that a few brief comments in opening statement contributed to the verdict, and any error was harmless.

## IV.

**DEFENDANT WAS NOT PREJUDICED BY THE USE OF DUAL JURIES DURING THE TRIAL OF HIS AND CO-DEFENDANT DOORBAL'S CASES.**

Whether to sever co-defendants or implement dual juries to

concurrently hear but separately deliberate their cases is within the trial court's discretion. *See McCray v. State*, 416 So. 2d 804 (Fla. 1992); *see also Velez v. State*, 596 So. 2d 1197 (Fla. 1992). Reversal for failure to sever is required only where joint trial of defendants rendered the jury incapable of independently evaluating evidence against each defendant. *U.S. v. Hernandez*, 921 F. 2d 1569 (11th Cir. 1991). Further, Defendant must show specific and compelling prejudice to justify reversal for a trial court's denial of severance. *U.S. v. LaChance*, 817 F. 2d 1491 (11th Cir. 1987). Here, the trial court did not abuse its discretion to have Defendant's case heard separately but concurrently to Doorbal's case and no prejudice accrued to Defendant.

The State presented extensive evidence that Defendant was the leader of the kidnaping ring. Pierre testified that Defendant was the leader who ran everything and Doorbal was merely the muscle in the organization. (T. 8180-82) Likewise, Delgado testified that Defendant originated the idea to kidnap Schiller. (T. 10975-78) The State also adduced substantial evidence that Defendant and Doorbal were friends. (T. 5092-94) Defendant claims that he was prejudiced by Doorbal's attorney eliciting on cross-examination that Defendant and Doorbal were friends and that Defendant was the leader; however, such evidence was merely cumulative to that already presented by the State on direct. Moreover, although Defendant did join in a motion for separate juries, he did not object to the majority of questions posed by Doorbal's attorney to which he cites in his Initial brief.

Defendant contends he was prejudiced by Doorbal's attorney eliciting from Atilla Weiland that Defendant initiated the conversation with Griga during the meeting; however, Defendant did not object to the cross-examination and this information was presented in the direct examination of this witness. (T. 5054). Similarly, Defendant complains that Doorbal's attorney cross-examined Beatrice Weiland concerning Doorbal's friendship with Defendant and the fact that Defendant had helped Doorbal "get everything he had," but both of these facts were also presented in direct examination. (T. 5092, 5094) Defendant also contends it was prejudicial that Doorbal questioned Det. Deegan whether she believed Defendant, Delgado, and Orlando Caceres to have masterminded the kidnaping of Schiller; however, as previously addressed, the State had already presented substantial evidence to the fact that Defendant had originated and participated in the plot. Additionally, Defendant did not object to Doorbal's question to Det. Deegan. (T. 5236) Defendant also objects to Doorbal's cross-examination of Det. Holman, Det. Hoadley, Det. Hernandez, and Sgt. Santos regarding the discovery of evidence which incriminated Defendant; however, all the information gleaned from their cross-examination by Doorbal had been presented by the State in direct. Further, Defendant did not object to Doorbal's questioning of these witnesses. (T. 5236, 5669-70, 5673-75, 5764-65) In fact, Defendant did not object to the great majority of questions asked by Doorbal in cross-examination. Further, the letters incriminating Defendant that the judge read to the jury and to which Defendant objected

were presented by the State, not Doorbal. (T. 6895) Doorbal's attorney only acquiesced to the manner in which the trial court decided to publish them to the jury. *Id*. As the trial court had deemed the letters admissible, no prejudice accrued to Defendant by Doorbal's mere agreement with how the letters were published.

Defendant also complains about Doorbal's cross-examination of the State's civilian witnesses, including Delgado, Pierre, and Gray. Primarily Defendant alleges he was prejudiced by the fact that through Doorbal's cross-examination of such witnesses, Doorbal established that Defendant was the leader of the group. Again, Defendant did not object to most of the questions at trial. Moreover, the State had already presented evidence that Defendant was the leader and friends with Doorbal and the other co-defendants. Indeed, the State's theory of the case was that Defendant was the leader of the organization with each co-defendant willfully performing his own function and each equally culpable. As this information was presented to the jury through the State's direct examination and at most Doorbal elicited cumulative testimony unfavorable to Defendant, Defendant cannot establish specific and compelling evidence that he was prejudiced. "The fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance." *McCray v. State*, 416 So. 2d 804 (Fla. 1992) (affirming denial of severance where co-defendants made no confessions incriminating the other and the evidence was not so confusing as to render the jury incapable of applying it to the

conduct of each individual defendant).

## V.
### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE RELATED TO DEFENDANT'S FEDERAL CONVICTION AND PROBATION.

Defendant claims the trial court abused its discretion by permitting the State to introduce evidence related to his federal conviction and probation for fraud.[6] As Defendant satisfied his probationary restitution with money misappropriated from the Schiller kidnaping, the evidence was relevant to Defendant's money laundering and RICO charges. Thus, the trial court properly admitted the evidence, determining the probative value of the evidence outweighed the prejudicial impact.[7]

Here, the testimony related to Defendant's federal and conviction was relevant to establish Mese's connection with Defendant's extortion and money laundering organization. Mese paid off the balance of Defendant's restitution obligation with a check in the amount of nearly $70,000 (T. 9175-80). While Mese claimed this money was payment for a computer program he was buying from Defendant, in reality the money was the proceeds from the Schiller kidnaping that Mese had laundered through Mese's various escrow and other accounts. (T. 8902-13, 8924-31, 9373). As this evidence was

---

[6]    The admissibility of evidence is within the sound discretion of the trial court and will not be reversed unless there has been a clear abuse of discretion. *Ray v. State*, 755 So. 2d 604, 610 (Fla. 2000).

[7]    Whether the probative value of evidence is substantially outweighed by its prejudicial impact is reviewed for abuse of discretion. *Rodriguez v. State*, 753 So. 2d 29, 42 (Fla. 2000)

not presented to establish Defendant's propensity to commit fraud but to establish the interrelated function of Mese's financial accounts with Defendant's RICO operations, the evidence was properly admitted. *See Bryan v. State*, 533 So. 2d 744, 747 (Fla. 1988). Although Defendant complains that the jury was not instructed on collateral crime evidence, he did not request such instruction at trial (T. 11975-12042) and thus waived any issue with regard to such instruction.

Even if the admission of this evidence was error, it was harmless. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986). The testimony about which Defendant complains was brief, in comparison to nearly 14,000 pages of transcript. Moreover, the State presented testimony regarding Defendant's participation in the planning of the Schiller kidnaping, the attempt to kidnap Lee and the Griga/Furton murders, eyewitness testimony regarding Defendant's involvement in the Schiller kidnaping, evidence that he was in possession of Schiller's property thereafter, and eyewitness testimony and physical evidence regarding his participation in the disposal of Griga and Furton's bodies. Given the brevity of the testimony about which Defendant complains and the wealth of evidence against him, any error in the admission of this testimony cannot be said to have affected the verdicts and was, therefore, harmless. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986).

## VI.

**TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING EVIDENCE THAT DEFENDANT'S EX-WIFE APPEARED AT THE STATE ATTORNEY'S OFFICE WITH HER LAWYER.**

Defendant alleges that the trial court improperly prohibited him from questioning Lillian Torres, Defendant's ex-wife, concerning the fact that she brought her lawyer with her to the State Attorney's Office with her lawyer. This claim is wholly without merit. The only area of inquiry that Defendant was prohibited from exploring was the fact that Torres' attorney accompanied her to the State Attorney's Office. (T. 7570) Torres' right to an attorney is guaranteed by the 5th and 6th amendments of the U.S. Constitution, and Defendant may not infringe on such rights by implying her solicitation of a lawyer was improper or indicative of wrong doing. The trial court permitted, and Defendant conducted, extensive cross-examination of Torres regarding the fact that she was subpoenaed to appear at the State Attorney's Office to give a statement concerning her knowledge of events related to Defendant's charges. (T. 7573) Other than perjury, if Torres had not testified truthfully, she never faced the possibility of being charged with any crime.. (T. 7564) No plea deal was ever discussed or entered between Torres and the State, as no charges against Torres were ever filed. (7567-73) Thus, Defendant was not forbidden to adduce evidence of any agreement Torres had with the State coloring her credibility, as there was no agreement. Defendant simply wished to imply culpability from the fact that a lawyer accompanied her to her interview at the State Attorney's Office.

Defendant's reliance upon *Jean-Mary v. State*, 678 So. 2d 928 (Fla. 3rd DCA 1996) is misplaced. In *Jean-Mary,* the defendant was improperly denied the right to cross-examine a State witness

regarding her arrest for fraudulently obtaining title to an automobile and the fact that charges were filed against her for that charge and recently nolle prosed. *Id.* Here, no charges were ever filed against Torres, nor were the filing of any charges contemplated.(T. 7567-73) Here, Defendant was afforded the opportunity to question Torres regarding her statement to the police and her signing of the documents pertaining to Defendant's fraudulent transfer of Schiller's assets. (T. 7573-74) Defendant was only prohibited from questioning her about having an attorney and from misleading the jury about the effect of being subpoenaed. Thus, *Jean-Mary* is inapplicable and the trial court did not abuse its discretion.

## VII.

### THE TRIAL COURT PROPERLY DENIED DEFENDANT'S MOTION FOR NEW TRIAL.

Defendant contends that the trial court failed to grant his motion for new trial based on alleged *Brady* violations pertaining to Schiller's federal indictment and a criminal investigation of the medical examiner. At the outset, it should be noted that Defendant's Supplemental Motion for New Trial Based on Newly Discovered Evidence was filed on July 29, 1998. A motion for new trial must be filed within ten (10) days of the verdict. *See* Fla.R.Crim.P. 3.590. The Supplemental Motion states that the "newly discovered" evidence became known to the Defendant on July 10 and July 14, 1998, but that the Supplemental Motion was filed on July 30, 1998. Thus, Defendant's motion for new trial was untimely and

therefore this issue is procedurally barred.[8]

Moreover, the allegations are insufficient in light of the record herein. The first portion of Defendant's claim of newly discovered evidence pertains to the prosecution's alleged failure to disclose Schiller's federal criminal investigation and pending indictment for a Medicare fraud scheme. According to the Defendant he did not know prior to and during trial, that there was a federal investigation of Schiller for Medicare fraud. Schiller was indicted for Medicare fraud by the federal government, after the trial but prior to entry of the sentence. Defendant claims that the State failed to disclose that Schiller was being investigated by the federal agents and that a federal indictment was being sought. However, the pre-trial hearing on October 23, 1997, clearly reflects that Defendant in fact knew about the federal investigation of Schiller. (T. 1962-68) Defendant's attorney, along with a number of other attorneys on behalf of the co-defendants in this case, were present in court when the court and the parties exhaustively addressed the federal investigation and possibility of a federal indictment, and, that the court allowed Defendant to depose witnesses with respect to said investigation. (T. 1964-66) After extensive conversation regarding the co-defendants' desire to

---

[8]     Defendant filed a notice of appeal with this Court on August 11, 1998, prior to obtaining a ruling on his Supplemental Motion for New Trial. The State preserved this procedural bar in its December 15, 1998 response to Defendant's motion to this Court to remand to circuit court and relinquish jurisdiction for purpose of evidentiary hearing and consideration of Defendant's motion for new trial.

conduct discovery regarding the Schiller Medicare fraud issue, the trial judge allowed Defendant to depose witnesses with respect to relevant aspects of the federal investigations. (T. 2001-02) The record further reflects that witness/co-defendant Delgado was, in fact, deposed,[9] and stated that he was "involved with Marc Schiller in a Medicare fraud scheme." (T. 2676) The deposition further reflects that Delgado was specifically asked whether the motivation behind the kidnaping of Schiller was, in fact, Schiller's Medicare fraud scheme to which Delgado replied in the affirmative. (T. 2678)

As seen above, it is abundantly clear that Defendant knew that Schiller was alleged to have been involved in a Medicare fraud scheme that was being investigated by the federal government, with a possibility of a federal indictment. The fact that a federal indictment was in fact returned after trial thus does not constitute newly discovered evidence. Additionally, Defendant contends he was prejudiced by the trial court prohibiting him from cross-examining witnesses regarding the issue of Schiller's alleged Medicare fraud. This patently untrue. Delgado testified that the money that he and Defendant plotted to steal from Schiller was the proceeds from Schiller's Medicare fraud. (T. 10976-80, 11307) Indeed, Pierre testified that Defendant and his associates believed they had less of a chance getting caught because Schiller and/or his family would not go to the police, as Schiller's money was

---

[9]      The Appellant also deposed Mr. Schiller.

illegitimate. (T.8183) Furthermore, Defendant specifically cross-examined Delgado regarding the allegation he could have curried favor with the state by testifying in Defendant's trial in exchange for immunity for his participation in the Medicare fraud. (T. 11366) Additionally, Defendant cross-examined Schiller concerning the allegations of Medicare fraud. (T. 6949-53) Although Defendant contends that the trial court prohibited questioning of Schiller about this issue, a review of the portion of the record cited by Defendant reflects the trial court merely sustained the State's objection because the question called for speculation.(T. 6952-53) Thus, Defendant cannot even make the requisite showing that he did not possess the information concerning Schiller's alleged Medicare fraud.

Defendant argues that although he had some knowledge of Schiller's alleged Medicare fraud, Schiller's federal indictment after trial constitutes newly discovered evidence. However, an indictment is neither a finding, nor, proof of guilt. Defendant further argues that the State must have known that Schiller was going to be indicted federally and that the State's failure to alert Defendant of such constitutes a willful discovery violation. However, this allegation of misconduct on the part of the State is wholly without merit.[10] The State of Florida certainly has no

---

[10]     The federal government is a sovereign entity. *Heath v. Alabama*, 474 U.S. 82, 89 (1985) ("the States are separate sovereigns with respect to the Federal Government").

71

control over the Federal Government's investigations or indictments.

Defendant also contends that the trial court erred by failing to grant a new trial because Dr. Mittleman was investigated by the State Attorney's Office. The allegations do not provide the timing or result of the investigation and thus do not reflect that it had any bearing on the trial. Moreover, contrary to Defendant's assertions, Dr. Mittleman did not give an opinion as to the victims' causes of death. (T. 11682-85) Rather, Dr. Mittleman conceded that he could not even conclusively determine whether many of the injuries to the bodies occurred before or after death. (T. 11684) Although Dr. Mittleman testified concerning the affects of Xylazine on the victims, such testimony was merely cumulative to Dr. Herron's testimony. (T. 11672, 10870-80) Moreover, no one contested at trial that Griga and Furton had been killed, rather the primary issue at trial was which Defendant committed the murder. Thus, Defendant cannot establish he suffered any prejudice with regard to Dr. Mittleman's testimony. As such, Defendant's convictions should be affirmed.

### VIII.
**ANY ERROR IN COMMENTS DURING THE STATE'S GUILT PHASE CLOSING ARGUMENT WAS NOT PRESERVED AND DOES NOT REQUIRE REVERSAL.**

Defendant contends that he was denied a fair trial due to 8 allegedly improper comments by the prosecutor during closing argument. Defendant argues generally that the comments attacked

72

Defendant's character, expressed personal views and opinions, attempted to inflame the passions of the jurors, and constituted a "golden rule violation. However, the majority of comments were not objected to and therefore unpreserved and the issues raised meritless.

The first comment to which Defendant objects, was merely a reflection upon the depth of Defendant's avarice and the nearly unfathomable lengths of cold, premeditated murder he would reach to satisfy it. (T. 14546) Defendant did not object to the comment. *Id*. Moreover, the State's assessment of Defendant's motive was fair comment on the evidence which established Defendant's crimes were born from his desire for personal wealth. *See Breedlove v. State*, 413 So. 2d 1 (Fla. 1982). The next comment to which Defendant objects referenced the continuing and serial aspect of Defendant's targets pertaining to Defendant's RICO crimes. (T. 12462) Again, Defendant did not object to this comment. *Id*. Nonetheless, the State was merely emphasizing the continuing aspect of Defendant's criminal enterprise. The evidence established that Defendant had selected three separate sets of victims and gave no indication his enterprise would have ceased but for his arrest.

The third comment raised by Defendant on appeal, was the State's response to Defendant's argument in his closing that Delgado testified he was involved in Medicare fraud with Schiller, and therefore Schiller was not a credible witness. (T. 12401-3)

73

Accordingly, the State reiterated the focus of the trial was the crimes Defendant was charged with in the instant case, and not allegations that Schiller committed uncharged and unrelated fraud. Similarly, the fourth comment merely revisited Defendant's impugning of Schiller for alleged Medicare fraud and emphasized the immateriality of such allegations in the face of the evidence that Defendant tortured Schiller to extort his assets. (T. 12464-65). Again, Defendant did not object to this comment. *Id.* Moreover, the recap of Schiller's abduction and torture is firmly supported by the evidence. Indeed, Schiller was put down on the floor, hands and feet bound, eyes taped, and held hostage for four weeks until Defendant had secured the release of all Schiller's assets. (T.6659-60, 6690-91, 8224-25)

Next, Defendant contends two golden rule violations merit reversal. However, Defendant objected to neither comment. (T. 12458, 12496) Regarding the first comment, Defendant claims that the prosecutor inserted her personal opinion regarding the guilt of the Defendant. However, her comment merely implied that the jurors knew who committed the crimes by the overwhelming evidence presented at trial, a conclusion supported by the evidence. This comment is not fairly interpreted as the prosecutor injecting her personal feelings regarding the Defendant's guilt.

The remaining comments raised in Defendant's brief all concern the prosecutor's response to Defendant's defense theme that

74

Delgado, Pierre, Schiller and Petrescu were all liars and therefore not credible witnesses. (T. 12540, 12547, 12570) Each comment refers to specific testimony that established Defendant, indeed, lied. Defendant's probation officer testified Defendant represented that he was paying off the balance of his probation restitution via a sale of a computer program to Mese, when in reality the payment was derived from the laundered money extorted from the Schiller. (T. 9176) Defendant lied repeatedly to Petrescu, telling her, including but not limited to: that he was stockbroker, that he worked for the C.I.A., that Doorbal's handcuffs were merely sex toys rather than kidnaping accouterment, that Lee was a Palestinian terrorist he intended on kidnaping for payment, and that Griga was wanted by the F.B.I. for unreported income (T. 9654, 9689-91, 9721) Defendant lied to Salgar concerning Schiller's sudden disappearance, representing that Schiller had moved to Columbia and his house was going to be used for dignitaries. (T. 6261-65) He lied to Griga, setting up meetings under the false pretenses of business ventures. (T. 5055-56) Defendant directed the matrix of lies that Schiller was coerced into telling his wife and bankers. (T. 8231, 10998-99, 6662, 8228, 6697-98) Likewise, Defendant misrepresented to Blanco that Schiller wanted to change the ownership of his house. (T. 6232-33) Similarly, Defendant lied to Murphy, his stockbroker, regarding the opening of an account for a fictitious Thomas Lewis. (T. 8770-80) Defendant represented to

police he would lead them to the bodies of the victims in exchange for an agreement that the eventual jury hearing his case would be advised he cooperated and then only divulged the location of the torsos, which had been rendered unidentifiable. (T. 10653-61) Defendant lied to the post office clerks, identifying himself as Javier Hernandez. (T. 8528-34) Likewise, Defendant's treasure trove of false identity cards and foreign passports is unambiguous indicia of deceit. (T. (T.5542-00, 5482-20, 6733-36) However, perhaps most poignantly, Defendant lied to Furton, telling her she would see Griga, who at the time lay dead in a pool of his own blood in the bathroom, if she merely cooperated. (T. 10070-82)

The State's comment on the evidence establishing Defendant's systematic and continuous fabrications and misrepresentations to further the objectives of his criminal enterprise was proper. See *Shellito v. State*, 701 So. 2d 837, 842 (Fla. 1997)(where no objection was made to prosecutor's comment defense witness lied, this Court found no fundamental error because evidence established that witness's testimony was contradicted by other evidence); see also *Craig v. State*, 510 So.2d 857, 865 (Fla.1987) (finding that prosecutor's closing argument remarks characterizing defendant's testimony as untruthful and the defendant himself as being a "liar" did not exceed the bounds of proper argument in view of the record evidence).

In order to preserve an issue regarding a comment in closing,

a defendant must interpose a contemporaneous objection to the comment. *See McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999); *Chandler v. State*, 702 So. 2d 186, 191 (Fla. 1997); *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996). Here, Defendant did not object at all to any of the comments about which he complains. As such, the issues were not preserved.

Moreover, any error in these comments was harmless. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986). The State's initial closing argument covered over 100 pages of transcript, and the comments were brief. Further, the State presented overwhelming evidence of Defendant's guilt. There was abundant testimony of Defendant's planning, orchestration and supervision of the Schiller kidnaping, the attempt to kidnap Lee and the Griga/Furton murders. Independent eyewitnesses placed Defendant with Griga and Furton immediately before they were kidnaped. Given the mountain of evidence against Defendant, any error in the brief comments in closing was harmless. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986); *Bertolotti v. State*, 476 So. 2d 130 (Fla. 1985).

## IX.
## DEFENDANT'S CLAIM OF CUMULATIVE ERROR IS WITHOUT MERIT.

While Defendant references the adoption of issues raised in Doorbal's brief, nothing in the record reflects that Defendant has actually moved to adopt any appellate issues raised by Doorbal. In the event this Court finds any such issues adopted by Defendant by

such reference of same, the State will adopt all arguments raised in its Answer Brief in Doorbal's case. Additionally, Defendant argues that the "cumulative" effect of alleged cumulative errors render his conviction questionable, and therefore he should be granted a new trial. The instant argument should be rejected, where the individual errors alleged are either procedurally barred or without merit. *Downs v. State*, 740 So. 2d 506, 509 n.5 (Fla. 1999). As seen above, all of Defendant's claims are procedurally barred and meritless. As such, this argument should be rejected.

X

**ANY ISSUE WITH REGARD TO COMMENTS DURING THE STATE'S PENALTY PHASE CLOSING ARGUMENT IS UNPRESERVED AND MERITLESS.**

Defendant next asserts that the State made improper comments during its penalty phase closing argument. However, this issue is unpreserved and meritless.[11]

The first penalty phase comment Defendant raises is the State's comment to the jury concerning their oath to follow the law and return a recommendation for death where the aggravating factors outweighed the mitigating factors. (T. 13087-13088) Although Defendant objected, the trial court overruled him, as the comment merely reviewed that the jury should return a verdict recommending death where the aggravating factors outweighed the mitigating

---

[11] An appellate court's review of a trial court's ruling on closing argument is for an abuse of discretion. *Occhicone v. State*, 570 So. 2d 902, 904 (Fla. 1990); *Breedlove v. State*, 413 So. 2d at 8." *Moore v. State*, 701 So. 2d 545, 551 (Fla. 1997).

factors. The State accurately averred that such was an "awesome responsibility" but that in the instant case the death sentence was appropriate due to the aggravating circumstances of Defendant's crimes. Defendant's objection at trial was overruled because the comment in context was an accurate depiction of the jury's responsibility.

The next comments Defendant raises concern the State's discussion of the aggravating factors that distinguish Defendant's murders from non-capital murders, including the cold, calculated and premeditated aggravator and the heinous, atrocious or cruel aggravator (HAC) applicable to Furton's murder. (T. 13090) Defendant did not object to the first of the two comments regarding the aggravators. The State commented that the evidence of Defendant's purchase of duct tape before hand and the failed first attempt to abduct Griga and Furton, clearly demonstrated that the murders were cold and calculated. Indeed, Delgado testified that Defendant summoned Raimondo while Furton was still alive to complete the murders and dispose of the bodies. (T. 11078-80) Thus, the State was properly commenting on how the evidence illustrated the CCP aggravator. Furthermore, the State's reference to Furton being bound hand and feet by the duct tape was relevant to the HAC aggravator in her case, as noted by the trial court in its sentencing order. (R. 5560-61)

Although Defendant objected to the second comment, arguing

79

that the dismemberment of the bodies was not relevant to any of the aggravators (T. 13095), the trial court ruled that in conjunction with the evidence that Defendant had plotted the disposal of the bodies before he actually murdered Furton, the evidence of the dismemberment was relevant to the CCP aggravator. (T.13097-98)

The next two comments by the State raised discussed evaluation of the aggravators within the context of consideration for the death penalty. (T. 13099-13100) Again, Defendant did not object to either comment. Within context of the comments, the State merely was reviewing the applicable aggravators that distinguished this case from other murders that do not warrant the death penalty. Specifically, the State emphasized that Defendant's crimes evidenced a complete disregard for human life and were motivated for mere pecuniary gain; that Defendant preferred to literally prey on victims who had made their fortune rather than earn his own living.

The next comment raised by Defendant discussed the evidence that Defendant's father loved Defendant and even accompanied Defendant during his escape to the Bahamas, which rebutted Defendant's alleged mitigator that he was abused by his father. (T. 13102) Defendant did not object to this comment either. *Id*. In order to preserve an issue regarding a comment in closing, it is necessary to object to the comment. *See McDonald*, 743 So. 2d at 505; *Chandler*, 702 So. 2d at 191; *Kilgore*, 688 So. 2d at 898. As

Defendant did not object to these comments, this issue is unpreserved. Even if the issue had been preserved, the trial court would still not have abused its discretion in permitting these comments.[12]

With regard to the fifth comment, Defendant contends that the State made an improper "Golden Rule" argument. However, the State was not attempting to have the jury place themselves in Defendant's position, as Defendant suggest; rather, it was properly commenting on the lack of evidence of the mitigation presented. Defendant had claimed that the fact he was allegedly abused by an alcoholic father who did not love him should be considered as mitigation. The State was merely pointing out that ample evidence attested to the fact his mother and father loved him and had given him opportunities, such as higher education, that many others were not afforded. As such, the trial court would not have abused its discretion in permitting this comment had there been an objection. See Hooper v. State, 476 So. 2d 1253, 1257 (Fla. 1985)(comments made to explain conduct and not to inflame the jury did not violate "Golden Rule.").

With regard to the other alleged Golden Rule comment, Defendant contends that the State asked the jury to show him the same mercy that he had shown the victims. However, this is not

---

[12]    An appellate court's review of a trial court's ruling on closing argument is for an abuse of discretion. *Fernandez v. State*, 730 So. 2d 277, 281 (Fla. 1999).

true; the State never asked the jury to show Defendant the mercy he had shown the victims. The State merely pointed out that given the heinous nature of crimes, the strength of the aggravators and the weakness of the mitigation, imposition of a life sentence was inappropriate. As such, *Urbin v. State*, 714 So. 2d 411 (Fla. 1998), is inapplicable here, and the comment was not improper.

Even if the comments were improper, any error was harmless. The State presented evidence that Defendant planned to kidnap the victims, torture them to obtain their property and kill them to eliminate_ them as witnesses. Defendant had already kidnaped Schiller, tortured him until he signed over everything that he had and then tried to kill him. Furton was held for hours after seeing Griga killed in front of her and tortured to get access to Griga's property. She was repeatedly given painful injections of a horse tranquilizer, which eventually caused her to suffocate. The only mitigation presented by Defendant was that his father drank heavily for a period, threw a bowl of cold spaghetti at him, and once beat him with a hanger, and that Defendant was a loving father to his children and a loving son to his parents. Given the strength of the aggravation and the weakness of the mitigation, the State's brief comments cannot be said to have affected the outcome. As such, any error in the comments was harmless, and Defendant's sentences should be affirmed. *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986).

XI

**DEFENDANT'S SENTENCE OF DEATH WAS PROPORTIONATE.**

Defendant claims that his sentence is disproportionate. Initially, Defendant contends his sentence is disproportionate because Delgado received a 15 year prison sentence in exchange for his testimony at Defendant's trial. However, as this Court has stated, "[a] trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder is a finding of fact and will be sustained on review if supported by competent substantial evidence." *Puccio v. State*, 701 So. 2d 858, 860 (Fla. 1997); *see also Scott v. Dugger*, 604 So. 2d 465 (Fla. 1992). In comparison to Defendant and Doorbal, Delgado played a comparatively minor role in the Furton/Griga murders, not participating in the planning of the Furton/Griga murders and receiving a call from Defendant only after Griga had been killed. (T. 10059-60) The trial court specifically responded to this argument in its sentencing order citing competent substantial evidence that supported Delgado's lack of involvement in the planning of Griga/Furton murders and his lessor role as primarily an accessory after the fact. (T. 5510) Defendant's reliance upon *Larzelere v. State*, 676 So. 2d 394 (Fla. 1996) is not well-placed. The defendant in *Larzelere* conspired with a co-defendant, her son, to murder the victim for insurance proceeds. Although, Larzelere's son was the actual trigger-man who killed the victim, Larzelere planned and participated in the preparation of the murder. This Court held Larzelere's sentence proportionate, as she was equally

83

culpable for the murder. Conversely, Delgado did not plan or participate in the Griga/Furton murders except as an accessory after the fact. Rather, Defendant planned and affected the murder of the Griga/Furton murders and contacted Delgado only afterward to assist in disposal of the victims' bodies and Griga's Lamborghini. As such, Defendant's sentence should be affirmed.

Next, Defendant asks this Court to reweigh the aggravating and mitigating circumstances in this matter. Specifically, Defendant challenges the trial court's rejection of his claim that he was not the hands on killer. Competent substantial evidence established that Defendant planned the Griga/Furton murders and fully intended their death to eliminate witnesses of his crimes.[13] *See Larzelere.*

Reweighing the aggravating and mitigating circumstances is not this Court's function. *Hudson v. State*, 538 So. 2d 829, 831 (Fla.), *cert. denied*, 493 U.S. 875 (1989)(not prerogative of the Florida Supreme Court, in conducting proportionality review, to "reweigh the mitigating evidence and place greater emphasis on it than the trial court did."); *see also Cave v. State*, 727 So. 2d 227, 230

---

[13]   As the trial court set forth: "The evidence indicates that Griga died as a result of a vicious beating and strangulation by Doorbal. That, of course, is not to say that Lugo is not as responsible for the death of Frank Griga as Doorbal. Pursuant to *Tison v. Arizona*, the jury was properly instructed that before they could recommend a death sentence for Lugo, they had to find that he either killed, attempted to kill, or intended that the killing take place or that lethal force be employed. The jury obviously concluded that this requirement was met and this court so finds." (R. 5506)

(Fla. 1998); *Blanco v. State*, 706 So. 2d 7, 10 (Fla. 1997), *cert. denied*, 119 S. Ct. 96 (1998); *Campbell v. State*, 571 So. 2d 415, 419 & n.5 (Fla. 1990). As such, any claim that this Court should do so in the guise of proportionality review should be rejected.

This Court must "consider the totality of circumstances in a case, and compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." *Porter v. State*, 564 So. 2d 1060, 1064 (Fla. 1990), *cert. denied*, 498 U.S. 1110 (1991). "Absent demonstrable legal error, this Court accepts those aggravating factors and mitigating circumstances found by the trial court as the basis for proportionality review." *State v. Henry*, 456 So. 2d 466, 469 (Fla. 1984).

The trial court found 5 aggravators applicable to both murders: prior violent felonies, including the contemporaneous murder of the other victim and the kidnaping, robbery and attempted murder of Schiller; during the course of a kidnaping; commission for the purpose of avoiding arrest; for pecuniary gain; and CCP. (R. 5552-61) The trial court also found the HAC aggravator applicable to the Furton murder. (R. 5561-63) The trial court accorded great weight to each of the aggravators. *Id.*

The trial court found no statutory mitigators, and considered Defendant's proposed four non-statutory mitigators, as well as three other mitigators *sua sponte*. (T. 5565-69) The trial court

85

rejected Defendant's contention that he was not the "hands-on killer," because "the facts...clearly indicate [Defendant's] intention that Griga and Furton were to be killed." (R. 5565) The court rejected Defendant's contention that he could help others if imprisoned by teaching inmates computer skills because no evidence was presented that Defendant demonstrated he was "interested in helping other inmates" nor that state prison resources could accommodate such. (R. 5567) Additionally, the trial court gave little weight to the following mitigators: "Defendant is not totally immoral;" Defendant's execution will have a negative impact upon his family; Defendant exhibited appropriate courtroom behavior; and the fact that Defendant's life mandatory sentence would preclude the risk of future violent acts in society. (R. 5565-66) Additionally, the trial court gave very little weight to Defendant's contention that he assisted police in locating the victim's bodies because Defendant led police only to the torsos of the body, which he knew had been stripped of identifying features. (R. 5568)

In *Knight v. State*, 746 So. 2d 423 (Fla. 1998), *cert. denied*, 514 U.S. 1085 (1995), this Court found a death sentence proportionate, where a defendant kidnaped his victim at the victim's place of business and then forced to drive with the defendant to pick up the victim's wife. Knight then demanded the victim's withdraw $50,000.00 from the bank and upon receipt of the

money, the defendant fatally shot both victims. *Id.* at 427. There, as here, the same five aggravating factors were found: prior violent felony; for pecuniary gain; during commission of a kidnaping; for purposes of avoiding arrest; and CCP. *Id.* at 35. The trial court in Knight found and gave weight to several non-statutory mitigation: that Knight was a victim of childhood abuse; that he suffered some degree of paranoia; and that he was raised in poverty. *Id.* at 440. Based upon the balance of aggravators and mitigators, this Court upheld the proportionality of the death sentence in *Knight*. Id. at 437. Comparatively, the trial court in the instant case found an additional HAC aggravator applicable to Furton's murder and gave only little and very little weight to Defendant's non-statutory mitigators. Thus, Defendant's case is even more compelling for the death penalty.[14] Thus, the sentence should be affirmed.

The evidence established that Furton saw Doorbal attack Griga, was conscious during the painful injections of xylazine, and was obviously cognizant of the fact Defendant turned to her for Griga's house code which she could only construe was due to Griga's death

---

[14]     *See Rodriguez v. State*, 753 So. 2d 29 (Fla. 2000)(where defendant had the same aggravators as the instant case, but also mental health mitigators and history of drug abuse, death penalty was affirmed); *Johnson v. State*, 660 So.2d 637, 641, 648 (Fla.1995)(finding defendant's death sentence proportionate where there were three aggravating factors-prior violent felony, commission of murder for financial gain, and heinous, atrocious, or cruel murder-and fifteen mitigating factors).

and would soon be followed by her own. (T. 11066-67, 11069-76) Furton was aware of her surroundings and realized the imminence of her impending death. This Court has upheld this aggravator as applied to cases in which the victim was conscious during the attack and aware their impending death. *See Brown v. State*, 721 So. 2d 274 (Fla. 1998)(upholding HAC aggravator when victim was alive and conscious during attack evidenced by victim's trail of blood indicating victim moved to another room to escape).

## XII.

### DEFENDANT'S SENTENCING ORDER WAS SUPPORTED BY COMPETENT SUBSTANTIAL EVIDENCE AND PROPERLY CONSIDERED ALL MITIGATORS AND AGGRAVATORS APPLICABLE TO DEFENDANT'S CASE.

Defendant next contends his sentencing order is riddled with cumulative error because the trial court erroneously applied the following aggravators: prior violent felony conviction; for pecuniary gain; for purpose of avoiding arrest; HAC; and CCP.[15] With regard to the first aggravator, previous violent felony conviction, Defendant maintains that the statute permitting significant prior criminal history as an aggravator is vague and unconstitutional.

---

[15]     Whether an aggravating circumstance exists is a factual finding reviewed under the competent, substantial evidence test. *See Alston v. State*, 723 So. 2d 148, 160 (Fla. 1998). The appellate court's function is not to reweigh the evidence but rather to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, and if so whether competent substantial evidence supports its finding. *See Willacy v. State*, 696 So. 2d 693 (Fla.), *cert. denied*, 522 U.S. 970 (1997).

However, this aggravator does not include "significant prior criminal history," but rather prior violent felonies.[16]

Alternatively, Defendant argues that this prior violent felony aggravator should not apply because he did not premeditate Griga's murder. This argument is flawed in several respects. First, Delgado and Petrescu testified that Defendant had advised them he planned to abduct Griga and Furton, extort money from them and finally kill them; competent and substantial evidence established Defendant premeditated both murders. (T. 11060-66, 9719-22) Moreover, there is no requirement that the prior violent felony be premeditated, and Defendant was convicted of the kidnaping and attempted murder of Schiller prior to his sentencing, as well. Thus, even had the sentencing order erroneously considered the Griga murder, Defendant had other prior violent felony convictions to satisfy this aggravator.

Next Defendant contends that the sentencing order erroneously

---

[16]    Furthermore, this Court has repeatedly upheld the constitutionality of this aggravator and held contemporaneous murders qualify as a prior violent felony under the statute. *See Cole v. State,* 701 So. 2d 845 (Fla. 1997)(prior violent felony aggravator upheld for defendant's contemporaneous convictions for violent felonies upon murder victim's sister where evidence established defendant killed victim and raped and robbed victim's sister during single criminal episode)*; see also Mahn v. State,* 714 So. 2d 391, 399 (Fla. 1998)*; Knight v. State,* 746 So. 2d 423 (Fla. 1998)*; Elledge v. State,* 346 So. 2d 998 (Fla. 1977). Similarly, Defendant argues the felony murder aggravator is unconstitutional. However, this Court had repeatedly rejected this argument. *See Jones v. State,* 748 So. 2d 1012 (Fla. 1999)(upholding death sentence for felony murder based on an underlying kidnaping when defendant had prior violent felony).

89

found that the Furton murder was for financial gain, as allegedly Defendant only murdered Griga for his assets. This is patently refuted by the evidence. After Griga was dead, Furton was drugged and interrogated for Griga's house code to enable Defendant to raid Griga's home to obtain his property. (T. 11073-76) Whether the financial assets Defendant sought belonged to Griga or Furton is inconsequential for the purpose of this aggravator, as the evidence established that Defendant clearly killed Furton to obtain such assets.

Defendant next asserts that the trial court erred in finding that the murders were committed to avoid arrest. However, as the trial court applied the correct law, and its findings are supported by competent, substantial evidence, its finding should be affirmed. *Willacy*, 696 So. 2d at 695; *Cave*, 727 So. 2d at 230.

Regarding the avoid arrest aggravator, the trial court found:

> The State proved beyond and to the exclusion of every reasonable doubt that [Defendant]'s plan was to kill the victims after taking all of their assets in order to eliminate them as witnesses and, thereby, avoid arrest. . . .
> At the time of the murders [Defendant] and his co-defendants were facing a threat of prosecution by Schiller who, having escaped their attempt to murder him and fearing for his life, had fled the country and was demanding - through his lawyer - return of over 1 million dollars stolen from him by the defendants. Defendants were unaware that Schiller intended to report their crime to the police after recovering his money and property, but now knew the risks created when a victim survived their attempt to murder him.

90