UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No: 10-CIV-20098-LENARD**

**DANIEL LUGO,**

       Petitioner,

vs.

**EDWIN G. BUSS[1],**
Secretary, Florida Department of Corrections,

       Respondent.

_____/

**ORDER DISMISSING AMENDED PETITION UNDER 28 U.S.C. §2254 FOR
WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Petitioner, Daniel Lugo ("Mr. Lugo") is on death row at the Union Correctional

Institution in Raiford, Florida, for two first-degree murder convictions from 1998.  The

case is now before the Court on Mr. Lugo's Amended Petition Under 28 U.S.C. §2254 for

Writ of Habeas Corpus By a Person in State Custody ("Amended Petition"), filed

December 20, 2010 ([D.E. 41]).  On March 6, 2011, the State filed its Response to Order

to Show Cause Why Amended Petition for Writ of Habeas Corpus Should Not Be

---

[1] Walter McNeil is no longer the Secretary of the Department of Corrections.  Edwin G. Buss is now the proper respondent in this proceeding.  Buss should, therefore, "automatically" be substituted as a party under Federal Rule of Civil Procedure 25(d)(1). The Clerk is directed to docket and change the designation of the Respondent.

Granted. ([D.E. 48]).  On June 10, 2011, Mr. Lugo filed a Reply to the Government's Response to the Order to Show Cause Why Amended Petition for Writ of Habeas Corpus Should Not be Granted.[2] ([D.E. 59]).

Mr. Lugo filed the original federal habeas petition in this case pro se on January 12, 2010. ([D.E. 1]). However, because the State responded that the habeas petition was an impermissible successive petition, was barred by the statute of limitations, and contained unexhausted claims, the Court appointed Jeffrey Feiler, Esq. as counsel for Mr. Lugo pursuant to the Criminal Justice Act. ([D.E. 25]).  The Court specifically ordered counsel to "file a status report addressing issues raised in the respondent's Response to Order to Show Cause, including, but not limited to: [w]hether this Petition is a successive petition; [w]hether this Petition is barred by the statute of limitations and [w]hether Petitioner has exhausted all of his state court claims."  ([D.E. 25] at 2).  Counsel did not do so.  Rather, the Amended Petition followed.  The Court has considered the written submissions, the record of Mr. Lugo's state court proceedings, and applicable law.  For the reasons that follow, the Court dismisses Mr. Lugo's petition as untimely.

### *Factual Background*

The Supreme Court of Florida gave the following summary of the pertinent and

---

[2] Mr. Lugo has also filed a Supplement to Petitioner's Reply to the Government's Response to the Order to Show Cause Why Amended Petition for Writ of Habeas Corpus Should Not be Granted. ([D.E. 66]).  The State has moved to the strike the supplement. ([D.E. 67]).  In light of this Order denying Mr. Lugo's Amended Petition as untimely, the additional bases raised in the Supplement do not affect this Court's analysis and ruling and the State's Motion to Strike Supplement is hereby denied as moot.

salient facts:

> Lugo's case involves an intricate set of facts, which at times involved many persons. Most of the criminal charges in this case are related to the abduction, extortion, and attempted murder of Marcelo (Marc) Schiller, or to the abduction, attempted extortion, and murders of Frank Griga and Krisztina Furton.

> *Abduction, Extortion, and Attempted Murder of Marc Schiller FN1*

> FN1. The criminal charges that flow from these facts are referred to as the "Schiller counts."

In the early 1990s, Marc Schiller was a wealthy Miami businessman who owned an accounting firm, Dadima Corporation. His business interests expanded into providing services that were reimbursed by Medicare. Schiller hired Jorge Delgado FN2 to assist him with his business pursuits, and the two became close friends. Delgado often visited Schiller's home for both business and social reasons. Eventually, Schiller sold the Medicare-related portion of his business to Delgado, which retained the name "Dadima Corporation" after the sale.FN3 Schiller selected a new name of "D.J. & Associates" for his accounting business. For a period of time after he sold the Medicare portion to Delgado, Schiller performed consulting work for Delgado and Dadima Corporation.FN4

> FN2. Jorge Delgado was a codefendant with Lugo. In exchange for sentences of fifteen and five years, respectively, for his roles in the attempted murder of Schiller and the murders of Griga and Furton, he testified for the State.

> FN3. Eventually, however, Delgado changed the name of the company.

> FN4. At various times, Lugo also did some billing work for both Schiller and Delgado.

Delgado exercised at Sun Gym in the Miami area, where Lugo was employed. FN5 The two became good friends, and at times Lugo would accompany Delgado on visits to Schiller's home. Delgado also came to know Lugo's codefendants, Noel Doorbal and John Mese. Schiller believed Lugo to be an unsavory character, and expressed his concern to Delgado.

3

FN5. Both Lugo and his codefendant, Noel Doorbal, were avid bodybuilders.

By 1994, a rift had developed between Schiller and Delgado. Schiller had been questioning Delgado's accounting practices with regard to Dadima Corporation, and was also concerned with transactions involving some bank accounts. During a meeting with a banker at a local restaurant, the conflict expanded as Delgado refused to respond to questions and became angry with Schiller. Thereafter, Schiller advised Delgado that he was severing all business ties and, on the advice of Lugo, Delgado hired John Mese to be his replacement accountant. FN6

FN6. Mese was Lugo's codefendant, along with Doorbal. All three were tried together, though separate juries decided the fate of Doorbal and Mese.

In the September-October 1994 time frame, Lugo advised Delgado of his belief that Schiller had been cheating Delgado with regard to the billing operations that Schiller had been performing for Delgado and the Medicare business. Delgado testified that Lugo showed him documentation which purported to prove that Schiller had been cheating Delgado. Lugo asserted to Delgado that Schiller had also been cheating Lugo. Schiller flatly denied accusations of cheating Delgado in the billing operation when Delgado confronted Schiller with the claim.

Lugo and his cohorts subsequently generated a plot to kidnap Schiller, with the goal of forcing him to sign over assets equivalent in value to that which Delgado and Lugo believed to be owed to them.FN7 Delgado asked Lugo to do whatever he could to recover the value Schiller owed to both of them, but Delgado expressed that he did not want to be involved in any of the scheming. However, Delgado nevertheless became deeply involved in a plan to kidnap Schiller. He informed Lugo, Doorbal, and two men recruited by Lugo from Sun Gym (Stevenson Pierre and Carl Weekes) of details concerning Schiller's home, FN8 family, cars, and personal habits. The group agreed to secretly observe Schiller to learn his daily routine to implement the plan. Testimony at trial established that Lugo was the unquestioned mastermind of the plan to abduct and extort money from Schiller. Stevenson Pierre observed Lugo's role to be that of a general in a military operation. The group eventually purchased or otherwise procured handcuffs, walkie-talkies, and a stun gun (among other items) to aid in the abduction plan.

4

FN7. Prior to creating the plot to kidnap Schiller, Delgado had
expressed concerns to Schiller that the Medicare-related business that
Delgado had purchased from Schiller might have been involved in
Medicare fraud when Schiller was the owner. Delgado feared that he
might have been inadvertently involved in continuing the fraud after
he purchased the business from Schiller. Schiller denied that he was
ever involved in Medicare fraud. Delgado indicated that he rejected
the idea of suing Schiller for the money he claimed because a legal
action brought against Schiller might expose the fraudulent activity.

FN8. Schiller had previously told Delgado the code for the alarm
system at his home.

After several failed attempts at locating and capturing Schiller, on
November 15, 1994, the group finally succeeded in abducting him from the
parking lot of the delicatessen restaurant he owned in the Miami area.
Doorbal and Weekes grabbed Schiller, and Weekes subdued Schiller,
shocking him with a stun gun. Another cohort, Sanchez, assisted Doorbal
and Weekes in forcing Schiller into a waiting van. Inside the van, Schiller
was handcuffed and duct tape was placed over his eyes. A gun was placed
at Schiller's head, and his wallet and jewelry removed as the van proceeded
to a warehouse that Delgado had rented. He also received additional shocks
with the stun gun and he was kicked. Lugo arrived at the warehouse shortly
after Doorbal and the others arrived with Schiller.

Schiller's captors demanded a list of his assets which Schiller initially
refused to provide. The refusal resulted in his being slapped, shocked with
the stun gun, and beaten with a firearm. Weekes questioned Schiller about
his assets, based on information provided by Lugo and Delgado. Schiller
testified that after he again refused to provide the requested information, he
was told that he was going to engage in a game of Russian Roulette. A gun
was placed to his head, the cylinder was turned, and the trigger was pulled
twice but no bullets fired.FN9 Schiller's captors proceeded to read a highly
accurate list of his assets to him, demanding that he corroborate what they
already knew and that he add to the list assets of which they were not
aware. The captors also apprised Schiller that they knew the alarm code for
entry into his home. Because his assailants possessed such detailed
knowledge of his assets and his home, Schiller surmised that Delgado must
have been involved in the plot. Schiller also came to recognize Lugo's
voice, despite Lugo's efforts to disguise the identity. Schiller testified that
Lugo's speech often had a very recognizable lisp-like trait.

5

FN9. Schiller did not know if the gun was loaded or not. He also had tape over his eyes during these incidents, as he did for the vast majority of his captivity. On another occasion, Schiller's captors placed a gun in his mouth.

The captors further threatened that if Schiller did not cooperate, his wife and children would also be abducted and his wife raped in his presence. Schiller was eventually compelled to agree to cooperate but only if his wife and children were allowed to leave the country unharmed. In the ensuing days, Schiller began signing over his assets, including a quitclaim deed for his home, various documents granting access to his checking,FN10 savings, and IRA accounts, and authorization for changing the beneficiary of his million-dollar insurance policies.FN11

FN10. These documents included drafts on his checking account.

FN11. The beneficiary was changed to the name of Lillian Torres, Lugo's ex-wife. Torres was also listed as the putative "owner" of Schiller's home when the quitclaim deed was executed. At the time of Lugo's trial and conviction, Torres had not been charged with any crime. The quitclaim deed and the change in beneficiary for the life insurance policies were notarized by codefendant John Mese.

During Schiller's captivity, Lugo and Doorbal entered Schiller's home and removed many furnishings and other items. Lugo, Delgado, and Weekes also began charging thousands of dollars to Schiller's credit cards. Money in Schiller's safe in his home was divided among Doorbal, Weekes, and Pierre. Three weeks into Schiller's captivity, Doorbal and Delgado convinced Lugo that Schiller must be killed, because he had likely surmised the identities of some, if not all, of his captors. A plan was then developed to kill Schiller but to give the appearance that Schiller's death resulted from the operation of his automobile under the influence of alcohol.

In the fourth week, Schiller was forced to consume large amounts of alcohol to make him intoxicated. Lugo drove Schiller's Toyota 4-Runner into a utility pole on a Miami-area street to create the impression that Schiller had been involved in an accident resulting from driving while intoxicated. Doorbal and Weekes accompanied Lugo, and Schiller was placed in the front seat of the 4-Runner after it had been driven into the pole. Lugo and Doorbal then poured gasoline on the vehicle and set it ablaze. Lugo, Doorbal, and Weekes had planned to exit the scene in another

vehicle that Weekes had driven to the scene, but they noticed that Schiller had somehow managed to exit his burning vehicle and was staggering in the roadway. Schiller had not been securely bound in the seat of the vehicle. At the urging of Lugo and Doorbal, Weekes used his vehicle to strike and run over Schiller. The three left the scene of these events believing they had killed Schiller. Lugo later instructed Stevenson Pierre to drive by the scene to determine if there was any police activity.

Miraculously, Schiller survived this attempt to take his life. He remembered awakening in a Miami hospital having a broken pelvis, ruptured bladder, bruises and burns, and temporary paralysis. Lugo and the others eventually learned that Schiller had survived, so they visited the hospital where they thought Schiller was recuperating, with a plan to suffocate him while he lay in his hospital bed. Unknown to Lugo and the others, based upon a well-founded fear for his safety, Schiller had already arranged to be airlifted to a New York hospital to complete his recuperation. Lugo, Doorbal, and some of the other captors proceeded to empty Schiller's home of the remaining furnishings and valuables. A black leather couch and computer equipment were among the articles pilfered.

Schiller's testimony at trial included not only a description of the events surrounding his abduction and captivity, but also testimony as to the assets that had been extorted from him and his attempts to recover those assets. He also stated that while he signed an agreement with Lugo and his cohorts, indicating that the events surrounding his "abduction" were actually the result of a failed business deal, he had always intended to report the incident to the police.FN12 He thought that signing the agreement was an expeditious way to recover much of the value of the assets that had been extorted from him. Schiller further testified that he never willingly gave any of his assets to Lugo, Doorbal, Mese, Torres, or anyone associated with them. He noted that the quitclaim deed to the home that he and his wife owned was forged, because on the date indicated for his wife's purported signature, she was actually in South America.

> FN12. Miami-area police agencies became thoroughly involved in the investigation of the crimes.

Schiller identified several items of property that belonged to him or his wife and which police found in Lugo's possession. Among the items were computer equipment, furniture, and keys to a BMW automobile. He also stated that drafts on his checking account, which were payable to John

Mese or to entities related to Sun Gym, must have been those signed by him when he was blindfolded during his captivity because he never willingly signed the drafts.FN13 A forensic accountant confirmed that after an extensive review of records pertaining to corporations and accounts controlled by Lugo, Doorbal,FN14 or Mese, it was clear that money and assets formerly in Schiller's control had been laundered.FN15

> FN13. Certain documents listed John Mese as president and secretary of Sun Gym.

> FN14. Doorbal was not convicted of money laundering.

> FN15. When police executed search warrants at Doorbal's apartment, they found the following items: computer equipment and jewelry belonging to Schiller, receipts for purchases on Schiller's credit card, a receipt relating to the changing of locks at Schiller's home, and handcuffs. Moreover, after executing a search warrant at Lugo's apartment, they found the following: a set of keys for a BMW automobile, an executed deed for Schiller's home, and a letter concerning a wire transfer from one of Schiller's accounts.

### *Abduction, Attempted Extortion, and Murders of Frank Griga and Krisztina Furton FN16*

> FN16. We will refer to the criminal charges that stemmed from these facts as the "Griga-Furton counts."

Frank Griga was also a wealthy Miami-area businessman, who accumulated much of his fortune from "900" lines in the phone industry. He and his girlfriend, Krisztina Furton, were both of Hungarian heritage. Lugo's codefendant, Noel Doorbal, learned of Griga through Doorbal's girlfriend at the time. Doorbal was quickly enthralled when shown a picture of a yellow Lamborghini owned by Griga and when he learned of Griga's enormous wealth. Doorbal determined that Griga would be a prime target for kidnaping and extortion, and soon convinced Lugo to join his idea. Delgado was aware that Lugo and Doorbal intended to kidnap and extort a rich "Hungarian couple." Lugo was a full participant in the plot and he told his girlfriend, Sabina Petrescu, that he intended to kidnap a Hungarian who drove a yellow Lamborghini or Ferrari. Lugo also related to Petrescu that he worked for the Central Intelligence Agency (CIA), and that Doorbal was a

killer who assisted him in his CIA missions. Petrescu testified that Lugo and Doorbal had at their disposal a suitcase with handcuffs and syringes FN17 to use in the kidnaping.

> FN17. Lugo and Doorbal used a substance known as Rompun, a tranquilizer sometimes given to horses, to subdue Griga and Furton later in the kidnaping episode.

Through an intermediary, Lugo and Doorbal arranged a business meeting with Griga to discuss Griga's interest in investing in phone lines in India. The Indian investment scheme was totally bogus and designed as a scheme for Lugo and Doorbal to ingratiate themselves with Griga and to gain his confidence. At the first meeting, Griga indicated his lack of interest but Lugo and Doorbal persisted.

In May 1995, Lugo and Doorbal gathered the suitcase containing handcuffs and syringes and made another visit to Griga's home, under the guise of presenting a computer to him as a gift.FN18 Lugo and Doorbal each had a concealed firearm during this visit, as they intended to execute the abduction plan at this time. This first attempt was aborted after only a fifteen-minute stay. Doorbal was irate that Lugo did not follow through with the abduction, but he was placated with the news that Lugo had arranged another meeting with Griga for later that day.

> FN18. Petrescu rode with Lugo and Doorbal to Griga's home. At trial she supplied many of the details of what happened during this visit.

When Lugo and Doorbal returned to Griga's home on May 24, 1995, they had concocted the scheme of inviting Griga and Furton to dinner, with the further goal of luring them to Doorbal's apartment, where the abduction and extortion would begin.FN19 Between 10 and 10:30 p.m.,FN20 Judi Bartusz, a friend of Griga's, saw Lugo and Doorbal leave Griga's home in a gold Mercedes, while Griga and Furton left in the Lamborghini.FN21

> FN19. A warehouse had been rented to hold Griga and Furton captive for an indefinite period, if necessary.

> FN20. Later, Delgado received a call from Lugo inquiring whether Delgado knew how to drive a Lamborghini, because Lugo was having trouble attempting to do so.

FN21. Bartusz testified that Griga was wearing jeans, crocodile boots, and a silk shirt. Furton was wearing a red leather dress, red jacket, and red shoes, and was carrying a red purse. These items, along with other incriminating evidence discussed infra, were subsequently discovered after police executed a search warrant at Lugo's apartment.

On May 25, Delgado met Lugo and Doorbal at Doorbal's apartment. Lugo informed him that Griga was already dead: Doorbal had killed Griga after the two became involved in a scuffle in and around the downstairs computer room in Doorbal's apartment.FN22 Griga's body had been placed in a bathtub in Doorbal's apartment.FN23 Lugo related that when Furton had heard the scuffling between Doorbal and Griga, she rose from her seat in the living room and began to scream when she realized that Griga had been seriously injured. Lugo restrained her and subdued her with an injection of Rompun. Lugo expressed his anger toward Doorbal for having killed Griga before the extortion plan had been completed.

FN22. The record reflects that, at some point before he was killed, Griga was injected with Rompun. Dr. Allan Herron, a veterinarian, provided expert testimony that the presence of horse tranquilizer in Griga's brain and liver indicated that he was alive when he was injected. Rompun slows respiration and heart rate, and causes salivation, vomiting, and a burning sensation. Dr. Herron stated that there are no clinical uses for Rompun in humans.

Medical examiner Dr. Roger Mittleman testified that Griga was a homicide victim. While he could not pinpoint the exact cause of death, he opined that Griga died from one or more of the following causes: an overdose of horse tranquilizer; asphyxia from strangulation, with the overdose of horse tranquilizer contributing to the asphyxiating effect; or blunt force trauma to his skull and the consequent bleeding (exsanguination) from this blunt force.

FN23. Delgado eventually noticed that blood was not only on the walls and carpet of the computer room, but also on much of the equipment and furnishings.

Lugo and Doorbal subsequently turned their focus toward Furton. They suspected that she must know the code to enter Griga's home. Knowledge of the code would allow Lugo and Doorbal to enter Griga's home with the hope of gaining access to valuables and, most importantly, bank account

information for access to much of his wealth. Doorbal carried Furton down the stairs from the second floor of the apartment. Furton was barely clad, wearing only the red leather jacket that she had worn when she left Griga's home the night before, and a hood covered her head. Not long after Doorbal placed Furton near the bottom of the stairs, although handcuffed, she began screaming for Griga. At Lugo's direction, Doorbal injected Furton with more horse tranquilizer, causing her to scream again. Lugo and Doorbal then questioned Furton about the security code for Griga's home. Eventually, Furton refused to answer more questions. Doorbal injected her yet again with additional horse tranquilizer. Delgado testified that at this point, corrections officer John Raimondo arrived to "take care of the problem." Lugo informed Delgado that Raimondo had been solicited to kill Furton and to dispose of her body along with Griga's, but Raimondo did neither. He left Doorbal's apartment, referring to Lugo and Doorbal as "amateurs."

Armed with what he believed to be the access code for Griga's home security, Lugo took Petrescu to attempt entry while Doorbal and Delgado stayed behind. After failing to gain access to Griga's home, Lugo called Doorbal on his cellular phone. As the two talked, Petrescu heard Doorbal say, "The bitch is cold," which she believed was Doorbal's indication that Furton was dead. FN24 Lugo returned to Doorbal's apartment, carrying some mail he had taken from Griga's mailbox. Lugo instructed Delgado that he should return home, but bring a truck to Doorbal's apartment the next morning.

> FN24. Dr. Mittleman, the medical examiner, opined that the effects from horse tranquilizer were consistent with the cause of her death. He also stated that her death was consistent with asphyxia.

When Delgado arrived with the truck on the morning of May 26, he noticed that Griga's body had been placed on a black leather couch that had been removed from the home of Marc Schiller.FN25 Furton's body was placed in a transfer box. The couch and the transfer box were loaded onto the truck. Neither body had been dismembered at this point.

> FN25. Lugo gave this black leather couch as partial payment to Mario Gray for his assistance in disposing of the bodies of Griga and Furton and other items. Lugo knew Gray from Sun Gym.

  Gray assisted in disposing of the torsos and limbs (legs and arms)

11

of both Griga and Furton, which were tightly packed in 55-gallon drums. He also found the site in southern Dade County where the body parts would be disposed. The drums were placed about 100 meters apart. On June 9, 1995, one day after being apprehended in the Bahamas, Lugo led police to the spot where the torsos and limbs were buried. He did not give any indication, however, of the location of the heads, hands, and feet of Griga and Furton.

Lugo, Doorbal, and Delgado proceeded with the bodies to a Hialeah warehouse. Delgado noticed a yellow Lamborghini stored there.FN26 He served as a lookout while Lugo and Doorbal went to purchase items including a chain saw, hatchet, knives, buckets, flint (for igniting a fire), fire extinguisher, and a mask respirator.FN27 When they returned, Lugo and Doorbal began dismembering the bodies of Griga and Furton. They used both the chain saw and the hatchet.FN28

FN26. Police eventually found Griga's yellow Lamborghini abandoned far off a Miami-area roadway.

FN27. Upon executing a search warrant at the warehouse in June 1995, police found the following items: fire extinguisher, flint, an owner's manual for a chain saw, and a mask respirator. They also found Griga's auto club card and numerous receipts with his name on them.

In July 1995, acting on an anonymous tip, police found a collection of human heads, hands, and feet in the Everglades off Interstate 75, along with a knife and a hatchet. The appendages were matched to Griga and Furton. Although Lugo and Doorbal had attempted to pull all of the teeth out of the human heads to prevent police from positively matching them to Griga and Furton, one tooth remained in one of the heads. The tooth and head were matched to Griga. Doorbal also told Delgado that he and Lugo had chopped off the fingertips from each of the hands, to prevent police further from matching the hands to Griga and Furton. Expert testimony confirmed that the fingertips had indeed been separated from the hands.

FN28. Delgado served as a lookout while Lugo and Doorbal dismembered the corpses. He noticed that Lugo and Doorbal were packing the body parts tightly into drums. He also noticed a collection

12

of heads, hands, and feet in a bucket. He was certain that the chain saw had been used. He surmised that the hatchet must also have been employed, because he heard several loud thumps consistent with those made by a hatchet. Expert testimony confirmed that the corpses were indeed at least partially dismembered by use of a hatchet.

Doorbal received a message on his pager and had to leave the warehouse, so Delgado drove him to his apartment. When Delgado returned to the warehouse, Lugo was attempting to burn the heads, hands, and feet in a drum. This attempt was largely unsuccessful and resulted in such a large amount of smoke that the fire extinguisher was used to smother the fire. Lugo and Delgado next went to Doorbal's apartment to remove everything, including the blood-stained carpeting, from the area where Doorbal and Griga had struggled. The items removed also included computer equipment stained with Griga's blood. The items were placed in the storage area of Lugo's apartment.FN29

> FN29. When police executed a search warrant at Lugo's apartment, they found not only the blood-stained computer equipment, but also the following items covered with blood: television, gloves, towels, carpet and padding, and clothing. The blood on these items was matched to Griga. During the search, police also found a computer printout listing Griga's bank accounts, Griga's driver's license, thirty syringes (some filled and some not), a vial marked "Rompun," a stun gun, duct tape, binoculars, and several firearms and ammunition.

> Further, police found the following incriminating items when they executed search warrants at Doorbal's apartment: Rompun and several foreign passports bearing Lugo's photograph but names other than "Daniel Lugo."

> By May 27, 1995, Lugo had traveled to the Bahamas in an attempt to access money that Griga had deposited in bank accounts there. His efforts were unsuccessful and he returned to Miami. On May 28, 1995, Lugo, Doorbal, and Mario Gray disposed of the torsos and limbs of Griga and Furton. Lugo subsequently fled on a second trip to the Bahamas, where he was captured in early June 1995. He was apprehended in part due to information supplied to the police by his girlfriend, Sabina Petrescu.

*Lugo v. State*, 845 So.2d 74, 84-91 (Fla. 2003).

*Procedural History*[3]

On October 6, 1996, Mr. Lugo was charged by indictment with thirty-nine

criminal counts: first-degree murder (two counts), conspiracy to commit racketeering,

racketeering, kidnapping (two counts), armed kidnapping, attempted extortion, grand

theft (three counts), attempted first-degree murder, armed robbery, burglary of a dwelling,

first degree arson, armed extortion, money laundering (nine counts), forgery (six counts),

uttering a forged instrument (six counts), possession of a removed identification plate,

and conspiracy to commit a first-degree felony.  *Lugo*, 845 So.2d at 91.  On January 22,

1998, Mr. Lugo proceeded to trial and was found guilty as charged on all counts.  *Id.*

Thereafter,

> The jury voted, eleven to one, to recommend that Lugo receive the death
> penalty for the murders of both Griga and Furton. The circuit judge
> accepted the jury's recommendation of death for each of the murders,
> sentenced Lugo to death for each of those offenses, and adjudicated him
> guilty on all thirty-nine counts of which he was convicted. The court
> ordered that all sentences were to run consecutively. In his sentencing
> order, the trial judge found five aggravating factors applicable to both
> murders: prior violent felonies (including the contemporaneous murder of
> the other victim, and the armed kidnaping, armed robbery, and attempted
> murder of Schiller); commission during the course of a kidnaping, for the
> purpose of avoiding arrest and for pecuniary gain; and cold, calculated, and
> premeditated (CCP). Additionally, the trial judge found that the heinous,
> atrocious, or cruel (HAC) aggravator applied to the Furton murder. The trial
> judge gave great weight to each of these aggravators. He also found no
> applicable statutory mitigators but five nonstatutory mitigators existed, each

---

[3] Over the past decade or so, Mr. Lugo has filed countless pro se complaints, motions,
and pleadings in this Court and various other state and federal courts.  As one would imagine,
the entire procedural history in this case is quite lengthy.  Therefore, the Court will include only
the relevant history needed to analyze the timeliness of the Petition.

of which was given little weight or very little weight.FN31

FN31. The five nonstatutory mitigators were: (1) Lugo was not a totally immoral person and had exhibited great acts of kindness in the past (little weight); (2) Lugo's execution would have a negative impact on his elderly mother (little weight); (3) Lugo exhibited appropriate courtroom behavior (little weight); (4) Lugo assisted the police after the murders had been committed in finding the torsos of Griga and Furton (very little weight); and (5) life terms for Lugo for each of the murders would permanently remove him as a menace to society (little weight).

The trial judge refused to find two other nonstatutory mitigators: (1) if incarcerated, Lugo would be able to assist other prisoners in learning computer skills; and (2) Lugo should not be sentenced to death because he was not the "hands-on" killer.

*Id.* at 91-92.  After Mr. Lugo was sentenced to death, he filed his direct appeal challenging his conviction and sentence with the Florida Supreme Court.  While his direct appeal was pending, Mr. Lugo filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 with this Court, attacking five of his thirty-nine convictions.  *Case No.* 1:00-CV-02912-SEITZ (S.D. Fla. 2000) ([D.E. 1]).  On November 29, 2000, the Court dismissed the petition, without prejudice, for failure to exhaust state remedies. (00-CV-02912-SEITZ [D.E. 11]).   On February 2, 2003, the Florida Supreme Court affirmed Mr. Lugo's conviction and sentence.  *See Lugo*, 845 So.2d at 74.  On April 15, 2003, Mr. Lugo filed a pro se Petition for Writ of Habeas Corpus in this Court challenging the lawfulness of his June 8, 1995 extradition from the Commonwealth of the Bahamas to the United States.  *Case No.* 03-CV-20902-UNGARO (S.D. Fla. 2004) ([D.E. 1]).  While his pro se petition was pending before this Court, Mr. Lugo also petitioned the United States Supreme Court for a writ of certiorari as to his convictions and sentences.  On October 6,

2003, the petition for certiorari was denied. *Lugo v. Florida*, 540 U.S. 920 (2003). On April 21, 2004, in *Case No.* 03-CV-20902-UNGARO, the Court entered an Order Affirming the Magistrate Judge's Report and Dismissing Petition for Writ of Habeas Corpus as moot. (03-CV-20902 [D.E. 37]). On October 18, 2004, Mr. Lugo filed his initial Rule 3.850 post-conviction motion in the state circuit court. ([D.E. 48] at 28). Ultimately, Mr. Lugo's Rule 3.850 motion was denied, and the Florida Supreme Court affirmed on October 8, 2008. *Lugo v. State*, 2 So.3d 1 (Fla. 2008). Mandate issued February 10, 2009. On January 5, 2010, Mr. Lugo filed his pro se petition for writ of habeas corpus by a person in state custody with this Court. ([D.E. 1]).

## SECOND OR SUCCESSIVE PETITION

The State of Florida first argues that Mr. Lugo's petition is an impermissible successive petition pursuant to §2244(b). ([D.E. 48] at 44). The State's principal argument is that when Mr. Lugo filed his pro se Petition for Writ of Habeas Corpus in this Court challenging the lawfulness of his June 8, 1995 extradition from the Commonwealth of Bahamas to the United States, 03-CV-20902-UNGARO, this petition was challenging the validity of his judgment and sentence. (*See* [D.E. 48] at 46). As such, the instant petition would be a successive petition within the meaning of 28 U.S.C. §2244(b). (*See id.*) Mr. Lugo has asserted that his petition was not filed pursuant to §2254 but rather it was filed pursuant to §2241. ([D.E. 59] at 9). The State countered that "Petitioner ignores that he did not actually characterize the petition as one under 28 U.S.C. §2241 when he filed it." ([D.E. 48] at 48). The Court rejects this argument.

16

First, Mr. Lugo filed his 2003 petition pro se.  "Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir.1998).  More importantly, this Court treated Mr. Lugo's 2003 petition as one filed "pursuant to 28 U.S.C. §2241."  (03-CV-20902-UNGARO [D.E. 37]).  Indeed, in his Report and Recommendation, the magistrate judge advised Mr. Lugo that if his petition was an attempt to "bootstrap a challenge to the lawfulness of his convictions onto his claim of unlawful extradition, his remedy lies in a petition for habeas corpus relief pursuant to 28 U.S.C. §2254, following exhaustion of available state court remedies, assuming that no procedural impediments exist as to his claims." (03-CV-20902-UNGARO [D.E. 30]). The Court is not inclined to now reverse course and determine that Mr. Lugo's 2003 petition was - for successive purposes - a federal habeas petition filed pursuant to 28 U.S.C. §2254.  The Court does not find that the instant petition is an impermissible successive petition prohibited by §2244(b).

## STATUTE OF LIMITATIONS

The State also argues that Mr. Lugo's petition is barred by the statute of limitations. ([D.E. 48] at 54).  The State asserts that Mr. Lugo's convictions and sentences "became final on October 6, 2003, when the United States Supreme Court denied certiorari from direct appeal."  (*Id.* at 55).   Therefore, since Mr. Lugo did not file any motions for post conviction relief in state court until October 18, 2004, and more than a year of untolled time passed before this petition was filed, the instant petition is time

17

barred. (*Id.* at 55).  The Court agrees.

### *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a

one-year limitations period for the filing of an application for relief under § 2254.

Accordingly, 28 U.S.C. § 2244(d) provides:

(1)     A 1-year period of limitation shall apply to an application for a writ of
        habeas corpus by a person in custody pursuant to the judgment of a State
        court.  The limitation period shall run from the latest of -

        (A)     the date on which the judgment became final by the conclusion of
                direct review or the expiration of the time for seeking such review;

        (B)     the date on which the impediment to filing an application created
                by State action in violation of the Constitution or laws of the United
                States is removed, if the applicant was prevented from filing by
                such State action;

        (C)     the date on which the constitutional right asserted was initially
                recognized by the Supreme Court, if the right has been newly
                recognized by the Supreme Court and made retroactively applicable
                to cases on collateral review; or

        (D)     the date on which the factual predicate of the claim or claims
                presented could have been discovered through the exercise of due
                diligence.

(2)     The time during which a properly filed application for State post-
        conviction or other collateral review with respect to the pertinent judgment
        or claim is pending shall not be counted toward any period of limitation
        under this subsection.

In most cases, including the present case, the limitation period begins to run

pursuant to §2244(d)(1)(A).  The Eleventh Circuit has decided that the judgment becomes "final" within the meaning of § 2244(d)(1)(A) as follows: "(1) if the prisoner files a timely petition for certiorari, the judgment becomes 'final' on the date on which the Supreme Court issues a decision on the merits or denies certiorari, or (2) the judgment becomes 'final' on the date on which the defendant's time for filing such a petition expires." *Bond v. Moore*, 309 F.3d 770, 773-4 (11th Cir. 2002).

### Timeliness

On February 2, 2003, the Florida Supreme Court denied Mr. Lugo's direct appeal and affirmed his convictions and sentences.  *Lugo v. State*, 845 So.2d 74 (Fla. 2003). Thereafter, Mr. Lugo petitioned the United States Supreme Court for a writ of certiorari. On October 6, 2003, the petition for certiorari was denied.  *Lugo v. Florida*, 540 U.S. 920 (2003).  It was from that day that Mr. Lugo had one year to file his petition for writ of habeas corpus with this Court or file a "properly filed" application for post-conviction relief in state court or other collateral review with respect to the pertinent judgment or claim which would toll the time for filing his federal habeas petition.  *See* § 2244(d).  He did not do so.  Rather, he waited until October 18, 2004 to file his initial Rule 3.850 post-conviction motion in the state circuit court. ([D.E. 48] at 28).  At that point, his time to file his federal habeas petition had expired.  "A state application filed after expiration of the limitations period does not relate back so as to toll idle periods preceding the filing of the federal petition."  *Moore v. Crosby*, 321 F.3d 1377 (11th Cir. 2003).  "The statutory tolling provision does not encompass a period of time in which a state prisoner does not

19

have a 'properly filed' post-conviction application actually pending in a state court." *Id.*

"[T]he tolling provision does not operate to revive the one-year limitations period if such

period has expired." *Id.*; *see also Tinker v. Moore*, 255 F.3d 1331, 1333 (11th Cir.2001)

(explaining that where a Rule 3.850 motion is filed after the expiration of the one-year

period, it does not toll the period under § 2244(d)(2) because no period remains to be

tolled). Mr. Lugo did not file his pro se federal habeas petition until January 12, 2010.

([D.E. 1]). The petition was not timely filed.

Understanding and appropriately applying the statute of limitations imposed by 28

U.S.C. §2244(d)(1) can be a complicated task. The AEDPA, 110 Stat. 1214, sets a 1-year

statute of limitations for seeking federal habeas corpus relief from a state-court judgment.

28 U.S.C. § 2244(d)(1).

> Congress enacted AEDPA to advance the finality of criminal convictions.
> *See Rhines v. Weber*, 544 U.S. 269, 276, 125 S.Ct. 1528, 1534, 161 L.Ed.2d
> 440 (2005). To that end, it adopted a tight time line, a one-year limitation
> period ordinarily running from "the date on which the judgment became
> final by the conclusion of direct review or the expiration of the time for
> seeking such review," 28 U.S.C. § 2244(d)(1)(A). If claims asserted after
> the one-year period could be revived simply because they relate to the same
> trial, conviction, or sentence as a timely filed claim, AEDPA's limitation
> period would have slim significance.

*Mayle v. Felix*, 545 U.S. 644, 662 (2005).

In reaching its determination, the Court must be mindful of the purpose of the

statute of limitations imposed by 28 U.S.C. § 2244(d). However, the Court is similarly

mindful that a person's life is at stake and since Mr. Lugo had originally filed his federal

habeas petition pro se, the Court appointed counsel pursuant to the Criminal Justice Act

so that this critical and dispositive issue could be briefed.  Indeed, the Court specifically

ordered counsel to file a status report addressing whether this Petition is barred by the

statute of limitations. ([D.E. 25]).  After reviewing the arguments put forth in the Reply

and after considering all the pleadings and applicable law, the Court has no alternative but

to find the petition time-barred.

### *Equitable Tolling*

In *Holland v. Florida*, the United States Supreme Court held that "§2244(d) is

subject to equitable tolling in appropriate cases." 130 S. Ct. 2549, 2560 (2010).  The

Eleventh Circuit recently articulated its interpretation of *Holland*'s application as follows:

> The Supreme Court recently reaffirmed, however, that "a petitioner is
> entitled to equitable tolling only if he shows (1) that he has been pursuing
> his rights diligently, and (2) that some extraordinary circumstance stood in
> his way and prevented timely filing." *Id*. at 2562 (internal quotation marks
> omitted); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir.1999)
> (per curiam) (holding that equitable tolling is available "when a movant
> untimely files because of extraordinary circumstances that are both beyond
> his control and unavoidable even with diligence"). "The diligence required
> for equitable tolling purposes is 'reasonable diligence,' not 'maximum
> feasible diligence.' " *Holland*, 130 S.Ct. at 2565 (internal quotation marks
> and citation omitted). As for the "extraordinary circumstance" prong, like
> the Supreme Court's articulation in *Holland*, we too have required a
> defendant to show a causal connection between the alleged extraordinary
> circumstances and the late filing of the petition. *See Lawrence v. Florida*,
> 421 F.3d 1221, 1226–27 (11th Cir.2005).

*San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir. 2011).  Therefore, Mr. Lugo must

establish that "(1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 130

S.Ct. at 2562 (citations and quotation marks omitted).  Mr. Lugo has not done so.

      In reply to the State's arguments regarding the timeliness of Mr. Lugo's petition,

counsel (appointed by the Court for Mr. Lugo) asserted that "Petitioner should not be

subjected to the heightened standards and limitations of post-AEDPA Federal Habeas

Corpus Law with respect to the time bar, exhaustion, and requirements for an evidentiary

hearing due to the 'extraordinary circumstances' of Federalized Anarchy during

Petitioner's direct appeal and thereafter."  ([D.E. 59] at 2).  Additionally, counsel argued

that "[i]f Petitioner is to be subjected to the heightened standards of post-AEDPA Federal

Habeas Corpus Law, the congressional intent of the AEDPA would be frustrated and it

would warrant equitable intervention under *Holland v. Florida*, 130 S.Ct. 2549 (2010)

("*Holland*"), to overcome the prejudice against Petitioner and to afford him all available

remedies to correct the peculiar injustices directly and ancillary to Federalized Anarchy

during and after his direct appeal." (*Id.* at 2).

      Mr. Lugo does not show a causal connection between the alleged extraordinary

circumstances and the late filing of the petition.  Indeed, the closest he ever comes to even

making this argument is when he argues that "equitable intervention is warranted as a

result of the professional negligence and egregious conduct of Court-Appointed Registry

Counsel, Roy D. Wasson, with regard to his failure to raise an agreed upon good cause of

United States and State of Florida collusion so as to alerted [sic] the Court that the

misconduct of the Government and State Attorneys hindered his ability to timely

recognize and raise all viable and fundamental errors in his Original Motion for Post-Conviction Relief under Florida Rule of Criminal Procedure 3.851 before the expiration of the one year time limit." ([D.E. 59] at 16).

Mr. Lugo has not shown how "some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 130 S.Ct. at 2562 (internal quotation marks omitted). Most importantly, Mr. Lugo has not begun to explain how the "Federalized Anarchy" or his counsel's failure to raise "an agreed upon good cause" ultimately caused the late filing of his federal habeas petition. Mr. Lugo also fails to explain why he did not have ample time to perfect the filing of his state post-conviction motion, leaving himself no time to ultimately file his federal petition or has he given any coherent explanation for his delay in filing in state court. Based on his assertions, it would appear that Mr. Lugo's argument should have been made as one of an impediment by State action pursuant to 28 U.S.C. §2244(d)(1)(B). However, the Court finds that any claim of State impediment is similarly vacant.

The AEDPA's one-year limitation period may be tolled by the existence of an impediment that was created by State action in violation of the Constitution or laws of the United States if "the applicant was prevented from filing by such State action." 28 U.S.C. § 2244(d)(1)(B). "To delay the running of the statute of limitations, § 2244(d)(1)(B) requires state action that both 'violat[ed] ... the Constitution or laws of the United States' and 'prevented [the prisoner] from filing' his federal petition. 28 U.S.C. § 2244(d)(1)(B)." *Johnson v. Sec'y Dep't. of Corr.*, 513 F.3d 1328, 1331-32 (11th Cir.

23

2008).  Assuming that the Court found that such an impediment existed, Mr. Lugo has

offered no cogent explanation as to how the "Federalized Anarchy" impeded his ability to

timely file his petition.  Mr. Lugo addresses this concern in his Reply by arguing to the

Court that "any assertion by the Government regarding the vagueness of the term

'Federalized Anarchy' is disingenuous as the substantial pleadings filed in the various

proceedings relating to Petitioner have explained the meaning of that term and its adverse

effect. (See Appendix S-V)." ([D.E. 25-1] at 57).  In Appendix S, which is a pro se

Motion for Relief from Order of November 20, 2000 and Leave to Amend Original

Petition in Case No. 00-CV-02912-SEITZ, Mr. Lugo defined "Federalized Anarchy" as

follows:

> Federalized Anarchy: this refers to the United States and State continuing
> anarchy of U.S.-State Collusion and its incorporation of Brady Evidence of
> June 22, 1995 from state criminal trial and into and thru actions taken by
> the United States and State thereafter termination of criminal proceedings of
> motion for new trial on January 11, 1999. As these actions involved federal
> courts of 99-0418, 99-2419, and 99-1638, it federalized the collective
> anarchy of U.S.-State Collusion;. . .

([D.E. 61-4] at 3.)  Unfortunately, this definition does not assist the Court in

understanding why Mr. Lugo failed to timely file his federal habeas petition, nor does it

explain why Mr. Lugo would be entitled to equitable tolling.  A review of the dockets of

the three federal cases cited by Mr. Lugo in his definition of "Federalized Anarchy"

reveals that these cases are forfeiture actions brought by the United States of America or

the State of Florida seeking the forfeiture of monies obtained by Mr. Lugo and his co-

24

defendants during the kidnapping and extortion of Marc Schiller.[4]  Even if the Court did

understand how these proceedings would constitute an extraordinary circumstance that

would entitle Mr. Lugo to equitable tolling of the statute of limitations, these cases were

closed and there were no motions pending between October 6, 2003 and October 18,

2004, which is the relevant time period for the filing of his federal habeas petition.  In

addition, Mr. Lugo represented himself pro se in both of those actions and so the Court

rejects Mr. Lugo's argument that these forfeiture cases "imped[ed] his counsel from

raising all pertinent issues on direct appeal, including any issues relating to fundamental

errors which took place at trial." ([D.E. 59-1] at 57.)  However, the Court's docket does

show that between October 6, 2003 and October 18, 2004 (the time period when Mr.

Lugo should have filed his federal habeas petition or a properly filed state post-conviction

motion which would have tolled the statute of limitations), Mr. Lugo was actively

engaged in pursing two pro se 28 U.S.C. §1983 actions against Assistant State Attorney

Gail Levine, Office of the State Attorney, 11th Judicial Circuit, State of Florida, Assistant

United States Attorney Alison Lehr, United States Attorney's Office, Southern District of

Florida, Miami-Dade County and the United States of America (02-CV-20398-MARRA);

---

[4] After Mr. Lugo was convicted and sentenced to death in 1998, Marc Schiller pled guilty
to committing a multi-object conspiracy to defraud the United States, to commit mail fraud in
violation of Title 18, United States Code, Section 1341, to make and present false, fictitious and
fraudulent claims to an agency of the United States government, in violation of Title 1, United
States Code, Section 287, all in violation of Title 18 United States Code Section 371. As part of
his plea agreement, Mr. Schiller agreed to forfeit the assets which were traceable to his
violations of Title 18, United States Code, Section 1956.  This included the $1,259,000.00 Mr.
Lugo and his co-defendants extorted from Mr. Schiller as ransom during his kidnapping. (*See
Case No.* 99-CV-06138-MIDDLEBROOKS [D.E.1]).

and The Office of the State Attorney, United States of America, Alison Lehr (official and individual capacity), Gail Levine (official and individual capacity), and Felix Jimenez (official and individual capacity) (02-CV-21640-MOORE).  As such, even if Mr. Lugo had made a cogent argument about his diligence, which he has not, the Court would have rejected it as Mr. Lugo clearly chose to pursue other claims rather than diligently pursue his federal habeas petition.

Mr. Lugo's failure to show that he had been pursuing his rights diligently is fatal to a claim for equitable tolling.  Mr. Lugo bears the burden of presenting "evidence showing reasonable efforts to timely file his action." *Dodd v. United States*, 365 F.3d 1273, 1277 (11th Cir. 2004) (*citing Drew v. Dep't of Corr.*, 297 F.3d 1278, 1286–89 (11th Cir. 2002)).  He has not done so.  Rather than articulate exactly how Mr. Lugo acted with due diligence in pursuing his rights, he cites to "several of the documents attached in the Appendix. (See Appendix C-R, dd-kk)." ([D.E. 59] at 20.)  The Court has reviewed the documents cited and found that all of the documents purporting to show diligence that could entitle Mr. Lugo to equitable tolling of the statute of limitations were filed well after the statute of limitations had already expired and were not documents regarding a federal habeas petition or the filing thereof.  Accordingly, the Court does not find that Mr. Lugo is entitled to equitable tolling.  The Amended Petition is denied as untimely.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Mr. Lugo's Amended Petition for Writ of Habeas Corpus [D.E. 41] is **DENIED** as untimely. All pending motions are **DENIED** as moot.  This Case is now **CLOSED**.

26

**DONE AND ORDERED** at Miami, Florida, this 13th day of July, 2011.

_Joan A. Lenard_

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

27